UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

JUDITH CURRAN and MICHAEL EARP, for the use and benefit of the Principal Funds, Inc. Strategic Asset Management (SAM) Balanced Portfolio, Principal Strategic Growth Portfolio, *et al.*,

Plaintiffs,

v.

Principal Management Corporation, Principal Global Investors, LLC, and Principal Funds Distributor, Inc.,

Defendants.

Case No. 4:09-cv-00433-RP-CFB

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

Action filed: October 28, 2009

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. SUMMARY OF THE COMPLAINT ..... 3

III. PLEADING STANDARD AND THE GOVERNING STATUTE ..... 4

A. The Legal Standard for a Motion to Dismiss in This Context ..... 4

B. Summary of Section 36(b) of the Investment Company Act ..... 5

IV. ARGUMENT ..... 6

A. Plaintiffs Lack Standing to Recover Fees on Funds Plaintiffs Do Not Own. ..... 6

B. The Complaint Fails to State a Cause of Action for Its Remaining Claims Under the Governing *Gartenberg/Gallus* Standard ..... 8

1. Allegations Regarding the Industry as a Whole are Insufficient to Establish a Breach of Fiduciary Duty Under Section 36(b) ..... 8

2. The Complaint Does Not Pass Muster Under the New *Gallus* Factors ..... 9

a. Plaintiffs Do Not Adequately Allege a Flawed Negotiation Process ..... 9

b. The Complaint's Comparison to the PVCFI Variable Funds Does Not Render Plausible Its Excessive-Fee Allegations ..... 12

3. The Complaint's Recitation of the Six *Gartenberg* Factors Also Falls Short of the Pleading Standard ..... 13

a. The Comparison to a Vanguard Fund Is Legally Deficient ..... 13

b. The Allegations Regarding Director Independence and Conscientiousness are Inaccurate and Misleading ..... 14

c. The SAM Funds' Shareholders Did Benefit From the Economies of Scale ..... 16

d. The Allegations Concerning PMC's Profitability from SAM Funds Fees Are Unavailing ..... 18

e. The Nature and Quality of the Services Provided to the Funds ..... 20

f. The Generalized Allegations Concerning Fallout Benefits Do Not Support a Cause of Action for Excessive Fees ..... 21

C. Count II Should Be Dismissed Because it is a *Gartenberg* Factor, Not an Independent Cause of Action Under Section 36(b). ..... 23

D. The Court Should Dismiss Count III Regarding Alleged Excessive Rule 12b-1 Distribution Fees ..... 24

**TABLE OF CONTENTS**
(continued)

**Page**

E. The Complaint's Causes of Action Should Also Be Dismissed For Those Defendants That Did Not Receive the Challenged Fees ...................................... 25

F. Plaintiffs' Claims for Damages Are Limited By Section 36(b)'s One-Year Cutoff ...................................... 26

V. CONCLUSION ...................................... 27

# TABLE OF AUTHORITIES

**Page**

**CASES**

*In re Am. Mut. Funds Fee Litig.*,
No. CV 04-5593-GAFRNBX, 2005 WL 3989803 (C.D. Cal. Dec. 16, 2005) .......... 7

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
464 F.3d 338 (2d Cir. 2006) .......... passim

*In re Bellanca Aircraft Corp.*,
850 F.2d 1275 (8th Cir. 1988) .......... 27

*Bell Atlantic Corp. v. Twombly*,
127 S. Ct. 1955 (2007) .......... 1, 4, 5, 9

*In re Franklin Mut. Funds Fee Litig.*,
478 F. Supp. 2d 677 (D.N.J. 2007) .......... 6

*Gallus v. Ameriprise Fin., Inc.*,
561 F.3d 816 (8th Cir. 2009) .......... passim

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
694 F.2d 923 (2d Cir. 1982) .......... passim

*In re Goldman Sachs Mut. Funds Fee Litig.*,
No. 04 Civ. 2567(NRB), 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006) .......... 16

*Green v. Fund Asset Mgmt., L.P.*,
147 F. Supp. 2d 318 (D.N.J. 2001) .......... 25, 26

*Green v. Fund Asset Mgmt., L.P.*,
286 F.3d 682 (3d Cir. 2002) .......... 6

*Hamilton v. Allen*,
396 F. Supp. 2d 545 (E.D. Pa. 2005) .......... 19

*Jones v. Harris Assocs. L.P.*,
527 F.3d 627 (7th Cir. 2008) .......... 3, 12

*Kalish v. Franklin Advisers, Inc.*,
742 F. Supp. 1222 (S.D.N.Y. 1990) .......... 13

*Krantz v. Prudential Invs. Fund Mgmt.*,
305 F.3d 140 (3d Cir. 2002) .......... 15, 20

*McAdams v. McCord*,
584 F.3d 1111 (8th Cir. 2009) .......... 4, 5

Migdal *v. Rowe Price-Fleming Int'l, Inc.*,
248 F.3d 321 (4th Cir. 2001) .......... passim

*In re Mut. Funds Inv. Litig.*,
519 F. Supp. 2d 580 (D. Md. 2007) .......... 7

**TABLE OF AUTHORITIES**
(continued)

**Page**

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
528 F. Supp. 2d 332 (S.D.N.Y. 2007) ........ 5

*In re Scudder Mutual Funds Fee Litigation*,
No. 04 Civ.1921 (DAB), 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007) ........ 14

*Sins v. Janus Capital Mgmt., LLC*,
No. 04-cv-01647-WDM-MEH, 2006 WL 3746130 (D. Colo. Dec. 15, 2006) ........ 19, 22

*Stalley v. Catholic Health Initiatives*,
509 F.3d 517 (8th Cir. 2007) ........ 4

*Steckman v. Hart Brewing Inc.*,
143 F.3d 1293 (9th Cir. 1998) ........ 5

*Stegall v. Ladner*,
394 F. Supp. 2d 358 (D. Mass. 2005) ........ 7

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*,
552 F.3d 430 (6th Cir. 2008) ........ 4

*Untermeyer v. Valhi, Inc.*,
665 F. Supp. 297 (S.D.N.Y. 1987) ........ 8

*Verkouteren v. Blackrock Fin. Mgmt., Inc.*,
37 F. Supp. 2d 256 (S.D.N.Y. 1999) ........ 15

*Wilkerson v. New Media Tech. Charter Sch. Inc.*,
522 F.3d 315 (3rd Cir. 2008) ........ 4

*Williams v. Bank One Corp.*,
No. 03 C 8561, 2003 WL 22964376 (N.D. Ill. Dec. 15, 2003) ........ 7

*Yampolsky v. Morgan Stanley Inv. Advisers Inc.*,
No. 03 Civ. 5710(RO), 2004 WL 1065533 (S.D.N.Y. May 12, 2004) ........ 8

*Zucker v. AIM Advisors, Inc.*,
371 F. Supp. 2d 845 (S.D. Tex. 2005) ........ 6, 25, 26

**STATUTES**

15 U.S.C. § 78bb ........ 22

15 U.S.C. § 78p(b) ........ 8

15 U.S.C. § 80a-12(d)(1)(G) ........ 2, 7

15 U.S.C. § 80a-15(c) ........ 10

15 U.S.C. § 80a-2(a)(9) ........ 14

15 U.S.C. § 80a-35(b) ........ passim

15 U.S.C. § 80a-35(b)(2) ........ 11

**TABLE OF AUTHORITIES**
(continued)

**Page**

15 U.S.C. § 80a-35(b)(3) .......... 6, 25, 26

Investment Company Act Section 15(c) .......... 10

Investment Company Act Section 36(b) .......... passim

Securities Exchange Act of 1934 Section 16(b) .......... 8

**OTHER AUTHORITIES**

Investment Company Institute, *Mutual Funds and Institutional Accounts: A Comparison*, 4 (2006) .......... 12

**RULES**

Fed. R. Civ. P. 12(b)(6) .......... 4

Fed. R. Civ. P. 12b-1 .......... 3, 6, 24, 25

Fed. R. Civ. P. 8 .......... 1, 4, 5, 15

Fed. R. Civ. P. 8(a)(2) .......... 4

**REGULATIONS**

17 C.F.R. § 270.12b-1 .......... 24

## I. INTRODUCTION

In the recent decision in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the Supreme Court redefined the floor below which pleadings will not pass muster under Rule 8 of the Federal Rules of Civil Procedure. *Twombly* requires that a plaintiff pleads facts, which if taken as true, state a claim to relief that is "plausible on its face." *Id.* at 1974. Applied to this derivative claim under Section 36(b) of the Investment Company Act, *Twombly* requires the pleading of facts that plausibly demonstrate that the fees charged to the two mutual funds owned by Plaintiffs were "so disproportionately large" that they bear no reasonable relationship to the services rendered and could not have been the product of arm's–length bargaining. *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir. 1982). The Amended Complaint ("Complaint") falls well short of this mark. Using standard allegations borrowed from prior Section 36(b) complaints brought by other plaintiffs against other mutual fund families, Plaintiffs here attempt to shoehorn the fees charged in connection with the two Principal mutual funds in which they invested into a preset mold of generalized complaints against the mutual fund industry. But Plaintiffs are not permitted to proceed on the basis of conclusory allegations and the prospect of filling in the holes through subsequent discovery. *See Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 345 (2d Cir. 2006). There is a wealth of publicly available information that contradicts Plaintiffs' unsupported conclusions about what the actual fees were and how they were set. When judicial notice is taken of these publicly filed facts, what remains of Plaintiffs' allegations do not adequately set forth plausible claims under the standards enunciated in the leading Section 36(b) case of *Gartenberg* (as more recently modified by the Eighth Circuit in *Gallus v. Ameriprise Fin., Inc.*, 561 F.3d 816, 824 (8th Cir. 2009)). The fees in question are not so disproportionately large that they negate the "arm's–length bargaining"

standard, nor is the process by which the board of directors approved those fees plausibly deficient. Even crediting the well-pleaded facts, what emerges is a set of fees that are within the norms for comparable funds and within the ambit of the discretion of directors acting within their fiduciary duties. The Complaint should be dismissed for the following reasons:

- **First**, Plaintiffs lack standing to sue based upon the fees charged by any fund other than the two funds whose shares Plaintiffs actually own. Section 36(b) expressly limits standing to assert claims on behalf of a mutual fund to **only** the security holders of that mutual fund. Although Plaintiffs allege that they only own shares in the SAM Balanced Portfolio and the SAM Strategic Growth Portfolio (the "SAM Funds"),[1] their Complaint nonetheless asserts Section 36(b) claims for the fees paid to Defendants by the SAM Funds and the 18 mutual funds in which the SAM Funds invest (the "Underlying Funds"). (*See* Compl. ¶ 9 (listing the Underlying Funds).) But Plaintiffs do not have standing to challenge the fees paid by the Underlying Funds merely because they own shares in entities that own shares in these funds.

- **Second**, the Complaint does not state a cause of action under the controlling *Gartenberg/Gallus* standard: to violate Section 36(b), an "advisor-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg*, 694 F.2d at 928. *Gartenberg* laid out six factors that should be considered when reviewing a claim for excessive fees under Section 36(b)g: (1) the fee structures of comparable funds; (2) the independence and conscientiousness of the board of directors; (3) the economies of scale realized by the adviser; (4) the profitability of the mutual fund to the adviser; (5) the nature and quality of the services provided by the adviser; and (6) fall-out benefits. *Id*. at 928–30. The *Gartenberg* test was adopted with modification by the Eighth Circuit in *Gallus v. Ameriprise Fin., Inc.*, 561 F.3d 816, 824 (8th Cir. 2009). *Gallus* adds two factors: consideration of the negotiation process and the

---

[1] The SAM Funds are both "affiliated fund of funds" registered by Principal Funds Inc. (PFI), which means that they may only invest in other mutual funds within PFI's family of funds, short-term paper, and government securities. 15 U.S.C. § 80a-12(d)(1)(G). They are a form of "one-stop shopping" that provides investors with a single, actively managed vehicle in which an investment is broadly allocated according to a preset menu of risks and style profiles.

fees charged to an investment adviser's "institutional fund" clients.[2] As explained herein, the Complaint fails to allege the facts necessary to state a claim for a flawed negotiation process or excessive fees under the *Gartenberg/Gallus* standard.

- **Third**, the Complaint's causes of action challenging the management and distribution fees should also be dismissed because they fail to allege facts that the fees were excessive under the applicable law. In addition, these claims should be dismissed against Defendants who did not actually receive the fees in question.

- **Fourth**, the Complaint should be dismissed to the extent it seeks damages for fees paid to Defendants before October 28, 2008 for the SAM Balanced Portfolio, and before January 15, 2009 for the SAM Strategic Growth Portfolio. Section 36(b) does not permit Plaintiffs to seek damages for any period prior to one year before they asserted their derivative claims against the various funds they own.

## II. SUMMARY OF THE COMPLAINT

In their Amended Complaint ("Complaint"), Plaintiffs Judith Curran and Michael Earp ("Plaintiffs") allege that Defendants Principal Management Corporation ("PMC"), Principal Global Investors, LLC ("PGI") and Principal Funds Distributor, Inc. ("PFD") breached their fiduciary duties to the SAM Funds and the 18 Underlying Funds by charging excessive fees in violation of Section 36(b). (*See, e.g.*, Compl. ¶ 115.) The Complaint includes allegations regarding the size of Defendants' fees in FY 2008 and FY 2009, the *Gartenberg* factors (*id*. ¶¶ 37–113), and a host of general allegations about the mutual fund industry. Based on these allegations, the Complaint asserts three theories of liability: excessive fees (Count I), excess profits from economies of scale (Count II), and excessive Rule 12b-1 fees (Count III). (*Id*. ¶¶ 114–124.) Regarding Defendant PMC, the Complaint challenges the management fees charged

---

[2] This standard for determining Section 36(b) liability is under review by the United States Supreme Court in *Jones v. Harris Associates L.P.*, No. 08-586. *Jones* is on review from a Seventh Circuit decision disapproving of the *Gartenberg* approach because it "relies too little on markets." The Seventh Circuit held that adequate disclosure of adviser fees satisfied an investment adviser's fiduciary duty because investors can assert indirect pressure on an adviser's compensation by choosing funds with lower fees. *See Jones v. Harris Assocs. L.P.*, 527 F.3d 627, 632 (7th Cir. 2008). Oral argument in *Jones* occurred on November 2, 2009, and an opinion could issue at any time now.

to the SAM Funds and Underlying Funds. (*Id.* ¶ 40.) As to Defendant PFD, the Complaint challenges the Rule 12b-1 fees charged to the SAM Funds and Underlying Funds for marketing, selling, and distributing mutual fund shares. (*Id.* ¶ 52.) Finally, with respect to Defendant PGI, the Complaint fails to identify any form of relief sought and instead alleges that PGI charged subadvisory fees related to certain Underlying Funds—but expressly states that it is not challenging those fees as excessive. (*Id.* ¶ 40.)

## III. PLEADING STANDARD AND THE GOVERNING STATUTE

### A. The Legal Standard for a Motion to Dismiss in This Context.

Rule 8 of the Federal Rules of Civil Procedure requires a pleading to contain "a short and plain statement of the claim **showing that the pleader is entitled to relief**." FED. R. CIV. P. 8(a)(2) (emphasis added). Under Rule 12(b)(6), a complaint must be dismissed when it fails to plead sufficient facts stating a claim to relief that is "plausible on its face." *See Twombly*, 127 S. Ct. at 1974. Under *Twombly*, "[t]he plaintiff must assert facts that **affirmatively** and **plausibly** suggest that the pleader has the right he claims…rather than facts that are merely consistent with such a right." *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007) (emphasis added).[3] A complaint cannot survive a motion to dismiss unless the complaint states "'enough factual matter (taken as true) to suggest' the required element." *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 322 (3rd Cir. 2008) (quoting, in part, *Twombly*, 127 S. Ct. at 1965). A motion to dismiss, therefore, will not be defeated by "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *McAdams v. McCord*, 584 F.3d 1111, 1113 (8th Cir. 2009).

[3] *See also Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430, 434 n.2 (6th Cir. 2008) ("This Court has cited the heightened pleading standard of *Twombly* in a wide variety of cases, not simply limiting its applicability to antitrust actions.").

The requirement of Rule 8 to plead facts supportive of a plausible claim, not mere conclusions, is especially important for Section 36(b) actions. Because a cause of action under Section 36(b) is a narrow one, a court reviewing this type of complaint should be careful not to "substitute its business judgment for that of a mutual fund's board of directors in the area of management fees." *Gallus*, 561 F.3d at 824 (quoting *Gartenberg*, 694 F.2d at 928). As recognized by the Second Circuit in *Amron v. Morgan Stanley Investment Advisors Inc.*, ("*Amron*"), the Investment Company Act contains an express presumption that the independent directors on a mutual fund's board are disinterested and a plaintiff's burden to overcome this presumption is a heavy one that requires the plaintiff to plead facts necessary to a finding that the fees in question were excessive. 464 F.2d 338, 344 (2d Cir. 2006) (affirming the dismissal of 36(b) complaints under Rule 8); *see also In re Salomon Smith Barney Mut. Fund Fees Litig.*, 528 F. Supp. 2d 332, 335 (S.D.N.Y. 2007) (applying the *Twombly* standard and dismissing a Section 36(b) action). Furthermore, in evaluating a plaintiff's complaint the court need not accept allegations that are contradicted by facts in documents referred to in the complaint or judicially noticeable material. *See, e.g.*, *Steckman v. Hart Brewing Inc.*, 143 F.3d 1293, 1295–96 (9th Cir. 1998); *see also McAdams,* 584 F.3d at 1113 ("The court accepts as true all factual allegations, but is 'not bound to accept as true a legal conclusion couched as a factual allegation.'") (internal reference omitted).

**B. Summary of Section 36(b) of the Investment Company Act.**

Section 36(b) of the Investment Company Act of 1940 ("ICA") imposes a fiduciary duty on mutual fund investment advisers "with respect to the receipt of compensation for services…paid by such registered investment company." 15 U.S.C. § 80a-35(b). This duty "is significantly narrower than the fiduciary relationship recognized by common law." *In re*

*Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d 677, 683 (D.N.J. 2007); *see also Green v. Fund Asset Mgmt., L.P.*, 286 F.3d 682, 685 (3d Cir. 2002) (Section 36(b) provides "a very specific, narrow federal remedy that is more limited than the common law doctrines..."). As the Eighth Circuit recently explained, "[f]und advisers do not have a fiduciary duty in merely an abstract sense. Rather, the duty is imposed 'with respect to the receipt of compensation.'" *Gallus*, 561 F.3d at 822–23 (internal citation omitted). Thus, a Section 36(b) action can only be brought against the **recipient** of the compensation in question, and no one else. *Zucker v. AIM Advisors, Inc.*, 371 F. Supp. 2d 845, 848–49 (S.D. Tex. 2005) (dismissing claim for excessive 12b-1 distribution fees against the investment adviser because the investment adviser was not the actual recipient of the 12b-1 fees) (citing 15 U.S.C. § 80a-35(b)(3)). And the only parties with standing to bring claims under Section 36(b) are "the [SEC], or a security holder of such registered investment company on behalf of such company." 15 U.S.C. § 80a-35(b). Finally, Section 36(b) permits only "actual damages resulting from the breach of fiduciary duty" and bars recovery of damages for "any period prior to one year before the action was instituted." 15 U.S.C. 80a-35(b)(3). In sum, "Congress took great pains to specify who may be held liable and from whom damages may be recovered under section 36(b) [sic]." *Green v. Fund Asset Mgmt., L.P.*, 147 F. Supp. 2d 318, 330 (D.N.J. 2001).

## IV. ARGUMENT

### A. Plaintiffs Lack Standing to Recover Fees on Funds Plaintiffs Do Not Own.

The statute at issue in this litigation, Section 36(b), defines who has standing and limits the right of a private litigant to sue to only those funds whose shares the litigant owns: "[a]n action may be brought under this subsection by the Commission, or by **a security holder** of such registered investment company on behalf of such company." 15 U.S.C. § 80a-35(b) (emphasis

added). Thus, a derivative plaintiff lacks statutory standing to bring a Section 36(b) claim against a mutual fund in which the plaintiff does not own any shares. *See In re Am. Mut. Funds Fee Litig.*, No. CV 04-5593-GAFRNBX, 2005 WL 3989803, at *1 (C.D. Cal. Dec. 16, 2005) ("Likewise, Plaintiffs lack standing to bring their Section 36(b) claim on behalf of the funds in which they do not own shares."); *Stegall v. Ladner*, 394 F. Supp. 2d 358, 362 (D. Mass. 2005) (finding that the plaintiff had "no standing to pursue claims for other funds within the Trust, but rather only for those he himself own[ed]").[4]

Plaintiffs lack standing to bring this action on behalf of, or otherwise recoup the fees charged to, the eighteen Underlying Funds because they have alleged only that they are holders of the SAM Funds. (Compl. ¶¶ 6–7.) Plaintiffs are attempting to bootstrap their status as owners of the SAM Funds into standing to challenge the fees associated with the Underlying Funds in which the SAM Funds invest.[5] But Section 36(b) does not accord a private party standing to sue to recover fees for other mutual funds in which the owned fund invests. Under Section 36(b)'s express language, it is **only** the security holders of the Underlying Funds who may derivatively

---

[4] *See also In re Mut. Funds Inv. Litig.*, 519 F. Supp. 2d 580, 590 (D. Md. 2007) ("Plaintiffs cannot overcome the fact that the text of Section 36(b) . . ., SEC pronouncements, and well-reasoned case law provide overwhelming support for treating an individual mutual fund as a 'registered investment company.' Accordingly, derivative plaintiffs may not assert claims under Section 36(b) on behalf of mutual funds in which they never held shares."); *Williams v. Bank One Corp.*, No. 03 C 8561, 2003 WL 22964376, at *1 (N.D. Ill. Dec. 15, 2003) (holding that the plaintiff may only sue on behalf of funds he owns, even when each fund is **not** a separate corporate entity).

[5] Because Plaintiffs lack standing to bring these causes of action under Section 36(b), Plaintiffs' attack on the fees charged to the Underlying Funds is in reality a disagreement with the decisions by the SAM Funds to invest in the Underlying Funds and their allegedly high fees. That challenge is misplaced for two reasons. First, Section 36(b) is not the right vehicle to challenge the appropriateness of investment decisions. *See* Migdal *v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 329 (4th Cir. 2001). Second, as an "affiliated fund of funds," the SAM Funds may only invest in government securities, short-term paper and other affiliated funds. 15 U.S.C. § 80a-12(d)(1)(G). Since the Investment Company Act specifically provides for affiliated fund of funds, the fact that the SAM Funds operate under this model and invest in the Underlying Funds can hardly be cited as a violation of the Act.

allege breach of fiduciary duty on behalf of those funds, not those parties, like Plaintiffs, who are merely shareholders of an investor in the Underlying Funds. 15 U.S.C. § 80a-35(b); *cf. Untermeyer v. Valhi, Inc.*, 665 F. Supp. 297, 299–300 (S.D.N.Y. 1987) (rejecting the very same gambit under a different, but similarly worded securities statute).[6] Even if the Court does not dismiss the Complaint in its entirety, it should dismiss all claims based on Defendants' alleged breaches of fiduciary duties to the Underlying Funds because Plaintiffs lack standing to sue those funds. Accordingly, Plaintiffs should be required to amend to limit their claims to the management and distribution fees paid directly by the SAM Funds to Defendants (i.e., the first layer of fees described in the Complaint ¶ 41).

### B. The Complaint Fails to State a Cause of Action for Its Remaining Claims Under the Governing *Gartenberg/Gallus* Standard.

#### 1. Allegations Regarding the Industry as a Whole are Insufficient to Establish a Breach of Fiduciary Duty Under Section 36(b).

As a threshold matter, the Complaint attempts to meet the *Gartenberg/Gallus* standard by generalized criticisms of the mutual fund industry as a whole, rather than allegations about the SAM Funds and Defendants' practices. (*See, e.g.,* Complaint ¶¶ 20–21, 27–30, 60–67, 82–83, 88–89.) These general attacks on the mutual fund industry drawn from prior complaints do not suffice for a pleading against the Defendants. *See Yampolsky v. Morgan Stanley Inv. Advisers Inc.,* No. 03 Civ. 5710(RO), 2004 WL 1065533, at *2 (S.D.N.Y. May 12, 2004) (dismissing Section 36(b) complaints that "rely heavily on generalities about deficiencies in the securities industry, and statements made by industry critics and insiders"). The *Yampolsky* prohibition

---

[6] *Untermeyer* involved claims under another federal securities law, Section 16(b) of the Securities Exchange Act of 1934, which limits standing to the "issuer" or "the owner of any security of the issuer." *See* 15 U.S.C. § 78p(b). The court refused to expand Section 16(b)'s explicitly narrow standing requirements to include a shareholder in "the owner of any security in the issuer"—the same position held by Plaintiffs in this action vis-à-vis the Underlying Funds. *Untermeyer,* 665 F. Supp. at 299–300.

makes sense: an indictment of the mutual fund industry **generally** says nothing about whether the **Defendants** have breached their Section 36(b) fiduciary duties. Therefore, the Complaint's heavy reliance on such industry attacks does nothing to meet the requirements of *Twombly* to plead facts stating plausible claims against these Defendants.

The Complaint also creates strawman hypothetical scenarios involving mutual funds with allegedly disproportionately high fees. (*See* Compl. ¶¶ 21, 60–67.) What the Complaint does not do, however, is allege that these scenarios are true for the SAM Funds. (*See id.*) This type of pleading also should be disregarded.

**2. The Complaint Does Not Pass Muster Under the New *Gallus* Factors.**

**a. Plaintiffs Do Not Adequately Allege a Flawed Negotiation Process.**

In evaluating whether a management fee could have been the product of arm's length bargaining, courts should consider the negotiation process by which that fee was determined. *Gallus*, 561 F.3d at 818–19, 823–24. The Complaint challenges the negotiation process (*see, e.g.*, Compl. ¶ 40), but does so in a conclusory fashion that fails to make a plausible case that the negotiation process here was flawed (*see, e.g., id.*. ¶¶ 116, 120, 124). Surprisingly, there is no reference to the SAM Funds' annual reports publicly filed in 2008 and 2009 (the "Reports"), both of which set forth in detail the steps taken by the Board to weigh each of the *Gartenberg* factors, including the information considered and the leadership role of the independent directors in the process. These reports show that Defendants' fees were determined through a well-developed, transparent process, which included meetings by the independent directors with their independent legal counsel. (*See* Declaration of Andrew R. Escobar ("Escobar Decl.") at A6–A8, B10–B11.) These deliberations considered the appropriate amount of management fees based in part upon the following factors: (1) economies of scale; (2) the fee structure of comparable

funds; (3) the profitability of the mutual fund to the adviser; and (4) the quality of the adviser's services. (*See id*.) The Reports are replete with examples of the independent directors' active involvement in the review of the Management and Subadvisory Agreements ("Agreements") for PFI's funds. (*See id.*) As required by Section 15(c) of the Investment Company Act, the independent directors reviewed and ultimately approved the Agreements. 15 U.S.C. § 80a-15(c).

Defendants' disclosure of the fee review process regarding the 2008 review shows the thoroughness and independence of the process. During the 2008 review, the Board, including the independent directors, reviewed a broad range of information **requested for this purpose by the independent directors**, including but not limited to the following:

- (i) the investment performance of each PFI fund compared to the investment performance of a market index and a broad-based industry category determined by Morningstar, Inc., a leading provider of independent investment research relating to mutual funds;
- (ii) a comparison of each fund's management fee (at current asset levels and theoretical asset levels) and expense ratio (at current asset levels) to the advisory fee and expense ratio for the mutual funds in a narrow peer group and a broad-based industry category, both **independently** selected by Lipper, Inc., a leading provider of data and analysis on mutual funds;
- (iii) fee schedules applicable to PMC's and the subadvisers' other clients;
- (iv) PMC's financial results and condition, including its profitability from services it performed for each fund;
- (v) an analysis of PMC's and each subadviser's use of breakpoints to allocate any benefits of economies of scale;
- (vi) PMC's and each subadvisers' record of compliance with applicable laws and regulations, and with each fund's investment policies and restrictions; and
- (vii) the nature and character of the services PMC and each Subadviser provides to each fund.

(*See* Escobar Decl. at A6.) The Board also specifically considered the "character and amount of other incidental benefits received by the Manager and its affiliates…and by each Subadviser"

(fall-out benefits) and determined that they were reasonable. (*Id.* at A7–A8.) The Board conducted a similar review in 2009. (*Id.* at B10–B11.) As demonstrated in the Reports, the Board specifically considered each of the *Gartenberg* factors when it conducted its annual meeting to review the Agreements. Plaintiffs are not entitled to ignore these publicly disclosed detailed explanations of the steps taken in setting fees simply because they are inconvenient.

Here, the Board's thorough review of the materials, its voluminous request for materials, the independent directors' additional meetings, and the Board composition consisting of 75% independent directors are consistent with industry best practices.[7] The completeness of the process here underscores the reasons for the Second Circuit's observation in *Amron* that a plaintiff's "burden to overcome this presumption [that the independent directors are truly disinterested] is a heavy one[.]" 464 F.3d at 344. Given the exacting public disclosure of a process that is demonstrably thorough, this Court is entitled to credit the presumption that these directors are doing their jobs with respect to overseeing the fees paid by the SAM Funds. *See* 15 U.S.C. § 80a-35(b)(2) (2009) ("[A]pproval by the board of directors of such investment company of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments . . . shall be given such consideration by the court as is deemed appropriate under all the circumstances.").

The Complaint fails to come to grips with this disclosed material regarding how fees were set. In doing so, it fails to state plausible claims that the fees here could not have been the product of arm's-length bargaining. The Complaint simply provides no justification for opening up the floodgates of discovery so that Plaintiffs may try to fill the voids in their pleading.

---

[7] (*See generally* Escobar Decl. at C19.) Nine of the twelve directors are not "interested persons" as defined under 15 U.S.C. § 80a-2(a). (*Id.* at F62–F63.)

b. **The Complaint's Comparison to the PVCFI Variable Funds Does Not Render Plausible Its Excessive-Fee Allegations.**

In an effort to buttress their deficient process argument, Plaintiffs also incorporate the other *Gallus* modification of *Gartenberg* and allege that Defendants charge the SAM Funds a management fee that is higher than what they charge to two affiliated variable account funds registered by Principal Variable Contracts Funds, Inc. (PVCFI).[8] (Compl. ¶ 84.) This argument falls flat. By way of illustration, the actual difference between the SAM Funds management fees and the PVCFI fees in 2008 is a paltry 8 basis points.[9] (*Compare* Escobar Decl. at F60 *with id.* at G70.) Thus, for every dollar in assets in 2008, PMC charged an additional eight-hundredths of a penny to the SAM Funds compared to the PVCFI fund.

Since even Plaintiffs admit that Defendants provide additional services to the SAM Funds that are not required by the PVCFI Funds (*see* Compl. ¶ 76 (conceding that corporate and administrative services provided are not identical), ¶86 (characterizing services provided as substantially similar, not identical)), a 0.08% difference in fees is simply insufficient to support

---

[8] The Complaint erroneously refers to the PVCFI funds as "institutional clients" or "institutional funds." (*See, e.g.*, Compl. ¶¶ 76–77.) "Institutional clients" or "institutional funds" as used in the *Gallus* test refer to third party clients such as pension plans, trusts, corporations, state and local governments, or wealthy individuals. *See* Investment Company Institute, *Mutual Funds and Institutional Accounts: A Comparison*, 4 (2006) (the "ICI Study") (attached as Escobar Decl. at Exh. D, and *available at* http://www.ici.org/pdf/ppr_06_mf_inst_comparison.pdf). Put more accurately, the PVCFI funds are variable account funds associated with variable annuity and variable life products offered by the Principal Life Insurance Company and other insurance companies not affiliated with Principal Life. The PVCFI funds are affiliated with the SAM Funds. While the PVCFI funds place a lower servicing burden on Defendant PMC than do the SAM Funds (much as would be the case for a true institutional client such as a third party pension fund), the PVCFI funds are not really institutional clients of PMC of the type identified in *Gallus* or *Jones*. In fact, PMC does not have any such "institutional clients" because its only clients are the PFI and PVCFI funds, and an affiliated investment trust called Principal Trust Target Date Collective Investment Funds. (Escobar Decl. at E41–E47.) PMC does not collect a management fee for the management of the Principal Trust Target Date Collective Investment Funds. (*Id.* at E47.)

[9] The difference between the actual fee percentages for 2009 is not currently publicly available.

an argument that the SAM Fund fees are outside the range of what would have resulted from arms-length negotiations.[10]

### 3. The Complaint's Recitation of the Six *Gartenberg* Factors Also Falls Short of the Pleading Standard.

#### a. The Comparison to a Vanguard Fund Is Legally Deficient.

Plaintiffs gain no traction by comparing the SAM Funds to a single Vanguard fund (Vanguard LifeStrategy Moderate Growth Fund), which differs markedly from the SAM Funds in structure and business model (for example, LifeStrategy is not a tactical asset allocation fund, but instead invests 25% of its portfolio in a tactical asset allocation fund). (*See, e.g.*, Compl. ¶ 81.) Unsurprisingly, the use of comparisons to Vanguard's low-fee business model as a toe-hold for breach of fiduciary duty claims against other fund families has been repeatedly rejected. In *Amron*, the plaintiffs also compared the funds at issue only to Vanguard funds: "That a mutual fund has an expense ratio higher than Vanguard, a firm known for its emphasis on keeping costs low, raises little suspicion under [the comparative fee structure] factor." 464 F.3d at 345; *see also Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1250 (S.D.N.Y. 1990) ("The Vanguard comparison is seriously flawed.").

Ours is a free market in which funds with different business styles compete for business: had Plaintiffs chosen to invest with Vanguard, they could have done so. The purpose of Section

---

10 Generally speaking, the service demands of non-retail customers, like those for "institutional client" or variable funds, are much less than the typical retail client for mutual funds. (Escobar Decl. at D27.) Moreover, the portfolio management services are significantly more complex for mutual funds as opposed to non-mutual "institutional accounts" because mutual fund advisers must manage fund assets with a constant eye to investors' daily share purchases and redemptions; by contrast, the non-mutual fund "institutional accounts" often have more predictable cash flows. (*Id.* at D25, D28–D29.) Flows in non-mutual fund "institutional accounts" are often predictable because the terms of the arrangement may restrict the institutional client's ability to make redemptions or require it to provide advance notice of large redemptions or purchases. Such terms are included precisely because of the complexities involved in managing large unexpected cash flows. (*Id.*)

36(b) is to ensure "reasonable" fees comparable to those that would result from "arm's-length bargaining," not to legislate the profit margins of the lowest-cost provider as the boundary for Section 36(b) liability. Moreover, comparisons to small groups of cherry-picked funds are inherently unpersuasive. For example, in *In re Scudder Mutual Funds Fee Litigation*, the court rejected the plaintiff's comparison to four funds as an unhelpful, skewed sample. No. 04 Civ.1921 (DAB), 2007 WL 2325862, at *17 (S.D.N.Y. Aug. 14, 2007). Instead, the court held, the plaintiffs should introduce evidence of how the challenged fund "rank[s] among all of their peer mutual funds." *Id*. The Vanguard comparison thus adds no support for Plaintiffs' claims.

b. **The Allegations Regarding Director Independence and Conscientiousness are Inaccurate and Misleading.**

Another factor that courts consider in assessing whether fees are excessive is whether the board of directors was independent and conscientious. The burden to allege facts dispelling director independence is, as noted above, a "'heavy one,'" because the Act carries "an express presumption" that natural persons are disinterested. *Amron*, 464 F.3d at 344 (internal quotation omitted) (emphasis added); 15 U.S.C. § 80a-2(a)(9); *see also Migdal*, 248 F.3d at 331 (failure to allege facts overcoming this presumption).

The sole factual support for Plaintiffs' claim of lack of independence is a table listing director compensation (Compl. ¶ 25), but the figures reported are not remarkable or lavish given the time and responsibility of the directors. Plaintiffs provide no reason to suspect that the compensation described in any way undercuts the independence and disinterestedness of the directors they challenge.[11] In *Amron*, as here, Plaintiffs argued that the directors lacked

---

[11] Plaintiffs also attempt to buttress their argument that the directors lacked independence or were interested by pointing to their service on multiple mutual fund boards and that they earned separate fees for attending a single meeting. (Compl. ¶¶ 24, 106.) Not only has this argument already been rejected by several circuit courts as "inadequate" and "insufficient as a matter of

independence because they receive compensation exceeding $150,000 (significantly more than directors were paid here) and allegations that they served on multiple mutual fund boards. *See* 464 F.3d at 344–45; *see also Verkouteren v. Blackrock Fin. Mgmt., Inc.*, 37 F. Supp. 2d 256, 259 (S.D.N.Y. 1999) (dismissing a complaint that alleged service by independent directors on multiple boards at a total compensation ranging from $140,000 to $160,000). The court held these allegations to be insufficient as a matter of law under Rule 8's pleading standard.

Apart from the inconclusive compensation table, Plaintiffs' Complaint presents no **facts** to support their theory that the nine independent directors lacked independence or conscientiousness or should not be considered disinterested. Instead of providing facts, Plaintiffs claim (1) that the Defendants "did not provide the Board with sufficient information for the directors to fulfill their obligations" (Compl. ¶ 98) and (2) "[o]n information and belief, the directors rarely, if ever, question any information or recommendations provided by Defendants" (*id.* ¶ 111). These allegations are simply at odds with the publicly disclosed record of a very active group of independent directors who served this Board and there is no reason to credit Plaintiffs' contradictory "information and belief" allegations. As discussed above, the public filings illustrate the **active** involvement of the independent directors in the fee-negotiation process and review for the funds. (*See supra* at 9–11.) As part of the fee-review process, the independent directors held several meetings with their independent counsel—outside the presence of the Fund management and the interested directors—and requested a wealth of

---

law[,]" *Amron*, 464 F.3d at 345; *see also Krantz v. Prudential Invs. Fund Mgmt.*, 305 F.3d 140, 143–144 (3d Cir. 2002) (quoting *Migdal*, 248 F.3d at 330), it is also inaccurate. The Complaint falsely states that each of the mutual funds registered by PFI has a separate board of directors, and that as a result the funds' directors are paid by each fund for attending over 100 simultaneous meetings. (Compl. ¶ 24.) To the contrary, the directors serve on PFI's board of directors, which has responsibility for all of the PFI funds, including the SAM Funds and Underlying Funds. (*See* Escobar Decl. at F61–68.)

information to assist them with their separate review. (*See* Escobar Decl. at A6, B10–B11; *supra* at 10 (listing some of the information requested.)

### c. The SAM Funds' Shareholders Did Benefit From the Economies of Scale.

In assessing whether mutual fund fees are excessive, a court should also consider the economies of scale realized by the fund. *See Gartenberg*, 694 F.2d at 930; *Gallus*, 561 F.3d at 822–23. Here, Plaintiffs engage in a conclusory assertion that Defendants have failed to pass along economies of scale achieved by the SAM Funds. The Complaint is deficient because it overtly ignores two key facts that are matters of public record: (1) the management fee schedules of the SAM Funds have break points that deliver the benefits of larger size in the form of reduced fee percentages as each break point is reached and (2) these break points dramatically lowered the actual fee percentage (i.e., the "effective rate") paid by the SAM Funds.

Plaintiffs claim that "[e]conomies of scale exist for the Fund as well as the Underlying Funds; they are just being appropriated for the benefit of the service-provider managers of the funds." (Compl. ¶ 68.) To support this allegation, Plaintiffs' section on economies of scale engages in a broadside against the mutual fund industry generally, provides hypothetical examples unrelated to the SAM Funds, and concludes by simply asserting without any factual showing that Defendants have not shared the economies of scale with shareholders. (*See* Compl. ¶¶ 60–69.) These unsubstantiated general allegations are insufficient. *See In re Goldman Sachs Mut. Funds Fee Litig.*, No. 04 Civ. 2567(NRB), 2006 WL 126772, at *9 (S.D.N.Y. Jan. 17, 2006) ("Mere assertions that fees increased with the size of the Funds are not enough to establish that the benefits from economies of scale were not passed on to investors.") (citation omitted).

In fact, the fee schedule set forth in the Complaint demonstrates the opposite—that the SAM Funds shareholders **<u>did</u>** benefit from funds' the economies of scale:

| **Assets Under Management** | **Fee percentage (as a percentage of daily net assets)** |
|---|---|
| First $500 million | 0.55% |
| Next $500 million | 0.50% |
| Next $1 billion | 0.45% |
| Next $1 billion | 0.40% |
| Next $1 billion | 0.35% |
| Next $1 billion | 0.30% |
| Over $5 billion | 0.25% |

(Compl. ¶ 41.) And, significantly, the SAM Funds' breakpoints are not solely based on the size of their respective daily net assets, but instead offer additional economies of scale to shareholders because they are based on the **aggregate** daily net assets of **all five** SAM portfolio funds issued by PFI, increasing the chance that a shareholder of any one SAM Fund will benefit from price breaks based upon the overall success of the SAM Fund program. (Compl., Exh. 1.) What is more, the effective rate PMC charged the SAM Funds for its services in FY 2008 was **0.32%**, down from the first tier breakpoint rate of 0.55%—a fact that was publicly available at the time Plaintiffs filed their original and amended complaints.[12] (Escobar Decl. at F60.) Clearly, PMC's fee schedule reduces its effective charges as its assets under management grow in size—a policy that Plaintiffs, Congress and the courts have stated is the "best industry practice." (Compl. ¶ 79 (quoting *Gartenberg* and the Senate Committee).)

Both the SAM Funds' breakpoint schedule and their 0.32% effective fee for FY 2008 are curiously omitted from the Complaint's discussion of economies of scale. (Compl. ¶¶ 60–69.) These specific facts flatly contradict the Complaint's generalized allegations for this *Gartenberg* factor. This type of pleading cannot support Plaintiffs' causes of action.

[12] The effective management fee for FY 2009 will not be publicly available until the SAM Funds file their prospectus and statement of additional information on or around March 1, 2010.

d. **The Allegations Concerning PMC's Profitability from SAM Funds Fees Are Unavailing.**

The Complaint's allegations on the profitability factor also ring hollow. Plaintiffs allege that Defendants "obfuscate" their "true profitability," and that Defendants achieve "enormous" profits with "nominal" costs. (Compl. ¶¶ 88–89.) But, as in *Amron*, Plaintiffs do not state Defendants' profits, revenue, or expenses; nor do they approximate such figures. 464 F.3d at 344 ("[T]he size …of advisory fees…are irrelevant to a showing of profitability without some allegation of the corresponding costs incurred in operating the funds.").

As with the other *Gartenberg* Factors, the specific disclosures regarding the Board's annual reviews in 2008 and 2009 undermine Plaintiffs' unsupported conclusions. These public reports show that the Board specifically evaluated the profitability of PMC and the SAM Funds' subadviser, Edge Asset Management, Inc. ("Edge"), and concluded that their profits were reasonable. Regarding the profitability of PMC and Edge, the Board reviewed "detailed information regarding revenues the Manager receives under the Management Agreements, as well as the estimated direct and indirect costs the Manager incurs in providing to each Fund the services described in the applicable Advisory Agreements" for the prior year. (Escobar Decl. at A7; *see also id.* at B11.) Additionally, the Board analyzed the "returns on revenue generated in connection with the payment of subadvisory fees to affiliated Subadvisers," such as Edge. (*Id.* at A7; *see also id.* at B11.) The Board concluded that the fees for each Fund were reasonable, accounting for the "profitability percentages the Manager provided." (*Id.* at A7; *see also id.* at B11.) Plaintiffs offer no specific facts to show why the Board's detailed examination of revenues, costs and profits and its conclusions that profits were reasonable should be disregarded.

Tacitly acknowledging that they do not have any facts on which to base their claim of unreasonable profits, Plaintiffs allege on "information and belief" that Defendants "employ inaccurate accounting practices in their financial reporting, including arbitrary and unreasonable cost allocations." (Compl. ¶ 88.) Plaintiffs then pray for discovery on "Defendants' true profitability[,]" which Plaintiffs claim will demonstrate "enormous profitability." (*Id.* ¶ 89.)

Similar "information and belief" allegations have been received skeptically by other courts reviewing pleading challenges in the Section 36(b) context: "[M]ore specificity than an attenuated implication is required in order for a claim to be brought pursuant to Section 36(b)." *Hamilton v. Allen*, 396 F. Supp. 2d 545, 557 (E.D. Pa. 2005) (rejecting general allegations based on information and belief as insufficient in this context). Reliance on information and belief allegations becomes "troubl[ing]" when plaintiffs lift "identical allegations in unrelated cases." *Sins v. Janus Capital Mgmt., LLC*, No. 04-cv-01647-WDM-MEH, 2006 WL 3746130, at *2 (D. Colo. Dec. 15, 2006) (refusing to credit under *Gartenberg* allegations of profitability based purely on information and belief where the complaint used verbatim allegations from other complaints). Yet that is exactly what Plaintiffs have done here. The mere two paragraphs devoted to profitability are almost verbatim copies from the complaint in *Gallus*, among others. (*Compare* Compl. ¶¶ 88–89 *with* Escobar Decl. at H90–H91, ¶¶ 45–46.)[13] Nor does the Complaint's request for discovery on profitability advance Plaintiffs' cause under these circumstances. *See Amron*, 464 F.3d at 345 (rejecting profitability allegations, including prayer for discovery); *Migdal*, 248 F.3d at 328 ("[P]laintiffs cannot simply promise the court that once they have completed discovery, something will turn up. Rather, before they are permitted to

[13] Keller Rohrback LLP, which represents Plaintiffs, also represented the plaintiffs in *Gallus*. (*See* Escobar Decl. at Exh. H.)

proceed with discovery, plaintiffs must have some factual basis for believing that a legal violation has actually occurred.").

e. **The Nature and Quality of the Services Provided to the Funds.**

"[I]n order to determine whether a fee is excessive for purposes of Section 36(b), a court must examine the relationship between the fees charged and the services rendered by the investment adviser." *Migdal*, 248 F.3d at 327; *see also Krantz*, 305 F.3d 140 at 143. To that end, Plaintiffs raise three allegations. The first two—that Defendants charge larger fees than a Vanguard fund's investment adviser, and larger fees to the SAM Funds than two affiliated variable account funds—are a rehash of the same allegations made by Plaintiffs to support their comparative fees argument, and for all the reasons previously discussed, these comparisons add nothing here.

The only remaining allegation is that Defendants (i.e., PMC) provide *de minimis* services beyond hiring the SAM Funds' subadviser, Edge. (Compl. ¶¶ 73–74.) This pleading is insufficient because the only detail Plaintiffs offer regarding Defendants' investment services concerns not the SAM Funds, but rather the Real Estate Investors Fund. (*Id*.) In the portion of the Complaint covering the nature and quality of the sub-advisory services, there are no references specific to the SAM Funds. (*Id*.) Nor does the Complaint allege that the SAM Funds' "performance is appreciably worse than comparable funds." *Amron*, 464 F.3d at 344 (affirming dismissal of a 36(b) complaint).

In fact, the Complaint itself proves that PMC provided more than minimal services to the SAM Funds. Under its management agreement with the SAM Funds, in addition to the advisory services it provides in conjunction with the subadviser it retains (Edge), PMC supplies the funds with a wide range of services, including accounting, corporate administrative, and investment

advisory services. (*See* Compl., Exh. 1.) The accounting services PMC provides to the SAM Funds include, among other things, SEC compliance-related accounting, maintaining the general ledger and journal, preparing and recording disbursements for direct fund expenses, preparing the numerous daily money transfers, reconciling the fund's bank and custodian accounts and recording trading activity for purposes of determining net asset value per share and determining accrued income. (*Id.*) PMC also provides the SAM Funds with corporate administrative services, which includes supplying the personnel and facilities necessary to perform the funds' general corporate functions. (*Id.*) These services contradict the Complaint's conclusory claim that PMC's services were "*de minimis*." To the contrary, this *Gartenberg* factor supports the fees charged.

**f. The Generalized Allegations Concerning Fallout Benefits Do Not Support a Cause of Action for Excessive Fees.**

The final *Gartenberg* factor is "fallout benefits"—that is, indirect profits that may include attraction of new customers, cross selling related funds, and goodwill that causes growth in the subject funds. (Compl. ¶¶ 90–91.) Here, Plaintiffs have alleged no specific facts indicating that Defendants have received any fallout benefits that rendered as excessive the fees they charged the SAM Funds. The Complaint simply alleges that Defendants received "soft dollars" from broker-dealers in exchange for routing the securities transaction orders for the SAM Funds and Underlying Funds, and that such dollars should be used to benefit the funds' shareholders. (*Id.* ¶ 91–92.) It also states, "[o]n information and belief, however, the soft-dollar arrangements benefit Defendants and result in increased costs to the shareholders of the Subject Funds with little to no corresponding benefits to the shareholders of the Subject Funds." (Compl. ¶ 91.) There is no indication in the Complaint of what these "soft dollar" arrangements are or the basis

for the conclusion that they result in additional costs to the shareholders.[14] These allegations share the same generic flavor as the balance of the Complaint. That is not surprising since these allegations are near-verbatim copies of the fallout benefit allegations in the *Gallus* complaint. (*Compare* Compl. ¶¶ 90–95 *with* Escobar Decl. at H96–H98, ¶¶ 56–61.) Therefore, as with the "profitability" factor, they can and should be disregarded by the Court. *See Sins*, 2006 WL 3746130, at *2.

Likewise, the Complaint raises the unsupported allegation that Defendants (i.e., the investment adviser, PMC) enjoy the benefit of "reselling" to other clients the investment research PMC allegedly purchased with the SAM Funds' brokerage commissions, the profits from which are not passed on to SAM Funds shareholders. (Compl. ¶¶ 93–94.) Yet Plaintiffs fail to identify even a single client for whose benefit PMC has "sold" this investment research. This is not surprising since unlike the advisers to fund families targeted by prior complaints on which these allegations were modeled, PMC does not have outside advisory clients to which it is marketing research, even if the alleged research existed. (*See* Escobar Decl. at E41–E47 (PMC's only clients are its affiliates, the PFI and PVCFI funds, and an affiliated investment trust called Principal Trust Target Date Collective Investment Funds, for which PMC does not receive management fees).)

Finally, the Complaint alleges that the directors lacked sufficient information to assess the fallout benefits. (Compl. ¶ 95.) Again, this conclusory allegation is contradicted by public disclosures. For the fees at issue, the Board considered the "character and amount of other

---

[14] This allegation is not plausible because the SAM Funds invest only in the Institutional Class Shares of the Underlying Funds. (Escobar Decl. at B12, B14.) These transactions do not require trades by third-party brokers on exchanges, and thus do not generate even the opportunity for "soft dollar" arrangements. "Soft dollar" arrangements typically refer to research, analysis, reports, and similar benefits provided by third party brokers in return for routing trades to them. 15 U.S.C. § 78bb.

incidental benefits received by the Manager and its affiliates . . . and by each Subadviser." (Escobar Decl. at A8; *id.* at B11.) After reviewing the materials and deliberating, the Board concluded that "the management and subadvisory fees were reasonable in light of these fall-out benefits." (*Id*. at A8; *id.* B11.) Plaintiffs offer no explanation of why the information that the Board reviewed was deficient, nor do Plaintiffs cite to any information regarding fallout benefits the Board should have had but lacked. As with the balance of the Complaint, these allegations are nothing more than threadbare conclusions parroting back the *Gartenberg* standards in the negative. More is required to survive a motion to dismiss.

### C. Count II Should Be Dismissed Because it is a *Gartenberg* Factor, Not an Independent Cause of Action Under Section 36(b).

In addition to the Complaint's failings discussed above, Count II should be dismissed for the independent reason that it seeks recovery on a theory of liability that does not exist under Section 36(b). Count II alleges that Defendants breached their fiduciary duties based on the excess profits they received from economies of scale. The profitability of the SAM Funds to Defendants and whether economies of scale were passed along to shareholders, however, are but two factors under the *Gartenberg* test and, standing alone, cannot support liability under Section 36(b). Section 36(b) does not provide for a separate cause of action for excess profits derived from a failure to share economies of scale. 15 U.S.C. § 80a-35(b). As discussed above, this statute is violated only where the **fees** charged are so disproportionate to the services rendered that they could not have been bargained for at arm's length. *Gartenberg*, 694 F.2d at 928. The Court should dismiss this cause of action because it does not state a separate claim under Section 36(b).

**D. The Court Should Dismiss Count III Regarding Alleged Excessive Rule 12b-1 Distribution Fees.**

Plaintiffs' third cause of action against Defendants should also be dismissed for failure to state a claim. Congress enacted legislation permitting mutual funds to pay distributors to market, sell and distribute fund shares to new shareholders pursuant to an approved plan under Rule 12b-1, 17 C.F.R. § 270.12b-1. Rule 12b-1 lists specific requirements for charging distribution fees. Tellingly, the Complaint does not allege that Defendant PFD (or any other Defendant) violated these requirements for 12b-1 fees; instead, it engages in an industry-wide attack on the concept of 12b-1 fees, citing academic and political critiques against 12b-1 in general. (Compl. ¶¶ 53–56, 58.) But this argument does nothing to show that the distribution fees PFD charged to the SAM Funds were excessive and therefore provides no evidence to support a cause of action against Defendants for excessive 12b-1 fees.[15]

The Complaint also argues that the 12b-1 fees paid were excessive because Defendants benefit as the size of the SAM Funds increased, but Defendants failed "to pass along economies-of-scale benefits from the distribution fees" through reduced advisory and administrative fees. (Compl. ¶¶ 52, 58, 124.) As previously shown, this conclusory allegation is flatly contradicted by other allegations in the Complaint and in the SAM Funds' public filings, which demonstrate that PMC's fees were based on a series of declining breakpoints triggered by increased assets. (*See supra* at 16–17.) The SAM Funds' shareholders **did** benefit substantially from the fact that the five SAM Portfolio funds achieved sufficient size that the effective management fee percentage charged was lowered from the initial breakpoint of 0.55% to 0.32% in FY 2008. (*Id.*)

[15] Plaintiffs' attack on the SAM Funds' distribution fees also omits that the SAM Funds invest only in the Institutional Class shares of the Underlying Funds, which do not bear the distribution fees charged to the Underlying Funds' Class A, B, C and J shares. (*See, e.g.*, Escobar Decl. at B12, B16.)

Thus, Plaintiffs' primary support for their argument that PFD's distribution fees were excessive—an alleged failure to pass along economies-of-scale benefits generated by the distribution fees—finds no factual support in the Complaint or the SAM Funds' public filings and therefore cannot support Plaintiffs' third cause of action.

**E. The Complaint's Causes of Action Should Also Be Dismissed For Those Defendants That Did Not Receive the Challenged Fees.**

Count I of the Complaint alleges that each of the Defendants breached their fiduciary duty by charging excessive advisory fees. (Compl. ¶ 115.) The Complaint, however, alleges that only PMC received advisory fees; this is not surprising because PMC was the adviser to the SAM Funds, not PGI or PFD. (Compl. ¶ 10.) And because neither PGI nor PFD are alleged to have received advisory fees, they cannot be held liable under section 36(b). Section 36(b) allows only claims against the **recipient** of the compensation in question, and no one else. *See* 15 U.S.C § 80a-35(b)(3); *Zucker v. AIM Advisors, Inc.*, 371 F. Supp. 2d 845, 848–49 (S.D. Tex. 2005) (dismissing claim for excessive 12b-1 distribution fees against the investment adviser because the investment adviser was not the actual recipient of the 12b-1 fees); *Green v. Fund Asset Mgmt., L.P.*, 147 F. Supp. 2d 318 (D.N.J. 2001) (dismissing claim and holding that defendant's officers could not be held liable under 36(b) because plaintiffs did not prove that the officers received compensation). Count I should therefore be dismissed as to Defendants PGI and PFD. *Zucker*, 371 F. Supp. 2d 845; *see also Green*, 147 F. Supp. 2d 318.

Similarly, Count II alleges that each Defendant breached its fiduciary duty by receiving excessive profits derived from failure to share economies of scale. (Compl. ¶ 120.) Section 36(b) creates a fiduciary duty as to any Defendants that directly received fees from the SAM Funds. *See* 15 U.S.C. § 80a-35(b). The Complaint does not allege that PGI received any fees from the SAM Funds, whether as an adviser or distributor. PGI therefore cannot be held liable

under Section 36(b) and Count II should be dismissed as to PGI. *Zucker*, 371 F. Supp. 2d 845; *see also Green*, 147 F. Supp. 2d 318.

Lastly, Count III alleges that Defendants breached their fiduciary duty by charging and receiving excessive distribution fees. (Compl. ¶ 124.) The Complaint, however, alleges that only PFD received distribution fees; again, this is not surprising because only PFD was the distributor of the SAM Funds, not PMC or PGI. (Compl. ¶ 52.) Since neither PMC nor PGI are alleged to have received distribution fees, Count III should be dismissed as to these Defendants. *Zucker*, 371 F. Supp. 2d 845; *see also Green*, 147 F. Supp. 2d 318.

### F. Plaintiffs' Claims for Damages Are Limited By Section 36(b)'s One-Year Cutoff.

The Complaint should also be dismissed to the extent it seeks damages for fees paid to Defendants before October 28, 2008 for the SAM Balanced Portfolio, and before January 15, 2009 for the SAM Strategic Growth Portfolio. Section 36(b) does not permit Plaintiffs to seek damages for any period prior to one year before they asserted their derivative claims against the various funds they own. 15 U.S.C. § 80a-35(b)(3) ("No award of damages shall be recoverable for any period prior to one year before the action was instituted."); *Gallus*, 561 F.3d at 825 (same). Plaintiff Curran filed this action on October 28, 2009 on behalf of the SAM Balanced Portfolio, and she therefore cannot seek damages based on any fees paid to Defendants by this fund before October 28, 2008.[16] Plaintiff Earp's derivative claims on behalf of the SAM Strategic Growth Portfolio were not alleged until the Amended Complaint was filed on January 15, 2010. The original complaint made no mention of the SAM Strategic Growth Portfolio, let alone challenged the fees that fund paid to Defendants. Plaintiff Earp's claims involve a separate

[16] To the extent Plaintiffs' claims to recover fees paid by the Underlying Funds are not dismissed for lack of standing, they are also subject to Section 36(b)'s one-year damages cutoff.

fund and set of fees than those alleged in the original complaint. Because Defendants did not have notice when this action was filed that Plaintiffs would also challenge the distinct transactions relating to the SAM Strategic Growth Portfolio, Plaintiffs' claims for this fund do not relate back to the original complaint. *In re Bellanca Aircraft Corp.*, 850 F.2d 1275, 1283 (8th Cir. 1988) (setting forth relation-back standard in the 8th Circuit). Accordingly, Plaintiffs are barred from seeking any fees paid by the SAM Strategic Growth Portfolio to Defendants before January 15, 2009.

## V. CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court grant their motion to dismiss the Complaint in its entirety. In the alternative, Defendants request that all claims asserted against the Underlying Funds be dismissed for lack of standing. Defendants further request that Count I of the Complaint be dismissed against Defendants PGI and PFD, Count II of the Complaint be dismissed against PGI, and Count III of the Complaint be dismissed against PMC and PGI. Finally, Defendants request that all claims against the SAM Balanced Fund seeking damages prior to October 28, 2008 be dismissed and all claims against the SAM Strategic Growth Fund seeking damages prior to January 15, 2009 be dismissed. Defendants request oral argument for this motion.

DATED: January 29, 2010

By: /s/ Brian Campbell __________
Brian Campbell

Brian Campbell
WHITFIELD & EDDY P.L.C.
317 Sixth Ave., Suite 1200
Des Moines, Iowa 50309
Telephone: (515) 288-6041
Fax: (515) 246-1474
E-mail: campbell@whitfieldlaw.com

Phillip R. Kaplan (*admitted pro hac vice*)
Andrew R. Escobar (*admitted pro hac vice*)
O'MELVENY & MYERS LLP
610 Newport Center Drive, Suite 1700
Newport Beach, California 92660
Telephone: (949) 760-9600
Fax: (949) 823-6994
E-mail: pkaplan@omm.com; aescobar@omm.com

*Counsel for Defendants Principal Management Corporation, Principal Global Investors, LLC, and Principal Funds Distributor, Inc.*

NB1:790365