UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JUDITH CURRAN and MICHAEL EARP, for the use and benefit of the Principal Funds, Inc. Strategic Asset Management (SAM) Balanced Portfolio, Principal SAM Strategic Growth Portfolio, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Principal Management Corporation, Principal Global Investors, LLC, and Principal Funds Distributor, Inc. <br><br> Defendants. | Case No. 09-cv-00433-RP-CFB <br><br> **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT** <br><br> **ORAL ARGUMENT REQUESTED** |

**Table of Contents**

I.      INTRODUCTION ................................................................................................... 1

II.     FACTUAL BACKGROUND ................................................................................. 3

III.    ARGUMENT ......................................................................................................... 4

        A.      Plaintiffs Have Standing To Bring An Action On Behalf Of The
                Underlying Funds ..................................................................................... 4

        B.      Plaintiffs' Amended Complaint Provides Principal Defendants
                With Sufficient Notice Under All Pleading Standards. ....................... 7

                1.      Notice Pleading Remains The Controlling Standard. ............... 7

                2.      Plaintiffs Have Pled Facts Sufficient Under Section 36(b)
                        Of The ICA. ................................................................................ 9

                        a.      The Size of the Fees .................................................... 12

                        b.      Economics of Scale ..................................................... 14

                        c.      The Nature And Quality Of The Services Rendered .................. 16

                        d.      Comparative Fee Structures ....................................... 18

                        e.      The Profitability Of The Funds .................................. 20

                        f.      Fallout Benefits .......................................................... 21

                        g.      The Independence and Conscientiousness Of The
                                Directors ...................................................................... 21

        C.      Count II States A Separate Claim Under Section 36(b) For Excess
                Profits Derived From A Failure to Share Economies Of Scale. ......... 25

        D.      Count III States A Separate Claim Under Section 36(b) for
                Excessive 12b-1 Distribution Fees ....................................................... 25

IV.     ADDITIONAL MATTERS ................................................................................. 26

        A.      Only Defendants PMC And PGI Are Liable Under Counts I And II
                Of The Complaint. ................................................................................ 26

        B.      The Beginning Point For Statutory Damages In A Section 36(b)
                Case Is One Year Prior To The Filing Of The Action. ....................... 27

      C.     Defendants' Citation To Documents Not Referenced In The
              Amended Complaint Does Not Convert This Motion Into A
              Summary Judgment Motion .................................................................................... 28

V.      CONCLUSION ............................................................................................................ 28

## Table of Authorities

### Cases

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
  464 F.3d 338 (2d Cir. 2006) ........................................................................ 22

*Ashcroft v. Iqbal*,
  556 U.S. __, 129 S.Ct. 1937 (2009) .......................................................... 7, 11

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................ 3, 4, 7

*BJC Health Sys. v. Columbia Cas. Co.*,
  348 F.3d 685 (8th Cir. 2003) ...................................................................... 28

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009) ........................... passim

*Burks v. Lasker*,
  441 U.S. 471 (1979) .................................................................................. 24

*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984) ........................................... 1

*Dumond v. Massachusetts Fin. Servs. Co.*,
  No. 04-11458-GAO, 2006 WL 149038 (D. Mass. Jan. 19, 2006) ...................... 11

*Dumond v. Massachusetts Fin. Servs. Co.*,
  No. 04-11458-GAO, 2007 WL 602589 (D. Mass. Feb. 22, 2007) ...................... 28

*Fowler v. UPMC Shadyside*,
  578 F.3d 203 (3d Cir. 2009) ......................................................................... 7

*Gallus v. American Express Fin. Corp.*, 370 F. Supp. 2d 862 (D. Minn. 2005)
  ("*Gallus I*") .............................................................................. 12, 25, 26

*Gallus v. Ameriprise Fin., Inc.*, 561 F.3d 816 (8th Cir. 2009), *petition for cert.
  filed*, 78 U.S.L.W. 3083 (Aug. 6, 2009) ("*Gallus II*") ............................... passim

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
  694 F.2d 923 (2d Cir. 1982) ............................................... 9, 10, 15, 24

*Hunt v. Invesco Funds Group, Inc.*,
  No. 04-2555, 2006 WL 1581846 (S.D. Tex. June 5, 2006) ............................. 11

*In re American Mutual Funds Fee Litig.*,
  No. 04-5593 GAF(RNBx), 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009) ......... 5, 6, 24

*In re Federated Mutual Funds Excessive Fee Litig.*, No. 04-352, 2009 WL
  5821045 (W.D. Pa. Sept. 30. 2009) ....................................................... passim

*In re Goldman Sachs Mutual Funds Fee Litig.*,
  No. 04-2567 (NRB), 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006) ................................. 10, 14

*In re Mutual Funds Inv. Litig.*,
  519 F. Supp. 2d 580 (D. Md. 2007) ...................................................................... 5, 6

*In re Salomon Smith Barney Mutual Fund Fees Litig.*,
  528 F. Supp. 2d 332 (S.D.N.Y. 2007)........................................................................ 18

*In re Scudder Mutual Funds Fee Litig.*,
  No. 04-1921 (DAB), 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007)....................................... 5

*Jones v. Harris Assocs. L.P.*, 527 F.3d 627 (7th Cir. 2008) (*reh. en banc* denied),
  537 F.3d 728 (7th Cir. 2008) (*cert. granted*), 129 S. Ct. 1579 (2009) ........................... 23, 24

*Kamen v. Kemper Fin. Services, Inc.*, 500 U.S. 90 (1991) ......................................... 1

*Layton v. U.S.*,
  919 F.2d 1333 (8th Cir. 1990) ............................................................................ 28

*Meyer v. Oppenheimer Mgmt. Corp.*, 764 F.2d 76 (2d Cir. 1985) ............................................ 26

*Migdal v. Rowe Price-Fleming Int'l, Inc.*,
  248 F.3d 321 (4th Cir. 2001) ................................................................... 11, 14, 25

*Phillips v. County of Allegheny*,
  515 F.3d. 224 (3d Cir. 2008)................................................................................ 9

*Richard Krantz v. Fidelity Mgmt. & Research Co.*,
  98 F. Supp. 2d 150 (D. Mass. 2000) .................................................................. 10, 20

*Sheldon Krantz v. Prudential Inv. Fund Mgmt., LLC*,
  305 F.3d 140 (3d Cir. 2002)............................................................................. 9, 22

*Sins v. Janus Capital Mgmt., LLC*,
  No. 04-01647-WDM-MEH, 2006 WL 3746130 (D. Colo. Dec. 15, 2006)........................ 12

*Strigliabotti v. Franklin Resources, Inc.*,
  No. 04-00883, 2005 WL 645529 (N.D. Cal. Mar. 7, 2005) ................................................ 11

*Strougo v. BEA Associates*,
  No. 98-3725 RWS, 2000 WL 45714 (S.D.N.Y. Jan. 19, 2000)........................................... 10

*Verkouteren v. Blackrock Fin. Mgmt., Inc.*,
  37 F. Supp. 2d 256 (S.D.N.Y. 1999)..................................................................... 22

*Wicks v. Putnam Inv. Mgmt., LLC*,
  No. 04-10988-GAO, 2005 WL 705360 (D. Mass. Mar. 28, 2005) ...................................... 10

iv

**Statutes**

15 U.S.C. § 80a-l et seq. ................................................................................ 1, 5, 25, 27

**Rules**

Fed. R. Civ. P. 8 ....................................................................................................... 7

**Other Authorities**

S. Rep. No. 91-184, at 5 (1969), reprinted in 1970 U.S.C.C.A.N. 4897, 4898,
    4901-2, 4912 ........................................................................................................ 1

## I.    INTRODUCTION

A mutual fund is "typically created and managed by a pre-existing organization known as an investment adviser" that "generally supervises the daily operation of the fund and often selects affiliated persons to serve on the [fund's] board of directors." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984)(citation omitted).  For this reason, the relationship between a mutual fund and its investment adviser is "'fraught with potential conflicts of interest.'" *Id.* (citation omitted).  Mindful of these potential conflicts, Congress enacted the Investment Company Act of 1940, 15 U.S.C. § 80a-l et seq. (the "ICA"), to regulate mutual fund advisers and curb abuses in the mutual fund industry by imposing regulatory safeguards. *Kamen v. Kemper Fin. Services, Inc.*, 500 U.S. 90, 93 (1991); *Daily Income*, 464 U.S. at 536.

Despite the passage of the ICA, however, investment advisers continued to exploit their close relationship with the mutual funds they set up by charging excessive fees for the investment management services they provided.  Recognizing that "the forces of arms-length bargaining [over compensation] do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy," S. Rep. No. 91-184, at 5 (1969), reprinted in 1970 U.S.C.C.A.N. 4897, 4898, 4901-2, 4912, Congress amended the ICA to further strengthen protections for shareholders.  In adding Section 36(b) to the ICA, Congress intended for private shareholders to protect the interest of their fellow investors by acting as an "independent check[] on excessive [adviser] fees." *Daily Income*, 464 U.S. at 541.

Through their motion, the Principal Defendants seek to block Plaintiffs from fulfilling their important role of enforcing an investment adviser's fiduciary duties.  They do this by seeking to hold Plaintiffs to a heightened fact-pleading standard when only notice pleading is required, and by improperly raising factual issues that cannot properly be resolved on a motion to

dismiss.  In addition, Defendants' assertion of the legal standard is incorrect, as three recent decisions (two of them issued by the Eighth Circuit), provide the proper framework for analyzing the issues raised in Defendants' motion to dismiss:  (1) *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009), sets forth the appropriate pleading standards post-*Twombly* and *Iqbal*; (2) *Gallus v. Ameriprise Fin., Inc.*, 561 F.3d 816, 823 (8th Cir. 2009), *petition for cert. filed*, 78 U.S.L.W. 3083 (Aug. 6, 2009) ("*Gallus II*"), sets forth the framework for determining whether a defendant has violated its fiduciary duties with respect to receipt of compensation under Section 36(b); and (3) *In re Federated Mutual Funds Excessive Fee Litig.*, No. 04-352, 2009 WL 5821045 (W.D. Pa. Sept. 30. 2009) ("*Federated*"), is the most recent Section 36(b) decision to apply both the pleading and 36(b) standards to a motion to dismiss post-*Twombly* and *Iqbal*. After analyzing Plaintiffs' Amended Complaint using the three most recent and relevant cases, it is apparent that Plaintiffs have sufficiently stated a Section 36(b) claim, and their Complaint should not be dismissed.

In a detailed, 125-paragraph Amended Complaint ("AC"), Plaintiffs have adequately put Defendants on notice that they have breached their fiduciary duties with respect to the receipt of compensation by charging excessive fees, retaining economies of scale in violation of their fiduciary duty owed to Plaintiffs and the Funds, and accepting excessive and inappropriate compensation pursuant to unlawful distribution plans.  Plaintiffs describe in detail and at length in their Amended Complaint how Defendants breached their fiduciary duties owed under the Investment Company Act.  Plaintiffs demonstrate flagrant price gouging and fiduciary duty breaches on the part of Defendants arising in various ways.  For one thing, Plaintiffs pled facts showing that Defendants charged Plaintiffs investment advisory fees approximately two to eleven times more than what Defendants paid their sub-advisors for investment advisory fees

while not providing significant services justifying the price discrepancies (AC ¶¶ 45-47, 73). Additionally, Plaintiffs pled facts showing that Defendants demanded additional services from sub-advisers (to whom they do not owe fiduciary duties) for lower advisory fees but withheld the savings from the Funds by adding only immaterial breakpoints to the advisory fees charged to shareholders (AC ¶ 74).  As further evidence of their penchant for engaging in flagrant fiduciary duty breaches, Plaintiffs pled facts showing that Defendants:  (1) charged Plaintiffs twice as much as investors in identically named but much smaller affiliated variable account funds (AC ¶¶ 76, 84-86); (2) added to the SAM Funds lineup a fund that Morningstar had given its lowest one star rating for the previous five year period (AC ¶ 99); and (3) failed to pass along economies of scale benefits from the distribution fees they collected from Plaintiffs (AC ¶ 52, 56-58, 124).  Plaintiffs have met and far exceeded the applicable notice pleading standard by "giv[ing] the defendant fair notice of what the claim is and the grounds upon which it rests." *Braden*, 588 F.3d at 595 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## II.   FACTUAL BACKGROUND

The Principal SAM Balanced Portfolio and the Principal SAM Strategic Growth Portfolio (collectively "the SAM Funds") are both funds of funds or mutual funds which invest in other mutual funds.  While some fund of funds invest in mutual funds outside of the parent advisory company, the SAM Funds only invest in and hold Institutional Class shares of other equity or fixed-income funds of the Principal family of funds ("Underlying Funds").  Therefore, each of the Underlying Funds is a series of The Principal Funds, Inc.  Probably the most important product that investors buy and pay for when they invest in the funds is professional investment advice.  This work, done by an investment adviser, is paid for through advisory fees approved by the funds' boards.  Advisory fees are a major cost item for mutual funds, and the size of the fees

is naturally important to fund shareholders because every fee dollar paid out of the fund is a dollar subtracted from shareholders' holdings.

Shareholders of the SAM Funds pay *four* layers of advisory fees.  Defendant Principal Management Corporation ("PMC"), the investment adviser to the funds, hires sub-advisers to provide investment management services for both of the SAM Funds as well as for each Underlying Fund.  The first layer of fees charged to the shareholders is the fees paid to Defendant PMC, the adviser of the SAM Funds.  The second layer of fees charged to the shareholders is the fees PMC pays the sub-adviser of the SAM Funds, Edge Asset Management, Inc. ("Edge").  The third layer of fees charged to the shareholders is the fees paid by the SAM Funds to the adviser of each Underlying Fund, *i.e.*, Defendant PMC once again.  Finally, the fourth layer of fees charged to the shareholders is the fees PMC pays to the sub-adviser of the Underlying Fund.  Accordingly, the fee structure for the SAM Funds as well as each Underlying Fund is exactly the same: they are all managed by PMC, and PMC, in turn, contracts out the investment advisory services for each fund to a sub-adviser.  In fiscal year 2008 alone, PMC received $214,124,000 in advisory fees for the two SAM Funds and the Underlying Funds while paying its sub-advisers only $56,392,383 — thereby charging Plaintiffs almost *four times* what PMC itself was charged for investment advisory services by its sub-advisers.  *See* AC ¶ 45.  While PMC did provide a few additional services, those services cost but a tiny fraction of the additional $157,731,617 that PMC retained in advisory fees, net of what it paid to its sub-advisers.  *See* Sections III.B.2.b. and c., *infra*.

## III.   ARGUMENT

### A.   Plaintiffs Have Standing To Bring An Action On Behalf Of The Underlying Funds.

Section 36(b) provides that "[a]n action may be brought under this subsection . . . by a security holder of such registered investment company on behalf of such company."  15 U.S.C.

§ 80a-35(b).  While Defendants claim that Plaintiffs are not security holders of the Underlying Funds, Section 36(b) does not distinguish owners who hold shares through a first level fund or through a fund of funds.  *See, e.g.*, *In re American Mutual Funds Fee Litig.*, No. 04-5593 GAF(RNBx), 2009 WL 5215755, at *42 (C.D. Cal. Dec. 28, 2009) (holding Section 36(b) "does not distinguish among owners of different classes of shares in a mutual fund, and does not impose any requirement at the share class level").  Further, Defendants' cases on this point are inapposite as they only address the situation where a plaintiff *never* held shares of a fund (versus the situation at hand where Plaintiffs hold shares of the Underlying Funds through their fund of funds).[1]  In this case, unlike the cases Defendants are relying upon, the complaining shareholders actually are bearing the costs of the fees about which they are complaining.  As those fees are serving to reduce their investment returns, clearly they have standing to complain about Defendants' breaches of fiduciary duty in the way those fees are being extracted.

A plaintiff has Article III standing to bring an ICA claim against an investment adviser "where she plausibly alleges that (1) she has suffered an injury in fact traceable to a defendant and redressable by the court, *and* (2) her claimed injury is shared in common with others who have been similarly harmed by the same defendant's actions."  *In re Mutual Funds Inv. Litig.*, 519 F. Supp. 2d 580, 586 (D. Md. 2007).  *See also*, *In re Scudder Mutual Funds Fee Litig.*, No. 04-1921 (DAB), 2007 WL 2325862, at *8-9 (S.D.N.Y. Aug. 14, 2007) (discussing Article III standing requirement in the 36(b) context).  The question, therefore, is "whether the named plaintiffs have claimed injury they share in common with others who have been similarly harmed by the same defendant's actions."  *In re Mutual Funds Inv. Litig.,* 519 F. Supp. 2d at 586-7.  The

---

[1] Defendants also mischaracterize Plaintiffs claims as "a disagreement with the decisions by the SAM Funds to invest in the Underlying Funds" or a "challenge [to] the appropriateness of investment decisions."  Defs. Mtn. at 7, n.5.  To the contrary, Plaintiffs only challenge the fee structure of the Underlying Funds – not the *choice* of the underlying funds.

focus is "whether a defendant's allegedly illegal conduct caused the same type of harm to the plaintiff and all the others on whose behalf he is asserting claims." *Id.* at 587.

Here, both named Plaintiffs (and other shareholders in the funds) have suffered an injury in fact traceable to Defendants that is redressable by the Court. The SAM Funds hold shares in each of the Underlying Funds — each of which, in turn, is a registered investment company advised by Defendants. Through the SAM Funds, Plaintiffs own shares of each of the Underlying Funds in their portfolio and are directly affected by the fees charged to the Underlying Funds. Further, the Underlying Funds receive the same types and level of service and are managed in the same manner as the SAM Funds. Indeed, the Underlying Funds are governed by the exact same contract as the SAM Funds with respect to investment advisory fees paid to, and services received from, PMC. *See* AC Ex. 1.

Moreover, the allegedly illegal conduct by Defendants affects both the shareholders who own the Underlying Funds directly, and the shareholders who own the Underlying Funds through the SAM Funds; as a result, the injury suffered by both groups is exactly the same. Thus, Plaintiffs have standing to bring their claims on behalf of the SAM Funds and the Underlying Funds. *See In re Mutual Funds Inv. Litig.*, 519 F. Supp. 2d at 586-7. The fact that the Underlying Funds may individually be assessed different fees is not sufficient to preclude Plaintiffs from proceeding on behalf of shareholders of the Underlying Funds in addition to the SAM Funds, particularly when Plaintiffs have those same fees passed on to them through the SAM Funds' fee structure. *See In re American Mutual Funds Fee Litig.*, 2009 WL 5215755, at *42.

**B.**    **Plaintiffs' Amended Complaint Provides Principal Defendants With Sufficient Notice Under All Pleading Standards.**

**1.**    **Notice Pleading Remains The Controlling Standard.**

Fed. R. Civ. P. 8 only requires "a short and plain statement of the claim showing that the pleader is entitled to relief" in a complaint.  To meet this standard and defeat a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. __, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570)). While the plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a "sheer possibility," *id.*, it is not a "probability requirement."  *Id.*  Nor does Rule 8 require a plaintiff to plead "specific facts" by explaining precisely how a defendant's conduct was unlawful.  *Braden,* 588 F.3d at 595.  Rather, it remains sufficient "for a plaintiff to plead facts indirectly showing unlawful behavior, so long as the facts pled 'give the defendant fair notice of what the claim is and the grounds up on which it rests,'" *Id.* (quoting *Twombly*, 550 U.S. at 555), and the plaintiff alleges sufficient facts to "raise a reasonable expectation that discovery will reveal evidence of [the conduct complained of]."  *Twombly*, 550 U.S. at 556.  In this regard, "standards of pleading are not the same as standards of proof," and a plaintiff "need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element" of a claim.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (internal quotation omitted).

A complaint states a plausible claim for relief if its "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949.  The Eighth Circuit recently issued a reminder that *Twombly* and *Iqbal* did not change the fundamental tenet of Rule 12(b)(6) that "on a motion to dismiss, inferences are to be

drawn in favor of the non-moving party." *Braden,* 588 F.3d at 595.  Further, the Eighth Circuit

laid out some principles that should continue to be used as a guide in determining whether a

complaint sufficiently states a claim for relief.  First, the court must take the plaintiff's factual

allegations as true.  *Id*. at 594.  Second, the complaint "should be read as a whole, not parsed

piece by piece to determine whether each allegation, in isolation, is plausible." *Id.*  Third,

plaintiffs are not required to "plead facts tending to rebut all possible lawful explanations for a

defendant's conduct." *Id.* at 596.  Accordingly, under *Twombly,* "dismissal of a complaint

pursuant to Rule 12(b)(6) is proper only where the averments of the complaint plausibly fail to

raise directly or inferentially the material elements necessary to obtain relief under a viable legal

theory of recovery." *Federated*, 2009 WL 5821045 at *1.[2]

It is also important to keep in mind that Congress intended that private shareholders

would play an important role in enforcing the fiduciary duties of investment advisers.  While

discussed in the ERISA context, the Eighth Circuit's recent clarification regarding the pleading

standard in *Braden* has parallel applicability to claims brought by mutual fund shareholders

against the fund complexes under the ICA:

> No matter how clever or diligent, [ICA] plaintiffs generally lack the inside
> information necessary to make out their claims in detail unless and until discovery
> commences.  Thus, while a plaintiff must offer sufficient factual allegations to
> show that he or she is not merely engaged in a fishing expedition or strike suit, we
> must also take account of their limited access to crucial information. If plaintiffs
> cannot state a claim without pleading facts which tend systemically to be in the
> sole possession of defendants, the remedial scheme of the statute will fail, and the
> crucial rights secured by [the ICA] will suffer.  These considerations counsel
> careful and holistic evaluation of an [ICA] complaint's factual allegations before
> concluding that they do not support a plausible inference that the plaintiff is
> entitled to relief.

---

[2] Defendants failed to mention in their motion the *Federated* decision, the most recent decision regarding a motion
to dismiss a Section 36(b) claim in which the district court denied the defendants' motion and where the complaint
contained similar allegations as those in the instant Amended Complaint.

*Braden*, 588 F.3d at 598.  In sum, "'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest the required element . . . [and provides] enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Federated*, 2009 WL 5821045 at *1 (quoting *Phillips v. County of Allegheny*, 515 F.3d. 224, 235 (3d Cir. 2008).

### 2.    Plaintiffs Have Pled Facts Sufficient Under Section 36(b) Of The ICA.

As the Eighth Circuit recently explained, the proper approach to a claim under Section 36(b) "is one that looks to both the adviser's conduct during negotiation and the end result." *Gallus II,* 561 F.3d at 823.  "Unscrupulous behavior with respect to either can constitute a breach of fiduciary duty." *Id.*  Plaintiffs note that most of the cases cited by Defendants rely on the *Gartenberg* standard requiring a fee to be "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,* 694 F.2d 923, 928 (2d Cir. 1982).  However, the Eighth Circuit in *Gallus II* cautioned that diluting "an adviser's fiduciary duty . . . to a simple and easily satisfiable requirement not to charge a fee that is egregiously out of line with industry norms" would serve  to "create a safe harbor of exorbitance" and "eviscerate § 36(b)."  561 F.3d at 823.  Therefore, "[i]n order to determine whether a fee is excessive for purposes of Section 36(b), a court must examine the relationship between the fees charged and the services rendered by the investment adviser." *Sheldon Krantz v. Prudential Inv. Fund Mgmt.,* LLC, 305 F.3d 140, 143 (3d Cir. 2002).

Factors which may be relevant to determining whether Defendants have breached their fiduciary duty pursuant to § 36(b) include, but are not limited to:  (1) size of the fees; (2) the extent to which benefits derived from the economies of scale realized by the fund adviser as the fund grows have inured to the benefit of fund shareholders; (3) the nature and quality of the

services rendered; (4) comparative fee structures; (5) the profitability of the funds to the

advisor/manager; (6) fallout benefits (i.e. all benefits directly or indirectly received by persons

affiliated with an investment company and their affiliated persons by virtue of their relationship

with an investment company); and (7) the independence and conscientiousness of the directors.

*Gallus II*, 561 F.3d at 821.  *See also Gartenberg*, 694 F.2d at 928-31.[3]  Even though Plaintiffs'

Amended Complaint pleads facts relating to all of these factors, the pleading standards at the

motion to dismiss stage of a case do not require a court to assess whether all six factors have

been met.  *In re Goldman Sachs Mutual Funds Fee Litig.*, No. 04-2567 (NRB), 2006 WL

126772, at *9 (S.D.N.Y. Jan. 17, 2006).  *See also Wicks v. Putnam Inv. Mgmt., LLC*, No. 04-

10988-GAO, 2005 WL 705360, at *4 (D. Mass. Mar. 28, 2005) ("A plaintiff's failure to plead

certain *Gartenberg* factors is not itself grounds for dismissal."); *Richard Krantz v. Fidelity

Mgmt. & Research Co.*, 98 F. Supp. 2d 150 (D. Mass. 2000) (denying motion to dismiss Section

36(b) claim where plaintiff alleged facts concerning only four of the six *Gartenberg* factors);

*Strougo v. BEA Associates*, No. 98-3725 RWS, 2000 WL 45714, at *6-7 (S.D.N.Y. Jan. 19,

2000) ("*Gartenberg* is a post-trial decision in which the evidence can be weighed against the six

factor test.  The pleading standards under the federal rules . . . do not contemplate pleadings

sufficiently detailed to enable a court to make a determination on a 12(b)(6) motion as to whether

the six *Gartenberg* factors were met.").  Instead, a plaintiff must "allege facts that, if true, would

support a claim that the fees at issue are excessive."  *In re Goldman Sachs Mutual Funds Fee

Litig.*, 2006 WL 126772, at *9 (citation omitted).

Principal erroneously claims that Plaintiffs' Amended Complaint is a general indictment

of the mutual fund industry, Defs. Mtn. at 9, and only challenges the fee negotiation process in a

---

[3] The Eighth Circuit has cautioned and advised that *Gartenberg* is only "the starting point for interpreting a fund adviser's fiduciary duty."  *Gallus II*, 561 F.3d at 821.

conclusory fashion. *Id.* While Plaintiffs do supply some background information regarding the mutual fund industry in general to provide context for their Amended Complaint, Plaintiffs' Amended Complaint is grounded in sufficient facts to "raise a reasonable expectation that discovery will reveal evidence of the [excessiveness of the fees charged by Defendants.]" *Federated*, 2009 WL 5821045 at *1 (citations omitted). Further, the specific facts alleged about the excessive fees received by Defendants by their very nature call into question the process by which those fees were approved. In short, Plaintiffs' Amended Complaint more than passes muster under *Gallus II* as well as *Federated*, the most recent Section 36(b) case to deal with a motion to dismiss post-*Iqbal*. Indeed, a number of courts have upheld Section 36(b) claims based upon similar facts to those set forth in Plaintiffs' complaint, perhaps not surprisingly as they are cases in which counsel for Plaintiffs here also were involved. *See, e.g.*, *Federated*, 2009 WL 5821045 at *8 (denying motion to dismiss Section 36(b) claim founded on similar allegations); *Hunt v. Invesco Funds Group, Inc.*, No. 04-2555, 2006 WL 1581846 (S.D. Tex. June 5, 2006) (same); *Dumond v. Massachusetts Fin. Servs. Co.*, No. 04-11458-GAO, 2006 WL 149038 (D. Mass. Jan. 19, 2006) (same); *Strigliabotti v. Franklin Resources, Inc.*, No. 04-00883, 2005 WL 645529 (N.D. Cal. Mar. 7, 2005) (same).

Defendants fail to mention any of these cases, instead citing to cases in which the complaints had bare bones conclusory allegations that courts appropriately rejected, *see, e.g., Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 328 (4th Cir. 2001) (case dismissed as the complaint contained only conclusory allegations amounting to nothing more than "the mere recitation of boilerplate statutory language") — a far cry from Plaintiffs' complaint here. Their choice to omit these decisions is even more curious in light of the fact they chose to compare Plaintiffs' complaint to that filed in *Gallus* (which was similar to the *Federated*, *Hunt*, *Dumond*,

and *Strigliabotti* complaints).  Even more curious is the fact that Defendants did not inform the Court that the *Gallus* defendants' motion to dismiss — which contained allegations similar to those of the instant complaint — was denied.  *Gallus v. American Express Fin. Corp.*, 370 F. Supp. 2d 862 (D. Minn. 2005) ("*Gallus I*").[4]  Defendants criticize Plaintiffs' complaint because it contains allegations similar to those contained in the *Gallus I* complaint; yet, that is a Section 36(b) complaint in which the court denied the defendants' motion to dismiss and in which the Eighth Circuit later reversed the district's court granting of summary judgment to the defendants.

The critical question here is whether this Amended Complaint alleges the facts necessary to provide Defendants with notice of the claims against them.  In the cases where courts have noted the similarities in complaints, they have denied the motions to dismiss as the complaints contained sufficient factual allegations — just as Plaintiffs' complaint here contains numerous facts specific to Defendants' conduct.  *See, e.g.*, *Sins v. Janus Capital Mgmt., LLC*, No. 04-01647-WDM-MEH, 2006 WL 3746130 (D. Colo. Dec. 15, 2006) (cited by Defendants).  In fact, several courts have cited the similarities in the complaints as support for denying a motion to dismiss, as Judge Cercone did most recently in the *Federated* case.  *See, e.g.*, *Federated*, 2009 WL 5821045 at *8 (and cases cited therein).

An examination of Plaintiffs' Amended Complaint demonstrates it alleges more than sufficient facts to put Defendants on notice of the substance of Plaintiffs' claims:

### a.    The Size of the Fees

"The size of the adviser's fee is of course one of the factors to be considered in reviewing a § 36(b) challenge to a fee structure."  *Gallus II*, 561 F.3d at 823.  As discussed above, Defendants charge shareholders of the SAM Funds *four* layers of advisory fees as PMC hires

---

[4] While the district court judge in *Gallus I* expressed skepticism of some of plaintiffs' claims, he ruled that the complaint withstood the motion to dismiss and allowed the case to proceed.

sub-advisers for both the SAM Funds as well as each Underlying Fund.  AC ¶ 40.  Given that the

sub-advisers are responsible for the bulk of the investment advisory services provided to the

funds and PMC provides little, if any additional services, *see* Section III.B.2.c. *infra*, a

comparison of the fees paid to the sub-adviser as compared to Defendants is quite revealing.

Looking at just the effective fee schedule for the SAM Funds,[5] Defendants charge

Plaintiffs (to whom fiduciary duties are indisputably owed) anywhere from eight to thirteen

times as much as they pay for the sub-advisory services rendered by other for-profit investment

management companies.  AC ¶ 42.  In other words, shareholders are paying grossly inflated

prices for advisory services.  In dollar terms, for fiscal year 2008, shareholders of the SAM

Funds paid Defendants $20.5 million in advisory fees while paying their sub-adviser only $2.8

million.  AC ¶ 45.  Shareholders of the Underlying Funds similarly pay Defendants many times

more than what the sub-advisers for each fund are paid by Principal.  AC ¶¶ 44-45.  For the

Underlying Funds, shareholders paid $193.6 million to Defendants as compared to $53.6 million

for the sub-advisers.  *Id.*  The huge dollar difference between the true costs of the services

rendered (paid to the sub-advisory firms) and the costs charged to the funds is simply being

skimmed off and pocketed by Defendants in flagrant breach of fiduciary duty standards requiring

fair dealing and fair pricing in conflict-of-interest situations.  While these numbers are quite

stark, they become even more inexplicable when considered along with the other factors

discussed below.

---

[5]A fee schedule sets out the respective fee rates charged to shareholders at different asset levels while the effective
fee reflects the actual fee percentage paid by the fund shareholders by applying the fee schedule.  In a sense, the
effective fee rate paid by a fund shareholder is similar to a taxpayer's actual, final, effective tax rate, a percentage
which takes into account (but is different from) the various marginal rates applicable to a particular taxpayer's
total income.

### b.      Economics of Scale

Section 36(b) was enacted "in large part because Congress recognized that as mutual funds grew larger, it became less expensive for investment advisers to provide the additional services.  Congress wanted to ensure that investment advisers passed on to fund investors the savings that they realized from those economies of scale." *Migdal*, 248 F.3d at 326-7.

Defendants' cases stand for the proposition that "[m]ere assertions that fees increased with the size of the Funds are not enough to establish that the benefits from economies of scale were not passed on to investors." *See, e.g., In re Goldman Sachs Mutual Funds Fee Litig.*, 2006 WL 126772, at *9.  But Plaintiffs here have not simply asserted that fees increased with the size of the funds.  Plaintiffs have specifically alleged that, *inter alia*:  as assets under management have grown, so have the advisory and distribution fees paid to Defendants grown dramatically despite economies of scale (AC ¶ 63); the rates paid to sub-advisers, competitors and other clients provide a measure of how much the investment advisory services cost which, in turn, reflects the economies of scale realized by the advisers (AC ¶¶ 47, 63); the nature and quality of the services have not substantially changed (AC ¶ 89); and the economies of scale have not been shared with Plaintiffs or other shareholders of the funds (AC ¶¶ 68-69).  The facts contained in Plaintiffs' complaint go well beyond what courts have found sufficient to survive a motion to dismiss in other cases — as recognized by the case Defendants cite:  the court in *In re Goldman Sachs Mutual Funds Fee Litig.* acknowledged that simply asserting that fees had increased significantly over time while the quality of services rendered had not changed met the pleading requirement of *Gartenberg*.  2006 WL 126772, at *9, n.24 (citing *Wicks v. Putnam Inv. Mgmt. LLC.*, No. 04-10988, 2005 WL 705630, at *1 (D. Mass. Mar. 28, 2005).  Plaintiffs' Amended Complaint contains both such allegations and much more.

Defendants also make much of the fact that the management fee schedules of the SAM Funds (as well as the Underlying Funds) have breakpoints that Defendants purport deliver the benefits of larger size funds in the form of reduced fee percentages.  Defs. Mtn. at 16.  However, the mere existence of a fee structure that employs breakpoints at certain asset levels does not mean that economies of scale are *adequately* being passed on to Plaintiffs and the funds, or more to the point, does not mean that a fund ever gets so large that the shareholders can avail themselves of the fee breakpoints.  Defendants complain that Plaintiffs "curiously omitted from the Complaint's discussion of economies of scale [the effective fee rate for the SAM Funds.]" Defs. Mtn. at 17.  Notably, Plaintiffs did include this information.  They just included it earlier in the Amended Complaint and contrasted it to the effective fee schedule for the sub-adviser to the SAM Funds, Edge Asset Management, Inc.  AC ¶ 42.  Further, while Defendants would have the Court only look at the effective rate for PMC, hoping that it will appear to be a very small figure, a fuller picture emerges when one examines the effective rate for PMC compared to the effective rate for sub-adviser Edge — only then does one realize that PMC charges *eight times* more than Edge charges to actually provide the key services a fund buys — namely, the investment advisory services.  In dollar terms, this translates to an additional payment of almost $20.5 million to PMC for fees, by the SAM Funds' shareholders in fiscal year 2008 alone, while Edge itself only received $2.8 million, a *tenfold* difference when analyzed in real dollar terms.  Juxtapose this with Plaintiffs' allegation that various miscellaneous administrative items, aside from transfer agency costs (which are provided pursuant to a *separate* contract and, therefore, not part of the investment advisory costs) do not account for more than three basis points (or 3/100ths of a percent) of the average mutual fund's advisory fee (AC ¶ 46), and Plaintiffs surely

have provided sufficient notice to Defendants that they have breached their fiduciary duty with respect to their receipt of compensation.

### c.    The Nature And Quality Of The Services Rendered

Defendants' discussion of the facts alleged in Plaintiffs' complaint regarding the nature and quality of the services rendered is based on an overly-narrow and constrained reading of the complaint.  Defendants parse out this section as if one is supposed to ignore all the other relevant facts that are contained elsewhere in complaint.  However, a complaint is to be read "as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden*, 588 F.3d at 594.

The core and most costly service shareholders pay for when they invest in the funds is investment advisory advice.  Plaintiffs have alleged that Defendants hire the sub-advisers to the funds (including both the SAM Funds as well as the Underlying Funds) to provide those core investment advisory services to their designated funds, including making the decisions regarding the allocations (AC ¶¶ 47-48).[6]  Defendants assert that because Plaintiffs acknowledge Defendants provided some additional services, that contradicts the claim that the services were *de minimis*.  Defs. Mtn. at 21.  But Plaintiffs estimated that PMC's cost to provide these additional services was around three basis points (AC ¶ 46), which is *de minimis*.  This fact, which must be taken as true, *Braden*, 588 F.3d at 594, fairly raises the question whether, in fiscal year 2008 for example, the additional services provided could have cost PMC anywhere near the $157.7 million they charged the shareholders over and above what they paid the sub-advisers for investment advisory services for both the SAM Funds as well as the Underlying Funds (AC

---

[6] *Compare* Exhibit 1 to the Amended Complaint (PMC Investment Management Agreement) with Exhibit 4 to the Amended Complaint (Edge Sub-Advisory Agreement).

¶ 45).[7] This same question could be raised for each SAM Fund in the complaint as well as each Underlying Fund as the complaint contained numerous details about the disparity between what PMC received and each sub-adviser received.  AC ¶¶  42, 44-45, 47.

Defendants also dismiss the example Plaintiffs provided regarding the Real Estate Investors Fund (one of the Underlying Funds) and how, despite adding compliance testing and monitoring to the duties of the sub-adviser, Defendant PMC decreased the fees it paid to the sub-adviser while not materially changing the fees it charged its funds' shareholders (AC ¶ 76). Defendants then misleadingly assert that Plaintiffs provide insufficient detail to support the claim with regard to the SAM Funds because they only discuss the Real Estate Investor Fund.  Defs. Mtn. at 20.  However, in addition to providing information regarding the disparity in rates for the SAM Funds as well as each Underlying Fund as just discussed, Plaintiffs also explained how PMC earned over twice as much as the sub-adviser of the Large Cap Value III Fund — AllianceBernsteinWood, a third party with whom PMC negotiated at arm's length and to whom PMC owed no fiduciary duties (which earned Principal a public skewering by David Swenson, the chief investment officer of Yale University) (AC ¶ 47).  These are all examples that are indicative of Defendants' *modus operandi* regarding the provision of services to the funds' shareholders — negotiate for the lowest fee possible with the sub-advisers who provide the core investment advisory services but do not meaningfully share those savings with the fund shareholders, hiding behind the fact that they provide a few corporate accounting and administrative services that result in a *de minimis* expense to Defendants while charging

---

[7] Shareholders of the SAM Funds paid Defendants $20.5 million in advisory fees while paying the sub-adviser only $2.8 million in fiscal year 2008 (AC ¶ 45), and shareholders of the Underlying Funds paid $193.6 million to Defendants as compared to $53.6 million for the sub-advisers.  *Id.*  Plaintiffs will indulge in Defendants' basis points comparison by pointing out that despite the fact that the additional services only cost PMC approximately three basis points, Defendants charged shareholders an additional 48.3 basis points over what the sub-advisers were paid (*i.e.*, *sixteen times* the rate) at the $1 billion level of assets under management for those accounting and corporate administrative services (AC ¶ 48 with additional comparisons available at AC ¶¶ 42, 44-45).

shareholders tens of millions of additional dollars in fees.[8]  Plaintiffs have provided more than

sufficient detail to support the fact that the fees Defendants' charge are excessive.

### d.      Comparative Fee Structures

Defendants criticize Plaintiffs' comparisons of the SAM Funds to Vanguard LifeStrategy

Moderate Growth Fund because the LifeStrategy fund is not a tactical asset allocation fund but

merely invests in an asset allocation fund, the Vanguard Asset Allocation Fund Investor Shares

("VAAF").  Defs. Mtn. at 13.  This is a distinction without a difference as there is no practical

difference in how an investor achieves the active allocation.[9]  As Plaintiffs already explained in

their complaint:

> As Vanguard charges no management fee to the shareholders of its LifeStrategy
> fund of funds, one can isolate the fee Vanguard negotiated with Mellon, a for-
> profit investment management company, for its asset allocation services.
> Shareholders of the Vanguard LifeStrategy Fund pay 10 basis points to purchase
> the VAAF through LifeStrategy.  The ten basis points includes all advisory as
> well as administrative services. Analyzing the annual report of the VAAF, one
> can determine that the investment advisory fee paid to Mellon is 3.5 basis points
> which accounts for advisory services with three components to it:  1) the active
> management of the equity portfolio; 2) the active management of the bond
> portfolio; 3) and the asset allocation function.  While Plaintiffs cannot separate
> out how much of the 3.5 basis points accounts for only the asset allocation
> function, it is clear that shareholders of the Vanguard LifeStrategy fund of funds
> pay Mellon somewhere between 0 basis points and 3.5 basis points for the asset
> allocation service.  Contrasting this 3.5 basis points for a full tactical asset
> allocation service that was negotiated at arms length with the 32 basis points
> Defendants charge shareholders of the SAM Funds illustrates the excessive nature
> of the fees charged by Defendants.

(AC ¶ 81).  In any event, unlike the cases Defendants cite in which the complaints relied solely

on a comparison to Vanguard, Plaintiffs here provided much more.

---

[8] Defendants also complain that there are no allegations regarding the performance of the funds.  Defs. Mtn. at 20.
However, performance is just one aspect of the nature and quality of services provided by the investment adviser
and certainly is not the only way to challenge and evaluate the services offered by an adviser.  *In re Salomon Smith
Barney Mutual Fund Fees Litig.*, 528 F. Supp. 2d 332, 338 (S.D.N.Y. 2007) (faulting plaintiffs for not raising any
facts about the services offered and only making allegations regarding poor performance).
[9] In fact, the SAM Funds are part of Principal's "Asset Allocation Investments."

Plaintiffs also point out in their Amended Complaint how Defendants charge investment advisory fees to the SAM Funds that are *two times* as much as those charged to two PMC-affiliated variable account funds with the exact same names (AC ¶ 84).  While Defendants try to keep the discussion at the level of basis points which appear very small, an examination of the difference in *dollars* makes more significant the disparity in fees.  For example, at the $5 billion mark, shareholders of the SAM Funds offered through the variable account fund would pay $10.5 million in advisory fees while shareholders of the retail SAM Funds would pay roughly twice that or $20.3 million.  *Id.*

Moreover, some very telling facts pled by Plaintiffs are ignored by Defendants.  First, Plaintiffs pointed out that a Morningstar analyst observed in an April 10, 2008, article about Principal that, "[t]he one area where there's some room for improvement is the price; the A shares cost 1.24%, above the median for comparable share classes of moderate-allocation funds." (AC ¶ 39).

Second, Defendants barely mention the comparison made between the investment advisory fees charged to the Principal fund shareholders and those charged by its sub-advisers.  Plaintiffs allege that the fees paid to the sub-advisers of the fund provide a measure of how much the investment advisory services actually cost and the economies of scale realized by the advisers as the sub-advisers also are for-profit investment management companies (AC ¶ 47).  As the Eighth Circuit declared, "[t]he purpose of an inquiry into the fees paid by institutional [and] non-fiduciary clients is to determine what the investment advice is worth."  *Gallus II*, 561 F.3d at 824.

In relevant part, PMC delegates to Edge, its subsidiary, the provision of investment advisory services to the SAM Funds — including decisions regarding allocations — and had

19

similar arrangements with the Underlying Funds' sub-advisers.  *See* AC ¶¶ 47-48.[10]  Yet,

Defendants charged Plaintiffs investment advisory fees approximately two to eleven times more

than what Defendants paid their sub-advisers for investment advisory fees without providing

appreciable additional services (AC ¶¶ 45-47, 73), resulting in $214 million in fees paid by

shareholders to PMC for the SAM Funds and the Underlying Funds in fiscal year 2008 compared

to the $56 million PMC paid to the sub-advisers who provide the investment advisory services

(AC ¶ 45).  This enormous disparity demonstrates what PMC negotiated for itself at arm's

length but failed to provide to its own shareholders.  Accordingly, the complaint adequately

alleges the fees charged to the funds violated Section 36(b).

### e.      The Profitability Of The Funds

Principal criticizes Plaintiffs for not stating Defendants' profits, revenues, expenses or

approximating such figures.  Defs. Mtn. at 18.  However, such information is typically

considered highly proprietary by fund complexes and, as a result, not available absent discovery.

Therefore, absent discovery, it is impossible for Plaintiffs to know Principal's profit margins

with respect to the funds or how Principal allocates its costs among the funds, between the funds,

or between its other lines of business.  At minimum, these are inherently fact-based questions

that should appropriately be resolved after discovery.  Where "specific financial information is

not available prior to discovery," courts have refused to dismiss Section 36(b) claims based upon

the lack of information regard this factor.  *See Richard Krantz*, 98 F. Supp. 2d at 159.  *See also,*

*Braden*, 588 F.3d at 598.

---

[10] As discussed in Sections III.B.2.b and c, *supra*, while PMC provides some additional administrative services under the investment management agreement, the cost of those additional services is *de minimis* (AC ¶ 46).

####        f.        Fallout Benefits

Plaintiffs' Amended Complaint makes allegations specific to Defendants' receipt of fall-

out benefits from which Defendants obtain indirect profits (AC ¶¶ 90-95).  For purposes of

deciding this motion, these allegations must be taken as true.  *Braden*, 588 F.3d at 594.  Plaintiffs

allege that fall-out benefits (such as soft dollar arrangements) benefit Defendants and result in

increased costs to the Funds' shareholders with no corresponding benefits (AC ¶ 91).

Defendants criticize Plaintiffs for not having more specific information.  Again though, this type

of information is not publicly available and, therefore, cannot be known with any more

specificity without discovery.  *See Braden,* 588 F.3d at 598.  Finally, this one factor should not

be parsed out separately but, rather, should be considered within the context of the other

allegations in Plaintiffs' Amended Complaint.  *Id.* at 594.

####        g.        The Independence and Conscientiousness Of The Directors

Under Section 36(b), one of the factors this Court should consider is "the independence

and conscientiousness of the independent trustees."  *Gallus II*, 561 F.3d at 821.  Defendants are

simply wrong when they claim that "Plaintiffs' Complaint presents no **facts** to support their

theory that the nine independent directors lacked independence or conscientiousness."  Defs.

Mtn. at 15 (emphasis in original).  To the contrary, Plaintiffs have detailed how, *inter alia*:  each

member, save one, of the Board of Directors earned a six figure sum for the part-time job of

overseeing the funds (AC ¶¶ 25-26);[11] this Board oversees and monitors over 114 portfolios in

the Fund Complex (AC ¶ 96); the Board approved contracts charging Plaintiffs investment

advisory fees approximately *two to eleven times more* (in dollar terms) than what Defendants

paid their sub-advisers for investment advisory fees without providing many additional services,

(AC ¶¶ 45-47, 73); this Board approved a contract for the Real Estate Investors Fund that

---

[11] Craig Damos only earned $94,875 for his service on the Board as he did not serve the full year in 2008.

decreased the fees paid to the sub-adviser (despite adding services for which the sub-adviser was responsible) while not negotiating any significant decrease in fees on behalf of the Principal shareholders (AC ¶ 74); and this Board approved the addition of the Principal LargeCap Value Fund III to the SAM Balanced Portfolio despite the fact that the fund had been publicly skewered for its fee structure three years earlier (AC ¶ 47) and had been given Morningstar's *lowest rating of one star for the previous five year period* (AC ¶ 99).

While Defendants cite a handful of cases where compensation received by directors or the service on multiple boards alone were found to be insufficient as a matter of law (*see Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 344-5 (2d Cir. 2006); *Sheldon Krantz v. Prudential Invs. Fund Mgmt.*, 305 F.3d 140 (3d Cir. 2002); *Verkouteren v. Blackrock Fin. Mgmt., Inc.*, 37 F. Supp. 2d 256, 259 (S.D.N.Y. 1999)[12]), Plaintiffs here pled much more than bare compensation numbers.  Further, the most recent court addressing similar facts held that not considering each investment contract separately or independently could mask, for example, the profitability of the funds or economies of scale and "preclude[] a specific determination that [a fund's] investment advisory fees are in line with those that would be produced by informed arms-length negotiations."  *Federated*, 2009 WL 5821045 at *5.  Plaintiffs also provide at least three, concrete examples of PMC actions that, on their face, could be seen as detrimental to Plaintiffs and shareholders of the funds.  Yet, the Board still approved them.  Finally, while

---

[12] In *Amron*, the only allegations made about the directors included quotes from the Fund Director's Guidebook and the like and information concerning the compensation they received. 464 F.3d at 345.  In *Sheldon Krantz*, the only allegations contained in the complaint were that the directors served on multiple boards and facts concerning the compensation received by the directors. 305 F.3d at 144.  Similarly, the plaintiffs in *Verkouteren* only made allegations concerning the compensation received by the directors and a general statement that it appeared the directors rubber stamped the adviser's decisions as all the governing boards met on the same day.  37 F. Supp. 2d at 260.  The court in *Verkouteren* noted, however, that the complaint did not allege "a single instance where defendants suggested a course of action which would in any way have prejudiced the shareholders of the funds and therefore should have been resisted by the outside directors."  *Id.* Contrary to these cases, Plaintiffs' Amended Complaint goes far beyond mere allegations regarding compensation and the fact that the board oversees numerous funds, although Plaintiffs believe these are still relevant facts to be considered in context with all the other facts contained in their complaint.

Defendants callously characterize the compensation received by the Board members as "not remarkable or lavish," (Defs. Mtn. at 14), the cases cited by Defendants were decided prior to the recent financial crisis and provide testimony only to the excesses of executive compensation in the mutual fund industry.  *See Jones v. Harris Assocs. L.P.*, 527 F.3d 627 (7th Cir. 2008) (*reh. en banc* denied), 537 F.3d 728, 730 (7th Cir. 2008) (*cert. granted*), 129 S. Ct. 1579 (2009) (per curiam) (Posner, J., dissenting) (noting "the growing indications that executive compensation in large publicly traded firms often is excessive because of the feeble incentives of boards of directors to police compensation") (citation omitted).

Defendants also spend a full two and one-half pages or a little over ten percent of their brief bemoaning how Plaintiffs did not reference in their complaint the SAM Funds' annual reports that discussed the factors considered by the Board.  However, the discussion of factors considered by the Board contained in the Annual Report attached to Defendants' motion is nothing more than a self-serving, boilerplate recitation likely carefully crafted by Board counsel to address the *Gartenberg* factors.  Plaintiffs expect that discovery will reveal a less-than-thorough consideration of these factors by the Board, especially in light of the fact that noticeably missing from the annual report is any discussion addressing, *e.g.*, whether the asset allocation strategy for the SAM Funds justified PMC receiving almost $12 million more than the sub-advisers for the SAM Balanced Portfolio Fund alone in fiscal year 2008 (AC ¶¶ 45, 48) or the rationale for adding the Principal LargeCap Value Fund III given its abysmal record (AC ¶¶ 47, 99).

Indeed, it was only with discovery that the plaintiffs in *Gallus II* learned that despite the normal recitations regarding the factors considered by the board detailed in publicly filed documents, there were questions with regard to the veracity and accuracy of the materials

provided to the board.  561 F.3d at 824.  Likewise in *In re American Mutual Funds Fee Litig.*,

only after discovery were plaintiffs able to develop evidence that, despite outward appearances:

> [T]he Unaffiliated Directors' [sic] did not diligently inquire into some issues of importance and failed to recognize the consequences of some of the information presented to them . . . the Unaffiliated Directors accepted, with virtually no comment, statements made regarding compensation paid to CRMC and AFD employees either in the aggregate or in specific.  Likewise, the directors regularly approved a 25 basis point 12b-1 fee, regardless of the assets under management, on the assumption that the increase in asset size was proportional to the increase in investors.  However, the directors apparently failed to consider that the increase in assets under management resulted in significant part from appreciation of existing accounts and not the addition of new investors.  Moreover, no evidence was presented that the fee was decreased as the assets under management substantially decreased between the middle of 2007 and the end of 2008.  These failures are significant given the Unaffiliated Directors' important role as "independent watchdogs" with primary responsibility for protecting shareholder interests. [] Without exacting scrutiny by these directors, the possibility exists that issues of significant importance will not receive the attention they deserve, ultimately harming investors.

2009 WL 5215755, at *55 (citing *Burks v. Lasker, 441 U.S. 471 (1979)*).[13]  Therefore, while the

self-serving recitation in Principal's annual report, at most, may create a factual dispute, it cannot

be held to definitively establish the Board was independent or conscientious.  Indeed, drawing all

inferences in favor of Plaintiffs as the non-moving party and reading Plaintiffs' factual

allegations as a whole, Plaintiffs have presented a plausible claim that the fees charged to them

and other shareholders of the funds were received in violation of Defendants' fiduciary duties.

---

[13] Although the court in *In re American Mutual Funds Fee Litig.* eventually ruled against plaintiffs, it felt bound and constrained by the *Gartenberg* standard requiring "'a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.'" *In re American Mutual Funds Fee Litig.*, 2009 WL 5215755, at *2 (citing *Gartenberg,* 694 F.2d at 928*)*. However, the court also noted, "in the Court's view, this standard establishes a very low threshold for the mutual fund companies and a very high hurdle for a plaintiff."  *Id.* at *2 and n.1 (also quoting Judge Posner's dissent in *Jones*, 527 F.3d at 634-35, pointing out:  "It's not as if *Gartenberg* has proved to be too hard on fund advisers. 'Subsequent litigation [after *Gartenberg*] in excessive fee cases has resulted almost uniformly in judgments for the defendants...'").  In any event, the Eighth Circuit rejected the *Gartenberg* "disproportionately large" standard in *Gallus II*, similarly noting how it could "explain why no plaintiff has ever obtained a judgment in an action brought under that provision."  561 F.3d at 823, n.4.

**C.**     **Count II States A Separate Claim Under Section 36(b) For Excess Profits Derived From A Failure to Share Economies Of Scale.**

Count II of Plaintiffs' Amended Complaint seeks damages on the theory that Defendants received and continue to receive and retain excess profits attributable to the extraordinary economies of scale in the investment management business.  Defendants request the Court dismiss Count II on the ground that it seeks recovery on a theory of liability that does not exist under Section 36(b).  Defendants' claim represents a fundamental misperception that Section 36(b) only provides a remedy for excessive fees.  But Section 36(b) is *not* limited to excessive fee claims.  Rather, it is much broader, providing a cause of action "for breach of fiduciary duty in respect to such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person."  15 U.S.C. § 80a-35(b).

The court in *Migdal* provided an implicit basis for Count II of Plaintiffs' complaint, noting the importance of an allegation regarding "excess profits from economies of scale" in the context of Section 36(b).  248 F.3d at 327.  Indeed, it is hard to understand how an adviser could not be liable for charging excessive fees in breach of its fiduciary duty where a fund adviser experiences extraordinary economies of scale in providing investment advisory services to a growing asset base, but chooses to retain the benefit of those economies of scale, rather than passing them on to the fund shareholders in any meaningful way.  This is precisely what Plaintiffs have alleged (AC ¶ 68-69, 119-121), and is the law of the Eighth Circuit.  *See Gallus I*, 370 F. Supp. 2d at 868.

**D.**     **Count III States A Separate Claim Under Section 36(b) for Excessive 12b-1 Distribution Fees.**

Count III of Plaintiffs' Amended Complaint asserts that Defendants breached their fiduciary duty by charging and receiving additional compensation in the form of distribution fees that contributed to the economies of scale that benefited only Defendants when Defendants failed

to pass along any of those benefits to Plaintiffs or the SAM Funds.  As with Count II, Defendants

also assert that Count III should be dismissed for failure to state a claim.  Plaintiffs assert that

Defendants' distribution fees are excessive and another mechanism by which they obtain

additional advisory compensation (AC ¶¶ 55-56, 123-24).  In *Meyer v. Oppenheimer Mgmt.

Corp.*, 764 F.2d 76, 83 (2d Cir. 1985), the court expressly found that "[a] claim that payments

made under Rule 12b-1 are excessive when combined with advisory fees, where both payments

are made to 'affiliated persons' of an investment adviser, is cognizable under section 36(b)."

Further, in *Gallus I*, the court found very similar allegations sufficient to survive defendants'

motion to dismiss.  370 F. Supp. 2d at 868.  This Court should likewise find that Plaintiffs'

allegations sufficiently state a claim.[14]

## IV.   ADDITIONAL MATTERS

### A.   Only Defendants PMC And PGI Are Liable Under Counts I And II Of The Complaint.

Plaintiffs agree with Defendants that only the recipients of the compensation obtained

during the course of a breach of fiduciary duty can be held liable under Section 36(b).  As such,

Plaintiffs agree that Counts I and II do not apply to Principal Funds Distributor, Inc. as it did not

receive the investment advisory fees obtained in violation of Section 36(b) under those counts.

For the same reasons, Plaintiffs also agree that Count III, relating to the distribution fees only

applies to Principal Funds Distributor, Inc.

Plaintiffs disagree however, with Defendants' assertion that Defendant Principal Global

Investors, LLC is not liable, and continue to assert that Counts I and II properly state a claim

against Principal Global Investors, LLC.  Section 36(b) allows for the recovery of compensation

---

[14] Defendants once again argue that economies of scale were shared because the fee schedules for the funds
contained breakpoints.  As discussed in Section III.B.2.b., *supra*, employing breakpoints does not mean that
economies of scale are *adequately* passed on to Plaintiffs and the funds.

gained during the course of a breach of fiduciary duty not only from an investment adviser of a

registered investment company but also from "an affiliated person of such investment advisor."

15 U.S.C. § 80a-35(b).  As Plaintiffs explained in their Amended Complaint, "PMC provides

investment advisory services to the [SAM Funds as well as the Underlying Funds] through a

portfolio manager who functions as a co-employee of PMC and PGI under an investment service

agreement" (AC ¶ 11).  Since PGI was paid — through the investment service agreement — a

portion of the compensation Plaintiffs allege PMC received as a result of breaching its fiduciary

duties to Plaintiffs, PGI was a recipient of the compensation at issue as defined in Section 36(b).

Accordingly, PGI is a properly named Defendant for Counts I and II.

**B.      The Beginning Point For Statutory Damages In A Section 36(b) Case Is One Year Prior To The Filing Of The Action.**

Plaintiffs agree with Defendants that damages can only be sought for a period beginning

one year prior to the date Section 36(b) claims were made against the investment adviser.

Accordingly, as Plaintiff Curran's original complaint was filed on October 28, 2009, the

statutory period (or the "look-back period") for her claims *begins* for the SAM Balanced

Portfolio as well as the Underlying Funds, one year prior to the filing date, *i.e.*, October 28,

2008.  With regard to Plaintiff Earp's SAM Strategic Growth Portfolio, the look-back period

begins January 15, 2009, one year prior to the filing of Plaintiffs' Amended Complaint on

January 15, 2010.[15]

However, the statutory damages period does not *end* with the filing of the complaint.

This Circuit squarely addressed this issue in *Gallus II*:  while Section 36(b) only contains a

*retrospective* limitation on damages, "where the plaintiffs have continued to suffer damage

---

[15] However, the funds the SAM Strategic Growth Portfolio invests in are a subset of those that the SAM Balanced Portfolio invests in and are, therefore, included in the Underlying Funds for which the damages period begins on October 28, 2008.

during the litigation, both the language of the statute and the interests of judicial economy suggest that redress should be available in a single action." 561 F.3d at 825.  *See also*, *Dumond v. Massachusetts Fin. Servs. Co.*, No. 04-11458-GAO, 2007 WL 602589, at *4-5 (D. Mass. Feb. 22, 2007).

## C.   Defendants' Citation To Documents Not Referenced In The Amended Complaint Does Not Convert This Motion Into A Summary Judgment Motion.

Defendants have filed a declaration with eight exhibits in support of their motion to dismiss.  Despite their arguments to the contrary, consideration of these materials does not turn Defendants' motion to dismiss into a motion for summary judgment.  *See BJC Health Sys. v. Columbia Cas. Co.*, 348 F.3d 685 (8th Cir. 2003).  As in *BJC Health System*, the only purpose for which Defendants have attached these documents is to refute specific allegations in the complaint, which at best raises a factual issue not appropriate for determination on a motion to dismiss or a motion for summary judgment.  *See id.* at 688.

Plaintiffs have attempted to respond to Defendants' factual assertions, however, without the benefit of any discovery.  Therefore, at a minimum, Plaintiffs should be permitted to conduct discovery in order to refute the allegations in Defendants' motion.  *See Layton v. U.S.*, 919 F.2d 1333, 1335-36 (8th Cir. 1990) (electing not to turn motion into one for summary judgment, noting that record was deficient and not ripe for summary judgment where discovery process had not even begun and factual contours of the case were undefined).  In any event, Defendants' arguments only highlight that there are factual disputes, rendering a motion for summary judgment inappropriate.

## V.   CONCLUSION

Applying the law of *Braden* and *Gallus II* as well as reading the Amended Complaint as a whole, Plaintiffs have alleged sufficient facts demonstrating a flaw in Principal's fee negotiation

process, that resulted in a breach of Defendants' fiduciary duty with respect to receipt of compensation. *Gallus II*, 561 F.3d at 823. Plaintiffs also have alleged sufficient facts evidencing that the end result (excess fees paid by Plaintiffs and other shareholders of the SAM Funds and the Underlying Funds), separate and apart from the flawed negotiation process, demonstrated Defendants violated their fiduciary duty with respect to the receipt of compensation. *Id.* In short, Plaintiffs' Amended Complaint provides Defendants with fair notice of Plaintiffs' Section 36(b) claims. Accordingly, Plaintiffs respectfully request the Court deny Defendants' motion to dismiss with the exception of dismissing Counts I and II against Defendant Principal Funds Distributor, Inc. and dismissing Count III against Defendants Principal Management Corporation and Principal Global Investors, LLC.

DATED February 16, 2010.

_/s/ Michael D. Woerner_
Lynn Lincoln Sarko
Michael D. Woerner
Tana Lin
Laura R. Gerber
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA  98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

David H. Goldman
Michael J. Carroll
Kodi A. Brotherson
BABICH, GOLDMAN, CASHATT &
   RENZO, P.C.
100 Court Avenue, Suite 403
Des Moines, Iowa  50309-2200
Telephone:  (515) 244-4300
Facsimile:  (515) 244-2650

***Counsel for Plaintiffs***

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on February 16, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all parties so registered.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  February 16, 2010

s/Michael D. Woerner
Michael D. Woerner
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA  98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384