IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

|  |  |  |
|---|---|---|
| JUDITH CURRAN and MICHAEL EARP, for the use and benefit of the Principal Funds, Inc. Strategic Asset Management (SAM) Balanced Portfolio, Principal Strategic Growth Portfolio, et al., | * * * * * * | 4:09-cv-00433 |
| Plaintiffs, | * * | |
| v. | * * | |
| PRINCIPAL MANAGEMENT CORPORATION, LLC, PRINCIPAL GLOBAL INVESTORS, LLC, and PRINCIPAL FUNDS DISTRIBUTOR, INC., | * * * * * * | |
| Defendants. | * * * | ORDER ON MOTION TO DISMISS |

Before the Court is Defendants', Principal Management Corporation ( "PMC"), Principal Global Investors, LLC ("PGI"), and Principal Funds Distributor, Inc. ("PFD") (collectively "Principal" or "Defendants"),  Motion to Dismiss the Amended Complaint (hereinafter "Motion to Dismiss") filed on February 2, 2010.[1]  Clerk's No. 18.  Plaintiffs, Judith Curran ("Curran")

_____

[1] Defendants have also filed two Requests for Judicial Notice.  *See* Clerk's Nos. 18-1, 28-1.  In the first, they request the Court take judicial notice of the following public records: excerpts of part two of Form N-CSR, the Annual Shareholder Reports for fiscal years ending October 31, 2008 and October 31, 2009; Form ADV, the Uniform Application for Investment Adviser Registration; excerpts of Form 485BPOS, the Amendment to Form N-1A Registration Statement for Class A, B, and C shares, filed with the United States Securities and Exchange Commission ("SEC") by Principal Funds, Inc. on February 27, 2009; excerpts of Form 485APOS, the Amendment to Form N-1A Registration Statement, filed with the SEC by Principal Variable Contract Funds, Inc. on April 27, 2009; and the Corrected Complaint filed in *Gallus v. Ameriprise Financial, Inc.*, Case No. 04-cv-04498-DWF-SRN (D. Minn.), on April 22, 2005.  Clerk's Nos. 18-1, 20, Exs. A-H.  In addition, Defendants filed a Supplemental Request for Judicial Notice of the following documents: three Complaints, each filed in a separate 15 U.S.C. § 36(b) action; excerpts of Form 485BPOS, the Amendment to Form N-1A Registration

and Michael Earp ("Earp") (collectively "Plaintiffs"), filed their Response to the Motion to Dismiss on February 22, 2010.  Clerk's No. 25.  Defendants filed a Reply in Support of the Motion to Dismiss on March 4, 2010.  Clerk's No. 28.  The Court heard oral arguments on the Motion to Dismiss on March 16, 2010.  Clerk's No. 31.  The matter is fully submitted.

## I. FACTUAL AND LEGAL ALLEGATIONS

This action challenges the compensation that Defendants received as investment advisors or distributors, pursuant to § 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-35(b).  Curran is a shareholder of the Principal SAM Balanced Portfolio.  Am. Compl. ¶ 6.  Earp is a shareholder of the Principal SAM Strategic Growth Portfolio.  *Id.* ¶ 7.  Both the Principal SAM Balanced Portfolio and the Principal SAM Strategic Growth Portfolio (collectively "the SAM Funds") are diversified portfolios within The Principal Funds, Inc. ("PFI" or "Principal family of funds"), an open-end management investment company registered under the Investment Company Act of 1940 (hereinafter "ICA").  *Id.* ¶ 8.  The SAM funds are "funds of funds," meaning that the SAM funds only invest in other mutual funds ("Underlying Funds").[2]

---

Statement for Class A, B, and C shares, filed with the SEC by Principal Funds, Inc. on February 27, 2009 and February 26, 2010; and the Morningstar Quicktake Report for the Principal SAM Balanced Portfolio dated April 10, 2008.  Clerk's No. 28-1, Exs. A-F.  Defendants state that they do not seek to convert the Motion to Dismiss into a motion for summary judgment by requesting judicial notice of these documents.  Clerk's Nos. 18-1 at 3, 28-1 at 3.  Plaintiffs have not opposed either Request for Judicial Notice.  The Court, therefore, grants the Requests and takes judicial notice of these documents.

[2]  The National Association of Securities Dealers ("NASD"), the non-governmental, self-regulatory organization of security dealers that worked closely with the SEC and was succeeded by the Financial Industry Regulatory Authority, Inc. in 2007,  *see* SEC Release No. 34-56145 (July 26, 2007), has defined a "fund of funds" as:

> an investment company that acquires securities issued by any other investment company registered under the 1940 Act in excess of the amount permitted under

*Id.* ¶ 9; Tr. at 31.  Specifically, the Principal SAM Growth Portfolio holds Institutional Class shares of fourteen other equity or fixed-income funds of the Principal family of funds:  Principal Capital Appreciation Fund (formerly the Principal West Coast Equity Fund), Principal Disciplined LargeCap Blend Fund, Principal Diversified International Fund, Principal Equity Income Fund, Principal High Yield Fund, Principal International Emerging Markets Fund, Principal LargeCap Growth Fund, Principal LargeCap Growth Fund II, Principal LargeCap Value Fund III, Principal MidCap Stock Fund, Principal Money Market Fund, Principal Short Term Income Fund, Principal SmallCap Growth Fund, and Principal SmallCap Value Fund. Am. Compl. ¶ 9.  The Principal SAM Balanced Portfolio holds Institutional Class shares in the same fourteen Underlying Funds as the SAM Strategic Growth Portfolio, as well as four additional funds:  Principal Income Fund, Principal Government & High Quality Bond Fund (formerly the Principal Mortgage Securities Fund), Principal Preferred Securities Fund, and Principal Real Estate Securities Fund.  *Id.*

Defendant PMC is a registered investment advisor under the ICA and is the investment advisor to the SAM Funds and each of the Underlying Funds.  *Id.* ¶ 10.  Defendant PGI is also a registered investment advisor under the ICA and shares a portfolio manager with PMC under an investment service agreement.  *Id.* ¶ 11.  Defendant PFD is a registered broker-dealer under the Securities and Exchange Act of 1934 and receives compensation from the Subject Funds as the

---

paragraph (A) of Section 12(d)(1) of the 1940 Act.  An "acquiring company" in a fund of funds is the investment company that purchases or otherwise acquires the securities of another investment company, and an "acquired company" is the investment company whose securities are acquired.

NASD Manual, Conduct Rules, § 2830(b)(11).

distributor and principal underwriter of the SAM Funds and the Underlying Funds.  *Id.* ¶ 12.

Plaintiffs bring this § 36(b) action on behalf of the SAM Funds and eighteen Underlying Funds (collectively "Subject Funds"), alleging that Defendants breached their fiduciary duty pursuant to § 36(b) by charging the Subject Funds advisory and distribution fees that were unfair to the Subject Funds' shareholders.  *Id.* ¶ 32.  Plaintiffs seek to either rescind the investment advisory agreements and distribution plans and to recover the total fees charged by Defendants or, in the alternative, to recover any improper compensation retained by Defendants in breach of their fiduciary duty under § 36(b).  *Id.* ¶¶ 117, 121, 125.  Plaintiffs set forth three Counts for Breach of Fiduciary Duty, pursuant to § 36(b):  (I) excessive investment advisory fees;  (II) excessive profits from economies of scale; and  (III) excessive Rule 12b-1 distribution fees and extraction of additional compensation for advisory fees.  *Id.* ¶¶ 114-25.

Defendants now move to dismiss various portions of the action on the grounds that:  (1) Plaintiffs lack statutory standing to assert the breach of fiduciary duty claims against the Underlying Funds; (2) Plaintiffs have failed to state a claim for a breach of fiduciary duty under Count I; (3) Count II is not an independent cause of action under § 36(b); (4) Plaintiffs have failed to state a claim under Count III; and (5) Defendants PGI and PFD should be dismissed from Counts I and II, and Defendants PMC and PGI should be dismissed from Count III.[3]  The Court will address each of Defendants' arguments in turn.

---

[3]  Defendants also state that Plaintiffs' claims for damages are limited by § 36(b)'s one-year statute of limitations, thus, damages are unavailable before October 28, 2008 for the SAM Balanced Portfolio, and January 15, 2009 for the SAM Strategic Growth Portfolio.  Defs.' Br. in Supp. of Mot. to Dismiss at 26-27.  Plaintiffs respond, stating that they agree with Defendants' assertion regarding § 36(b)'s one-year statute of limitations, and adding that Plaintiffs' claims for the SAM Funds and the Underlying Funds begin one-year prior to the Plaintiffs' respective filing dates.  Pls.' Resp. Br. at 27.

## II.   LAW AND ANALYSIS

### A.   *Investment Company Act of 1940*

Congress adopted the ICA in 1940 to regulate investment companies, including mutual

funds.  "A mutual fund is a pool of assets, consisting primarily of [a] portfolio [of] securities,

and belonging to the individual investors holding shares in the fund."  *Burks v. Lasker*, 441 U.S.

471, 480 (1979).  Typically, a mutual fund is created by an investment advisor, who is a separate

entity from the investment company.  *See*, *e.g.*, *Jones v. Harris Assocs. L.P.*, 130 S. Ct. 1418,

1422 (2010), *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984).  "The adviser selects the

fund's directors, manages the fund's investments, and provides other services."  *Jones*, 130 S.

Ct. at 1422.  "The investment adviser is usually affiliated with the entity that organized the

fund."  *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451, 456 (D.N.J. 2005).  Because

Congress was concerned about "the potential for abuse" in this structure, given that the

relationship between a fund and its investment adviser is "fraught with potential conflicts of

interest," Congress enacted protections for mutual fund shareholders in the ICA.  *Daily Income

Fund*, 464 U.S. at 536-38.  To further effectuate these protections, Congress amended the ICA in

1970, creating, inter alia, a fiduciary duty on the part of "the investment adviser of a registered

investment company . . . with respect to the receipt of compensation for services, or of payments

of a material nature, paid by such registered investment company, or by the security holders

thereof, to such investment adviser . . . ."  15 U.S.C. § 80a-35(b).  Congress provided that "[a]n

action may be brought under [§ 36(b) of the ICA] . . . by a security holder of such registered

investment company on behalf of such company, against such investment advisor, or any

affiliated person of such investment advisor" for breach of this fiduciary duty.  *Id.*   The ICA

places the burden of proof to show that the fees are outside the range that arm's-length bargaining would produce on the party claiming breach.  15 U.S.C. § 80a-35(b)(1).

The Supreme Court recently addressed the governing standard for § 36(b) claims in *Jones*.  *See generally* 130 S. Ct. 1418.  In *Jones*, the Supreme Court concluded that liability under § 36(b) requires that "an investment adviser [] charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Id.* at 1426.   The Supreme Court's  discussion cited with approval the standard originally set forth by the Second Circuit in *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 928-29 (2d Cir. 1982), which was subsequently adopted by numerous other federal courts.  *Id.* at 1426-28.  In *Gartenberg*, the Second Circuit noted that consideration should be given to "all facts in connection with the determination and receipt of such compensation," and it articulated six factors to determine whether an investment advisor has breached its fiduciary duty with respect to compensation, including:  (1) the nature and quality of services rendered; (2) the profitability of the fund to the investment adviser; (3) fall-out benefits; (4) economies of scale; (5) comparative fee structures; and (6) the independence of the unaffiliated directors and the care and conscientiousness with which they performed their duties.  694 F.2d at 929-30.

In *Jones*, the Supreme Court approved how the *Gartenberg* approach takes "all relevant circumstances . . . into account" and "uses the range of fees that might result from arm's-length bargaining as the benchmark for reviewing challenged fees."  130 S. Ct. at 1427.  Accordingly, fee comparisons, such as comparisons between fees charged to different clients or comparisons to the fees charged by other advisors, may be relevant to a court's analysis of a § 36(b) claim,

but are not factors on which "courts should rely too heavily." *Id.* at 1429.   In addition, the

Supreme Court noted that *Gartenberg* struck the right balance in regard to the expert role of the

investment company's disinterested directors by considering:

> the expertise of the independent trustees of a fund, whether they are fully informed
> about all facts bearing on the [investment adviser's] service and fee, and the extent
> of care and conscientiousness with which they perform their duties are important
> factors to be considered in deciding whether they and the [investment adviser] are
> guilty of a breach of fiduciary duty in violation of § 36(b).

*Id.* (quoting *Gartenberg*, 694 F.2d at 930).   Thus, "where a board's process for negotiating and

reviewing investment-adviser compensation is robust, a reviewing court should afford

commensurate deference to the outcome of the bargaining process." *Id.*   "In contrast, where the

board's process was deficient or the adviser withheld important information, the court must take

a more rigorous look at the outcome." *Id.* at 1430.   A reviewing court should not "supplant the

judgment of disinterested directors apprised of all relevant information, without additional

evidence that the fee exceeds the arm's-length range."[4] *Id.*

---

[4]   The Amended Complaint, the Motion to Dismiss and the parties' briefs were all filed
before the Supreme Court issued *Jones*.   When the parties submitted their briefs and presented
their oral arguments to the Court, the law governing this action was *Gallus v. Ameriprise
Financial, Inc.*, 561 F.3d 816 (8th Cir. 2009), and the parties structured their arguments
accordingly.   On April 5, 2010, the Supreme Court granted the petition for writ of certiorari on
*Gallus*, vacated the judgment, and remanded the case for further consideration in lights of *Jones*.
*See Ameriprise Financial, Inc. v. Gallus*, No. 09-163, 2010 WL 1265857 (U.S. Apr. 5, 2010).
Despite the change in the law governing this case, the Court does not believe that additional
briefing will aid it in addressing these matters.   Both parties have been aware that the governing
standard might be altered by the Supreme Court's disposition of *Jones* and *Gallus* and, during
oral arguments, discussed the possible implications of a change in the governing law.   *See* Defs.'
Br. in Supp. of Mot. to Dismiss at 3, n.2; Tr. at 22, 47-49, 53-56, 72.   Moreover, the standard
adopted by the Supreme Court in *Jones* is substantially similar to the standard set forth in *Gallus*,
i.e., both endorse the *Gartenberg* factors and both acknowledge the role of disinterested
directors.   While it might be argued that *Gallus* goes further than *Jones* by recognizing a § 36(b)
claim where an investment advisor's conduct during its negotiations with the board of directors
violated a duty to be honest and transparent, the Court finds that this potential nuance does not

B. *The Scope of § 36(b)'s Private Right of Action–Statutory Standing*

Plaintiffs allege that they are shareholders of SAM Funds but do not allege that they own shares in the Underlying Funds.  Am. Compl. ¶¶ 6-7.  Defendants argue that "Plaintiffs lack [statutory] standing to bring this action on behalf of, or otherwise recoup the fees charged to, the eighteen Underlying Funds because they have alleged only that they are holders of the SAM Funds."[5]  Defs.' Br. in Supp. of Mot. to Dismiss at 7 (hereinafter "Defs.' Br."); *see also* Tr. at 14-19; Defs.' Reply at 1-3.  Plaintiffs assert that they do have statutory standing, noting that § 36(b) does not distinguish between owners who hold shares through a first level fund or through a fund of funds, that they own the Underlying Funds through the SAM Funds, and that they are affected by the fees paid to the investment advisor in the same way as people who directly own shares in the Underlying Funds.[6]  Pls.' Resp. Br. at 5-6; *see also* Tr. at 57-63.

_____

affect its analysis of the present Motion to Dismiss since the core of Plaintiffs' claims is that the advisory and distribution fees were excessive under the *Gartenberg* approach.

[5]  Defendants do not challenge Plaintiffs' Article III standing to assert their claims; indeed, they concede that Plaintiffs have a credible claim to an "injury-in-fact."  Tr. at 14.

[6]  Plaintiff cites *In re American Mutual Funds Fee Litigation*, No. 04-5593, 2009 WL 5215755, at *42 (C.D. Cal. Dec. 28, 2009), for the proposition that the statute does not distinguish between owners who hold shares through a first level fund or through a fund of funds.  In *In re American Mutual Funds Fee Litigation*, the district court addressed an issue distinct from that presented in the case at bar.  *Id.*  There, the district court considered whether a plaintiff has standing to pursue a § 36(b) claim with respect to Rule 12b-1 and administrative services fees charged to *each class of shares* within various Funds, and held that share classes did not affect statutory standing.  *Id.*  This case is inapposite to the question currently before the Court.  When a single mutual fund issues different classes of shares, that is, shares that offer varying fee and expense structures, each shareholder, regardless of the class of shares that shareholder owns, unarguably holds security in that mutual fund.  *See* U.S. Securities and Exchange Commission, Mutual Fund Classes, http://www.sec.gov/answers/mfclass.htm (describing mutual fund classes) (last visited May 27, 2010).  Because Plaintiffs here have not asserted that they are shareholders in the Underlying Funds, the Court concludes that the analysis in *In re American Mutual Funds Fee Litigation* does not bear on the dispute presently before the Court.

Section 36(b) creates a narrow fiduciary duty on the part of a registered investment company's investment advisor.  15 U.S.C. § 80a-35(b).  Specifically,

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.

*Id.*  A private plaintiff may bring an action under § 36(b) on behalf of a registered investment company against its investment adviser, provided that the plaintiff is "a security holder of such registered investment company."  *Id.*  To determine whether a person who owns shares in a fund of funds has statutory standing to sue on behalf of the acquired fund, as well as the acquiring fund, a question apparently of first impression, the Court begins by analyzing the statutory language, in particular, the terms "security" and "security holder."

The ICA defines "security" broadly, including "any note, stock, treasury stock, [or] security future . . . ," as well as "any group or index of securities (including any interest therein or based on the value thereof)," and "participation in . . . any of the foregoing."[7]  15 U.S.C. §80a-

---

[7] The complete statutory definition of "security" in the ICA states:

"Security" means any note, stock, treasury stock, security future, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security (including a certificate of deposit) or on any group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

2(36).  It is undisputed that shares in a mutual fund, including shares in a mutual fund that is

structured as a fund of funds, fall squarely within the definition of "security" for the purposes of

the ICA.  Given the breadth of the statutory definition of "security," including "any interest" in

"any group of securities," it appears that Plaintiffs' financial interest in the Underlying Funds

qualifies as a "security" under the ICA.

Regarding the phrase "security holder," neither the term "holder" nor the phrase "security

holder" is defined in the ICA.  The Court, thus, looks to the plain meaning of "holder" and any

specialized definitions that might apply to the term "security holder."  A review of several

dictionaries published in the late 1960s indicates that the term "holder," when referring to a

person, most commonly connotes a "possessor" or "owner."  *See* Webster's Third New

International Dictionary 1079 (1969) (listing the primary definition of "holder" as "one that

holds something as a (1): possessor; owner . . . b: a person in possession of and legally entitled to

receive payment of a bill, note, or check . . . . "); Am. Heritage Dictionary of the English

Language 62 (1969) (defining "holder" as: "1.  A person who holds something . . . 3.  One who

possesses something; an owner. . .  4.  *Law*.  One who legally possesses and is entitled to the

payment of a check, bill, or promissory note"); Black's Law Dictionary 576 (4th ed. 1968)

(defining "holder" as "1. something to hold a thing with. 2. one who has the ownership,

possession, or use of something; an owner; a tenant. 3.  *Law*. one who has a legal right to

enforce a negotiable instrument").  The Court was unable to locate a specialized trade definition

of the term "security holder," and neither party has offered any citations to support their

interpretation of the term.  Integrating the statutory definition of "security" and the common

---

15 U.S.C. §80a-2(36).

dictionary meaning of "holder," the Court finds that "security holder" for the purposes of the ICA is quite broad, and is significantly more expansive than the constricted definition proposed by Defendants under which a private plaintiff would be required to be a direct shareholder in the mutual fund at issue.  Indeed, a broad interpretation of  "security holders" for the purposes of a § 36(b) claim accords with the well-established principle that statutes regulating the sale of securities are to be liberally construed to effectuate the purpose of the statutes.  *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990) (discussing the breadth of the definition of "security" in the Securities Act of 1934, which mirrors the definition of "security" in the ICA and the Securities Act of 1933); *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 353-55 (1943); *cf. Van Dyke v. Coburn Enters., Inc.*, 873 F.2d 1094, 1097 (8th Cir. 1989) ("The 1933 Securities Act is an attempt to provide a remedy for investment fraud and should be, therefore, liberally construed."); *Greater Iowa Corp. v. McLendon*, 378 F.2d 783, 795 (8th Cir. 1967) ("[I]t is well recognized that the securities and exchange legislation has broad remedial purposes for protection of the investing public and should be liberally construed.").

Looking beyond the phrase "security holder," the Court has closely examined the entirety of § 36(b), the ICA as a whole, and the legislative history of § 36(b), and has found no indication that "security holder" for the purpose of § 36(b) claims should be limited to a direct shareholder of the registered investment company.  *See* H.R. Rep. No. 91-1382, at 7-8, 36-38 (1970);  S. Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901-02, 4909-11.  Rather, earlier, proposed versions of § 36(b) used the term "shareholder" to refer to the private plaintiffs who could bring a § 36(b) claim.  *Compare* H.R. Rep. No. 91-1382, at 7-8 (using "bona fide shareholder") *and* S. Rep. No. 91-184, *reprinted in* 1970 U.S.C.C.A.N. at 4901-02, 4909-11

(referring to a "shareholder") *with* Act of Dec. 14, 1970, Pub. L. 91-547, 84 Stat. 1413, 1428-1430 (enacting the current provision using the term "security holder").  There is no discussion in the conference report to explain why the broader term "security holder" was substituted for "shareholder," but it is apparent that Congress was cognizant that it could have adopted narrower language that would have limited the scope of the § 36(b) private right of action but, instead, opted to give all "security holder[s]" the ability to institute such suits.  *See* Conf. Rep. No. 91-1631, *reprinted in* 1970 U.S.C.C.A.N. 4943, 4897 (Nov. 25, 1970).

The Court also notes that in 1970, when amending the ICA to add § 36(b), Congress also added provisions at § 12(d)(1) that limited the establishment of funds of funds.  Act of Dec. 14, 1970, Pub. L. 91-547, 84 Stat. 1413, 1417-19.  Congress was cautious in permitting the establishment of funds of funds because of past abuses by the investment industry that had prompted the initial enacting of the ICA in 1940.  *See* H.R. Rep. No. 91-1382, at 10-11, 23-25.  A fund of funds was limited to highly restrictive circumstances, though the United States Securities and Exchange Commission ("SEC") could, and did, grant individual exemptions from those restrictions.  *See* Fund of Funds Investments, Proposed Rules, 68 Fed. Reg. 58,266, 58,228 (Oct. 8, 2003); *see also* Fund of Funds Investments; Final Rule, SEC Release No. 33-8713, at 6 (June 27, 2006).  In 1996, Congress amended the ICA again to add a provision, which is currently codified at § 12(d)(1)(G) of the ICA, allowing the creation of a fund of funds constructed solely of funds that are "part of the same group or family of investment companies." *See* H.R. Rep. No. 104-864, at 12-13 (1996); S. Rep. No. 104-293, at 22 (1996).  This structure is analogous to the structure of the Principal family of funds, though PFI is registered as a single investment company, rather than as several different investment companies.  Notably, when

Congress debated and passed the 1996 amendments allowing funds composed wholly of affiliated funds, it did not make any changes to the private right of action provision under § 36(b).  *See generally* H.R. Rep. No. 104-864; S. Rep. No. 104-293.

Finally, the Court observes that the Supreme Court in *Gollust v. Mendell* reached a similar conclusion regarding the breadth of statutory standing under an analogous securities statute.  In *Gollust*, holders of securities brought an insider trading action against corporate entities and partners, pursuant to § 16(b) of the Securities Exchange Act of 1934.  501 U.S. 115, 118-21 (1991).  The Supreme Court observed that § 16(b) provides that "a '[s]uit to recover [an insider's] profit may be instituted . . . by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer . . . ."  *Id.* at 121 (quoting 15 U.S.C. §78p(b)).  The defendants argued that the plaintiff shareholders did not have statutory standing to assert the insider trading claim because the plaintiffs did not continue to hold stock of the issuer.  The Supreme Court held that because the plaintiff had "an adequate financial stake" in the parent corporation of the issuer, the plaintiff satisfied the statutory requirements for a private enforcement action.  *Id.*  In support of its conclusion, the Supreme Court noted that "[t]he only textual restrictions on the standing of a party to bring suit under § 16(b) are that the plaintiff must be the 'owner of [a] security' of the 'issuer' at the time the suit is 'instituted.'"  *Id.* at 122-23.  Significantly, the Court observed that "§ 16(b) places no significant restriction on the type of security adequate to confer standing," and that "'any security' will suffice."  *Id* at 123.

Based on the statutory language of § 36(b), the legislative history of the ICA, and similar analysis in persuasive case law, the Court concludes that § 36(b) creates a private right of action for all "security holders" in the registered investment company, including persons who possess

an interest in a mutual fund that is acquired through a fund of funds, such as Plaintiffs have in the present case.

Defendants present a second argument, premised on the presumption that Plaintiffs are not "security holders" in the Underlying Funds.  Defs.' Reply at 2. Defendants assert that where a single registered investment company issues shares in more than one separate pool of assets, such that each pool of assets is identified as a separate "series" or "portfolio" within the registered investment company, that "for all practical purposes," each series or portfolio is a "separate mutual fund[]" and should be treated as a separate "registered investment company."[8] *Id.*  Having concluded that Plaintiffs are indeed security holders in the Underlying Funds, it is

_____

[8] In support of its arguments, Defendants cite the following cases in which courts have held that plaintiffs lacked the requisite statutory standing to bring a § 36(b) claim against a mutual fund because the plaintiff did not own shares in the particular mutual funds:  *In re Mutual Fund Investments Litigation*, 519 F. Supp. 2d 580, 588-590 (D. Md. 2007), *In re American Mutual Funds Fee Litigation*, No. CV 04-5593, 2005 WL 3989803, at *1 (C.D. Cal. Dec. 16, 2005), *Stegall v. Ladner*, 394 F. Supp. 2d 358, 362 (D. Mass. 2005), and *Williams v. Bank One Corp.*, No. 03 C 85621, 2003 WL 22964376, at *1 (N.D. Ill. Dec. 15, 2003).  These cases are inapposite because, in each, the plaintiffs owned shares in some mutual funds within a family of funds issued by a single investment company, but did not own any interest in other funds in the family of funds.  In each case, the reviewing court concluded that the plaintiffs did not have standing to pursue their action on behalf of the entire family of funds.  Here, Plaintiffs hold a financial interest in each of the Underlying Funds by virtue of their ownership in the SAM Funds.  None of the cases cited by Defendants addressed whether an owner of a fund of funds that acquires shares of other funds within the same family of funds offered by that investment company has standing to bring a private action on behalf of the acquired funds, as well as the acquiring fund.

Defendants also cite *Untermeyer v. Valhi, Inc.*, 665 F. Supp. 297, 299-300 (S.D.N.Y. 1987) which addressed an issue of statutory standing under § 16(b) of the Securities Exchange Act of 1934.  In *Untermeyer*, the district court focused on the derivative nature of a § 16(b) action and framed the issue before it as "whether a shareholder of a corporation which owns all of the stock of an existing issuer has standing to bring a section 16(b) suit for recovery of short swing profits."  *Id.* at 299.  That court held that the language of § 16(b) did not extend standing "to a shareholder of the parent corporation of a surviving issuer."  *Id.* at 301.  Again, the Court finds Defendants' analogy to *Untermeyer* misplaced.  Plaintiffs here pleaded facts that qualify them as "security holders" in the disputed funds.

not necessary to further examine Defendants' subsidiary proposition that the term "such registered investment company" should be read more narrowly than its plain meaning.  In the circumstances of this case, the Court concludes that Plaintiffs have statutory standing to bring a § 36(b) action on behalf of both the SAM Funds and the Underlying Funds.

## C.  *Failure to State a Claim*

Dismissal under Federal Rule of Civil Procedure 12(b)(6) is proper where a plaintiff's complaint fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "In reviewing the complaint, the Court must 'accept as true all of the factual allegations contained in the complaint.'"  *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).  "All reasonable inferences from the complaint must be drawn in favor of the plaintiff."  *Id.*

A viable complaint must include "enough facts to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1939, 1949 (2009) (citing *Twombly*, 550 U.S. at 570).

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

*Twombly*, 550 U.S. at 570.  "The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility.'  It is not, however, a 'probability requirement.'"  *Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Iqbal*, 129 S. Ct. at 1949).

The *Iqbal* court described a "two-pronged approach" for evaluating complaints

challenged under Rule 12(b)(6).  *Iqbal*, 129 S. Ct. at 1949-50.  First, a court should divide the allegations between factual and legal allegations; factual allegations should be accepted as true, but legal allegations should be disregarded.  *Id.*  Second, the factual allegations must be parsed for facial plausibility.  *Id.* at 1950.

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged . . . .  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* at 1949 (citing *Twombly*, 550 U.S. at 570).  However, "a defendant is not entitled to dismissal if the facts are merely consistent with lawful conduct."  *Braden*, 588 F.3d at 597.  "Requiring a plaintiff to rule out every possible lawful explanation for the conduct he challenges would invert the principle that the complaint is construed most favorably to the nonmoving party, and would impose the sort of probability requirement at the pleading stage which *Iqbal* and *Twombly* explicitly reject."  *Id.* (internal quotations and citations omitted).

A court will "draw on its judicial experience and common sense" when determining whether a complaint states a plausible claim for relief.  *Iqbal*, 129 S. Ct. at 1949.  In doing so, the court may consider other, more likely explanations for the acts described in the complaint when determining whether the pleaded factual allegations give rise to a plausible entitlement to relief.  *Id.* at 1950-51.  But, it must always be mindful that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and 'that a recovery is very remote and unlikely.'"  *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).  Additionally, "while a plaintiff must offer sufficient factual allegations to show that he or she is not merely engaged in a fishing expedition or strike suit, [a

court] must also take account of [his or her] limited access to crucial information." *Braden*, 588

F.3d at 597.

      1.    *Count I: "Excessive fees."*

Defendants first argue that Count I of the Amended Complaint is composed of

generalized criticisms of the mutual fund industry as a whole and lacks sufficiently detailed

factual allegations to survive Defendants' Rule 12(b)(6) Motion.  Plaintiffs counter by pointing

to numerous factual allegations in the pleading.

The 52 page, 125 paragraph Amended Complaint contains substantial amounts of

extraneous information, but among the many generalized statements about the mutual fund

industry, the Amended Complaint contains numerous factual allegations specific to Defendants

that support Plaintiffs' § 36(b) claim.  In particular, Plaintiffs describe four layers of fees that are

charged for the management of the SAM Funds.  Am. Compl. ¶ 40.

> The first layer is the fees paid to the advisor of the SAM Funds itself, *i.e.*, Defendant
> PMC.  The second layer is the fees paid by PMC to the sub-advisor of the SAM
> Funds, *i.e.*, Edge. The third layer is the fees paid by the SAM Funds to the advisor
> of each Underlying Fund, *i.e.*, Defendant PMC once again.  The fourth layer is the
> fees paid by PMC as the advisor of the Underlying Fund to the sub-advisor of that
> Underlying Fund . . . .

*Id.*  Plaintiffs allege that this layered fee structure results in excessive fees.  *Id.* ¶¶ 48-59, 51.

In addition, Plaintiffs assert that "[a] basic problem with the SAM Funds as well as the

Underlying Funds is that they are grossly over-priced for the services they provide."  *Id.* ¶ 70.

Plaintiffs detail the advisory fees charged by PMC and the subadvisors, showing that PMC

collects substantially higher fees than the subadvisors from each of the Subject Funds.  *Id.* ¶¶

44, 45.  Plaintiffs then allege:

On information and belief, the accounting and corporate administrative type services

included in the Management Agreement are a very small percentage of the expenses incurred under the agreement as transfer agency costs are typically by far the largest component of administrative costs but are provided to the Subject Funds pursuant to a separate contract with Principal Shareholder Services, Inc. (PSI), a wholly owned subsidiary of PMC.

*Id.* ¶ 46.  Plaintiffs assert that "Defendants provide little, if any, additional advisory services beyond hiring the sub-advisor (in all instances, subsidiaries of Defendants except for two Underlying Funds), and the non-advisory services called for in the Management Agreement account for a very small percentage of the expenses to the advisor."  *Id.* ¶ 73.  "Further, upon information and belief, while Defendants negotiated significantly lower rates over the years for themselves while simultaneously demanding additional services from the sub-advisors for those lower rates, Defendants only added immaterial breakpoints to the fees it charged the shareholders of the Subject Funds."  *Id.* ¶ 74.  Plaintiffs also assert that the advisory fees charged by PMC significantly outpaced the advisory fees collected by the subadvisors[9] of the SAM Funds and the Underlying Fees, as well as some of Defendants' competitors.  *Id.* ¶¶ 73-75, 78-81.  In addition, Plaintiffs highlight the fact that Defendants charge their institutional clients lower fees for services that Plaintiffs allege are similar, though not identical, to the services provided to the Subject Funds.  *Id.* ¶¶ 76, 85-87.  Plaintiffs urge that "economies of scale exist not only fund by fund but also exist with respect to an entire fund complex and even with respect to an investment advisor's entire scope of operations, including services provided to institutional and other clients."  *Id.* ¶ 66.

While some of the paragraphs in the pleading are generic and lack particulars, the

---

[9]  A subadvisor is an investment advisor to whom PMC has "subcontract[ed] the stock picking and the asset allocation."  Tr. at 17, 30.

Amended Complaint more than adequately states a § 36(b) claim against PMC.  As previously noted, the Supreme Court in *Jones* approved the *Gartenberg* factor approach.  *Jones*, 130 S. Ct. at 1426.  Thus, Plaintiffs need not make a conclusive showing of each of the *Gartenberg* factors but, instead, may state a § 36(b) claim by alleging any combination of facts that plausibly support an inference that a particular fee, given all of the surrounding facts and circumstances, is disproportionately large to the services rendered in exchange for that fee.  Plaintiffs' allegations that PMC charges more than the subadvisors, who allegedly provide the bulk of investment advice, that the charges do not reflect the benefits derived from economies of scale, and that other institutional clients pay less for the same services, all support a reasonable inference that PMC collected excessive fees for its investment advising services of the Subject Funds.

Defendants also attack the substance of Plaintiffs factual allegations, by asking the Court to review additional information that they are submitting with their Motion to Dismiss and asserting that Plaintiffs' allegations are implausible or inaccurate in light of this additional information.  *See* Defs.' Br. at 9-23.  For example, in regard to Plaintiffs' allegations that the Board of Directors was not independent and lacked conscientiousness when reviewing the fees paid by each Subject Fund, Defendants ask the Court to review "publicly disclosed detailed explanations of the steps taken in setting fees" and "credit the presumption that these directors are doing their jobs with respect to overseeing the fees paid by the SAM funds."  *Id.* at 11.  Defendants also dispute whether the SAM Funds shareholders actually benefitted from economies of scale, and whether the nature and the quality of the services provided to the Funds warranted the fees charged by PMC.  *Id.* at 16-18, 20-21.  These arguments ask the Court to engage in a factual inquiry that would be inappropriate in the context of a Rule 12(b)(6) motion,

where the Court must take Plaintiffs' factual allegations as true and make all reasonable inferences in favor of Plaintiffs. Indeed, Defendants' arguments here, raising what appear to be fact-intensive inquiries, suggests that resolution of the § 36(b) claim against PMC is unlikely even at the summary judgment stage of litigation.

Also, in regard to Count I, Defendants argue that Defendants PGI and PFD should be dismissed because only PMC received relevant advisory fees. Defs.' Br. at 25. Plaintiffs agree that Count I does not apply to PFD, but maintain that Count I properly states a claim against PGI. Pls.' Resp. Br. at 26; *see also* Tr. at 69. Plaintiffs argue that PGI is properly named as a Defendant in Count I because it is "an affiliated person of [the] registered investment advisor . . . [s]ince PGI was paid–through the investment service agreement–a portion of the compensation Plaintiffs allege PMC received as a result of breaching its fiduciary duties to Plaintiffs." Pls.' Resp. Br. at 26 (citing 15 U.S.C. § 80a-35(b)). In support of their argument, Plaintiffs point to the allegation that "PMC provides investment advisory services through a portfolio manager who functions as a co-employee of PMC and PGI, under an investment service agreement." Pls.' Resp. Br. at 27 (quoting Am. Compl. ¶ 11). The Court is unpersuaded by Plaintiffs' argument.

Section 36(b) makes clear that no person, including no person who affiliates with the "registered investment advisor," will be subject to liability under § 36(b) absent an allegation that such person was the recipient of the compensation paid for the investment advisory services. 15 U.S.C. § 80a-35(b)(3) ("No such action shall be brought or maintained against any person other than the recipient of such compensation or payments, and no damages or other relief shall be granted against any person other than the recipient of such compensation or payments."); *see also In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 598-99 (S.D.N.Y.

2006) ("[T]o survive a motion to dismiss, the § 36(b) claim must plead facts that proper

defendants (i.e., either an investment adviser or an affiliated person to the investment adviser . .

.) received compensation, which violates the ICA."); *Levy v. Alliance Capital Mgmt. L.P.*, No.

97 Civ. 4672(DC), 1998 WL 744005, at *3 (S.D.N.Y. Oct. 26, 1998) ("[A]bsent an allegation

that it received compensation for investment advisory services itself, [an affiliated person]

simply is not subject to liability under § 36(b) . . . ."). Even making all reasonable inferences in

favor of Plaintiffs, the mere fact that PGI and PMC shared a co-employee is insufficient to

support a plausible claim that PMC passed on the monies it collected from the Subject Funds for

investment advice to PGI. The Amended Complaint contains no other allegations regarding PGI

that would suggest that PMC passed investment adviser fees that it collected from the Subject

Funds on to PGI or that PGI collected compensation from the Subject Funds as an affiliated

person.[10] Accordingly, PGI is dismissed as a named Defendant from Count I.

      2.     *Count II–"Excess profits from economies of scale."*

      Count II alleges that Defendants PMC and PGI received and retained excess profits from

economies of scale and, thus, violated the breach of fiduciary duty set forth in § 36(b).[11] Am.

Compl. ¶ 119-20. Defendants challenge Count II, arguing that it should be dismissed because it

is not an independent cause of action under § 36(b). Defs.' Br. at 23. In response, Plaintiffs cite

*Migdal v. Rowe Price-Fleming International, Inc.*, 248 F.3d 321, 327 (4th Cir. 2001), asserting

---

     [10] As Defendants rightly observe, Plaintiffs alleged that PGI received compensation for
investment advice as a subadvisor to six of the eighteen Underlying Funds, but Plaintiffs clearly
disavowed any § 36(b) challenge regarding the fees paid to the subadvisors. Am. Compl. ¶ 40,
44.

     [11] Plaintiffs stated at oral argument: "Counts I and II only apply to PMC and PGI." Tr.
at 69.

that "*Migdal* provided an implicit basis for Count II" by "noting the importance of an allegation regarding 'excess profits from economies of scale' in the context of Section 36(b)."  Pls.' Resp. Br. at 25.  The Court does not agree.  First, the *Midgal* court simply evaluated the presence of excess profits from economies of scale when considering whether "the fees the investment advisers received from the fund were so disproportionately large that they bore no reasonable relationship to the services rendered."  248 F.3d at 326.  At no point does the discussion in *Migdal* suggest that "excess profits from economies of scale" provides an independent cause of action.  *Id.*  Moreover, in *Jones*, the Supreme Court made clear that the basis of liability under § 36(b) is "a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  130 S. Ct. at 1426.  The existence of excess profits from economies of scale may affect a factfinder's assessment of whether the investment advisor's fee is disproportionately large, but it is not the ultimate question presented in a § 36(b) claim.  Because the existence of "excess profits from economies of scale" does not provide an alternative, independent basis for a § 36(b) claim, Count II will be dismissed.

    3.    *Count III–"Excessive Rule 12b-1 distribution fees and extraction of additional compensation for advisory services."*

In Count III of the Amended Complaint, Plaintiffs challenge the Rule 12b-1 distribution fees collected by PFD from the Subject Funds for marketing, selling, and distributing mutual fund shares to new shareholders.[12]  Am. Compl. ¶¶ 52-59, 124.  Specifically, Plaintiffs allege that the distribution fees collected by PFD are excessive under § 36(b) because the shareholders of

---

[12]  Plaintiffs agree with Defendants' assertion that Count III is properly asserted only against PFD.  Tr. at 69 (Pls.:  "The Count III only applies against PFD.").

the Subject Funds pay for marketing, selling, and distributing the Subject Funds, yet the monetary benefits derived from attracting new shareholders largely accrue to Defendants, not the existing shareholders. *Id.* at ¶ 55. In addition, Plaintiffs suggest that the distribution fees are excessive because they are based on the net asset value of the Subject Funds, rather than the distribution activity, i.e., the number of shares sold. *Id.* ¶ 56. Thus, Plaintiffs assert that "any portion of the fees paid to [PFD] that are derived from market increases in the net asset value of the fund rather than any distribution activity by [PFD] constitutes additional and excessive compensation for advisory services." *Id.* Plaintiffs further allege that PFD received distribution fees in excess of $25 million from the SAM Balanced Portfolio and $13 million from the SAM Strategic Growth Portfolio in the fiscal year 2008. *Id.* ¶ 57. Plaintiffs argue that the excessive distribution fees represent additional compensation for advisory services and, thus, are subject to a § 36(b) claim. *Id.* ¶ 55 (citing *Meyer v. Oppenhiemer Mgmt. Corp.*, 895 F.2d 861, 866 (2d Cir. 1990) (holding that a security holder can bring a § 36(b) action to recover excessive distribution fees)); *see also* Pls.' Resp. Br. at 26.

Defendants challenge Count III, first, arguing that the Amended Complaint presents overly generalized attacks on the industry practice of charging distribution fees and, second, arguing that Plaintiffs' allegations regarding the economy of scale benefits are contradicted by other allegations in the Amended Complaint and in the SAM Funds' public filings. Defs.' Br. at 24-25. After a close reading of the Amended Complaint, the Court concludes that Count III survives the Rule 12(b)(6) Motion. While the factual allegations regarding the distribution fees are brief in comparison to Plaintiffs' lengthy allegations regarding PMC's advisory fees, the Court, nonetheless, finds that Plaintiffs have met their burden by alleging that fees collected by

PFD for its distribution services surpassed the value of those services, and that the manner in which those fees were assessed did not correspond to the type of services performed but, rather, resemble fees collected for advisory services.  It would be improper for the Court to engage in a factual inquiry regarding the sufficiency of the respective funds' declining breakpoints, even if the adequacy of the breakpoints was the sole basis for the allegations set forth in Count III, which, to the Court's reading, it is not.  Taking the facts alleged as true, the allegations set forth in Count III are sufficient to raise an inference that the distribution fees collected by PFD were additional and excessive compensation for advisory services subject to a § 36(b) claim.

### III.  CONCLUSION

For the reasons stated herein, Defendants' Motion to Dismiss is GRANTED in part and DENIED in part.  Clerk's No. 18.  More specifically, Defendants' Motion to Dismiss is GRANTED in regard to Count II, but DENIED as to Counts I and III.  In addition,  Principal Global Investors, LLC is DISMISSED as a Defendant.

IT IS SO ORDERED.

Dated this ___8th___ day of June, 2010.

_____
ROBERT W. PRATT, Chief Judge
U.S. DISTRICT COURT