**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| JUDITH CURRAN and MICHAEL EARP, for the use and benefit of the Principal Funds, Inc. Strategic Asset Management (SAM) Balanced Portfolio, Principal SAM Strategic Growth Portfolio, Principal Government & High Quality Bond (F/K/A Principal Mortgage Securities Fund, Principal Income Fund, Principal High Yield Fund, Principal Preferred Securities Fund, Principal Short Term Income Fund, Principal Equity Income Fund, Principal LargeCap Growth Fund II, Principal LargeCap Growth Fund, Principal Disciplined LargeCap Blend Fund, Principal LargeCap Value Fund III, Principal Capital Appreciation Fund (F/K/A Principal West Coast Equity Fund), Principal MidCap Blend Fund, Principal SmallCap Growth Fund, Principal SmallCap Value Fund, Principal Diversified International Fund, Principal International Emerging Markets Fund, Principal Money Market Fund, and Principal Real Estate Securities Fund | Case No. <br><br> ECF Case |
| Plaintiffs, <br> v. <br><br> PRINCIPAL MANAGEMENT CORPORATION and PRINCIPAL FUNDS DISTRIBUTOR, INC. <br> Defendants. | |

**SECOND ANNIVERSARY COMPLAINT**

**I.    INTRODUCTION**

Plaintiffs file this nearly identical Anniversary Complaint on the two year anniversary of

the filing of their original Complaint, *Curran, et al. v. Principal Management Corporation, et*

*al.*, Civ. No. 09-433, S.D. Iowa (J. Pratt).[1]  The Eighth Circuit previously held that "the damage limitation yields only a retrospective limitation . . . [so] where the plaintiffs have continued to suffer damage during the litigation, both the language of the statute and the interests of judicial economy suggest that redress should be available in a single action," *Gallus v. Ameriprise Fin., Inc.*, 561 F.3d 816, 825 (8th Cir. 2009), and Plaintiffs' original complaint in this matter alleges continuing violations of the Investment Company Act.  However, as the *Gallus* decision was vacated, albeit on other grounds, 130 S. Ct. 2340 (2010), and Defendants have asserted as their Tenth Affirmative Defense in the original action that the Investment Company Act "limits recovery of any damages to those incurred during the period one year before the institution of the action," Plaintiffs file this Anniversary Complaint out of an abundance of caution.  For the Court's convenience, new, modified, and/or updated information from the Amended Complaint is underlined in this Anniversary Complaint.[2]

With this Complaint, Plaintiffs seek to rescind the investment advisory agreements and distribution plans and to recover the total fees charged by Defendants or, alternatively, to recover any improper compensation retained by Defendants in breach of their fiduciary duty under Section 36(b) of the Investment Company Act of 1940, as amended, 15 U.S.C. § 80a-35(b). Because the conduct complained of herein is continuing in nature, Plaintiffs seek recovery for a

---

[1] Plaintiffs subsequently filed an Amended Complaint on January 15, 2010 to which Defendants filed an Answer on July 8, 2010.  Plaintiffs also filed an Anniversary Complaint on October 28, 2010.  The underlined changes reflect changes between the Second Anniversary Complaint and the Amended Complaint.

[2] Principal Global Investors, LLC ("PGI") was a defendant in the original complaint but is not included in this Second Anniversary Complaint as the Court dismissed PGI as a defendant.  *Curran v. Principal Mgmt. Corp.*, No. 4:09-00433, 2010 WL 2889752, at *10 (S.D.Iowa June 8, 2010).  For the same reason, a count alleging a breach of fiduciary duty based upon excess profits from economies of scale (Count II of the original Complaint) is not included in this Second Anniversary Complaint.  *Id.*

period commencing at the earliest date in light of any applicable statute of limitations through the date of final judgment after trial.  Plaintiffs allege:

## II.   JURISDICTION AND VENUE

1.      This action is a derivative action brought by Plaintiffs on behalf of the Principal SAM Balanced Portfolio, the Principal SAM Strategic Growth Portfolio, and the underlying funds in each portfolio (collectively "the Subject Funds" or the "Funds").[3]

2.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

3.      Venue is proper in this judicial district pursuant to 15 U.S.C. § 80a-43 and 28 U.S.C. § 1391(b)(2)-(3).  Defendants are inhabitants of or transact business in this district, a substantial part of the events or omissions that give rise to Plaintiffs' claims occurred in this district, and Defendants may be found in this district.

4.      No pre-suit demand on the board of directors of the Funds is required, as the requirements of Fed.R.Civ.P. 23.1 do not apply to actions under § 36(b) of the ICA.  *Daily Income Fund v. Fox*, 464 U.S. 523 (1984).

5.      All conditions precedent have been performed or have occurred.

## III.   PARTIES

**A.     The Plaintiffs**

6.      Plaintiff Judith Curran is a resident of Kensington, California and is a shareholder at all relevant times of the Principal SAM Balanced Portfolio.

---

[3] On January 24, 2011, the Court dismissed from the Amended Complaint the claims relating to the fees charges in connection with the Underlying Funds.  Plaintiffs' moved for reconsideration of the January 24th order, and the Court denied Plaintiffs' request on March 4, 2011.  As Plaintiffs respectfully disagree with the Court's order regarding the Underlying Funds, they include claims regarding the Underlying Funds in this Second Anniversary Complaint out of an abundance of caution in the event this issue of first impression is resolved in a different manner by an appellate court at a future date.

7.     Plaintiff Michael Earp is a resident of Middletown, Rhode Island and is a shareholder at all relevant times of the Principal SAM Strategic Growth Portfolio.

**B.     The Funds**

8.     The Principal SAM Balanced Portfolio and the Principal SAM Strategic Growth Portfolio are diversified portfolios of Principal Funds, Inc. ("PFI"), an open-end management investment company registered under the Investment Company Act of 1940, as amended, that was originally organized as a Maryland corporation.

9.     The Principal SAM Balanced Portfolio, as well as the Principal SAM Strategic Growth Portfolio (collectively "the SAM Funds"), are both fund of funds or mutual funds which invest in other mutual funds.  While some fund of funds invest in mutual funds outside of the parent advisory company, the SAM Funds only invest in and hold Institutional Class shares of other equity or fixed-income funds of the Principal family of funds ("Underlying Funds").  Therefore, each of the Underlying Funds is a series of PFI.  The Underlying Funds of the Principal SAM Strategic Growth Portfolio are:  Principal Capital Appreciation Fund (formerly the Principal West Coast Equity Fund), Principal Disciplined LargeCap Blend Fund, Principal Diversified International Fund, Principal Equity Income Fund, Principal High Yield Fund, Principal International Emerging Markets Fund, Principal LargeCap Growth Fund, Principal LargeCap Growth Fund II, Principal LargeCap Value Fund III, Principal MidCap Blend Fund,[4] Principal Money Market Fund, Principal Short Term Income Fund, Principal SmallCap Growth Fund, Principal Real Estate Securities Fund, and Principal SmallCap Value Fund.  The Principal SAM Balanced Portfolio consists of the same fifteen Underlying Funds of the SAM Strategic Growth Portfolio and three additional Underlying Funds:  Principal Income Fund, Principal

---

[4] At the time of the filing of the original Complaint, the Underlying Funds included the Principal MidCap Stock Fund.  However, the Principal MidCap Stock Fund merged into the Principal MidCap Blend Fund effective October 23, 2009.

Government & High Quality Bond Fund (formerly the Principal Mortgage Securities Fund), and Principal Preferred Securities Fund.  Hereinafter, "the Subject Funds" denotes both the SAM Funds and the Underlying Funds jointly.

## C.   Defendants

10.     Defendant Principal Management Corporation ("PMC") is an Iowa corporation with its principal place of business in Des Moines, Iowa.  PMC is registered as an investment advisor under the Investment Advisers Act of 1940.  PMC is the investment advisor to the SAM Funds and provides or arranges for advisory and some administrative services through a management agreement.  PMC also is the investment advisor to each Underlying Fund.  PMC is a direct wholly owned subsidiary of Principal Financial Services, Inc. ("PFS") and an indirect subsidiary of Principal Financial Group, Inc. ("PFG").  PFS is an Iowa holding company which, in turn, is a wholly owned direct subsidiary of PFG.  PFG is a holding company incorporated in Delaware which began offering mutual funds in 1969.  Defendant PMC contracts with Edge Asset Management, Inc. ("Edge"), to act as the sub-advisor for the SAM Funds.  Edge is a Washington corporation with its principal place of business in Seattle, Washington.  Edge is registered as an investment advisor under the Investment Advisers Act of 1940.  In addition to the SAM Funds, PMC contracts with Edge to act as the sub-advisor for six of the eighteen Underlying Funds:  Principal Capital Appreciation Fund, Principal Equity Income Fund, Principal High Yield Fund, Principal Income Fund, Principal Government & High Quality Bond Fund, and Principal Short Term Income Fund.

11.     Defendant Principal Funds Distributor, Inc. ("Principal Distributor"), is a Washington corporation with its principal place of business in Des Moines, Iowa.  Principal Distributor is a registered broker-dealer under the Securities and Exchange Act of 1934, is

affiliated with the Principal Financial Group, and receives compensation from the Subject Funds as the distributor and principal underwriter of the Subject Funds.

## IV.   BACKGROUND

12.     Plaintiffs are shareholders of the SAM Funds, which are sold, advised, and managed with other funds as part of a fund family or complex of funds by Defendants (the "Principal Complex" or the "Fund Complex").

13.     Defendants, as the underwriters, distributors, advisors, and control persons of the SAM Funds as well as the Underlying Funds, received compensation from the Subject Funds for providing investment management and other services to the Fund Complex.  As such, Defendants owe fiduciary and other duties to Plaintiffs and all shareholders of each of the funds in the Fund Complex.

## A.     Section 36(b) of the Investment Company Act of 1940

14.     Congress recognized as early as 1935 that mutual funds "present[ed] special features which require[d] attention beyond simply the disclosure philosophy of the Securities Act of 1933," *see* H.R. Rep. No. 91-1382, p. 2 (1970), because "a typical [mutual] fund is organized by its investment advisor which provides it with almost all management services and because its shares are bought by investors who rely on that service, a mutual fund cannot, as a practical matter sever its relationship with the advisor."  S. Rep. No. 91-184, p. 5 (1969).  Therefore, "the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy."  *Id.  See also, Jones v. Harris Associates L.P.*, 130 S.Ct. 1418, 1422 (2010).  Rather, "the relationship between investment advisers and mutual funds is fraught with potential conflicts of interest," *Burks v. Lasker*, 441 U.S. 471, 481 (1979), and "potentially incestuous."  *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 929 (2d Cir. 1982).

15.     Accordingly, in 1940, Congress enacted the ICA recognizing that:

> The national public interest and the interest of investors are adversely affected…when investment companies are organized, operated [and] managed…in the interest of…investment advisers…rather than in the interest of [shareholders]…or when the investment companies…are not subjected to adequate independent scrutiny.

ICA § 1(b)(2), 15 U.S.C. § 80a-1(b)(1994).  The ICA was designed to regulate and curb abuses in the mutual fund industry and to create standards of care applicable to investment advisors such as Defendants.

16.     In the 1960s, it became clear to Congress that investment advisors to equity mutual funds were gouging those funds with excessive fees, particularly by not taking economies of scale into account.  A report produced by the Wharton School that was commissioned by the SEC found that investment advisers tended to charge mutual funds "substantially higher" rates than they charged other clients.  *A Study of Mutual Funds Prepared for the Securities and Exchange Commission by the Wharton School of Finance and Commerce*, H.R. Rep. No. 2274, p. 29 (1962).  Thereafter, the SEC concluded in a study it conducted that board and shareholder approval could not protect shareholder interests with respect to advisory compensation as mutual funds could not terminate their relationships with their advisers as a practical matter.  *Report of the Securities and Exchange Commission on the Public Policy Implications of Investment Company Growth*, H.R. Rep. No. 2337, p. 148 (1966).

17.     As a result, Section 36(b), 15 U.S.C. § 80a-35(b), was added to the ICA in 1970, which created a federal cause of action for breach of fiduciary duty.  Section 36(b) imposes a fiduciary duty on mutual fund investment managers (and their affiliates) with respect to the receipt of compensation for services, specifically providing that:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.  An action may be brought under this subsection . . . by a security holder of such registered investment company on behalf of such company, against such investment advisers, or an affiliated person of such investment advisor . . . for breach of fiduciary duty in respect to such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

18.     Further, notwithstanding requirements regarding the increased disinterestedness of the board, "Congress decided not to rely solely on the fund's directors to assure reasonable adviser fees," *Daily Income Fund*, 464 U.S. at 540,  also adding a provision to Section 36(b) that provides:

> In any such action approval by the board of directors of such investment company of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, and ratification or approval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the shareholders of such investment company, shall be given such consideration by the court as is deemed appropriate *under all the circumstances*.

15 U.S.C. § 80a-35(b)(2) (emphasis added).  Through Section 36(b), Congress gave shareholders a "unique right," *Daily Income Fund*, 464 U.S. at 536, empowering them with the ability to be an independent check on unfair fees while leaving "the ultimate responsibility for the decision in determining whether the fiduciary duty has been breached [] with the court."  S. Rep. 91-184, p. 6.

19.     While fees may appear to be very small on a shareholder-by-shareholder basis, they cause a dramatic decrease in Plaintiffs' investment returns over time.  Arthur Levitt, past Chairman of the United States Securities and Exchange Commission ("SEC"), criticized this "tyranny of compounding high costs":

> Instinct tells me that many investors would be shocked to know how seemingly
> small fees can over time, create such drastic erosion in returns. ... In the years
> ahead, what will mutual fund investors say if they realize too late their returns
> have fallen hard under the weight of compounding fees?

Arthur Levitt, Jr., Inaugural address:  Costs Paid with Other People's Money, Address at

Fordham University School of Law (Nov. 3, 2000), in 6 Fordham J. Corp. & Fin. L. 261, 267

(2001).

      20.     For example, assume that an employee with 35 years until retirement has a current

401(k) account balance of $25,000.  If returns on investments in their account over the next 35

years average 7 percent, and fees and expenses reduce their average returns by 0.5 percent, their

account balance would grow to $227,000 at retirement, even if there were no further

contributions to their account.  However, if fees and expenses being withheld are 1.5 percent,

their account balance would grow to only $163,000 at retirement.  The 1 percent difference in

fees and expenses reduces their account balance at retirement by a shocking ***28 percent***.



*See* Department of Labor Publication "A Look at 401(k) Plan Fees," available at

*http://www.dol.gov/ebsa/publications/401k_employee.html.*

**B.      Inherent Conflict in the Structure of Mutual Funds**

21.      The Principal Complex, like almost all other mutual fund complexes, operates

under a single structure consisting of a group of related investment companies (the mutual funds

themselves) that are owned by their shareholders and governed by a Board of Directors.

However, the mutual funds themselves are basically corporate shells in that they have few or no

employees.  Instead, the mutual funds contract for all of the services they need -- including

distribution of its securities, custodianship of its assets, auditing, servicing shareholder accounts,

portfolio management, and day-to-day operation, all of which are provided by or arranged for by

Defendants and their affiliates.

22.      The Principal Complex consists of dozens of mutual funds, all of which were

conceived and started by the Defendants or their predecessors.  The Defendants' purpose in

starting, maintaining, and servicing mutual funds is to make a profit on the advisory,

administrative, and shareholder services sold to the <u>Subject</u> Funds for fee income to the service-

providers.

23.      When the Defendants start a new mutual fund, they not only contract to provide

all the services the fund needs but also nominate and elect the fund's Board of Directors, which

consists of the same people that serve on the boards of all of the funds in the Fund Complex.  In

the case of the Subject Funds at issue in this case, during the fiscal year ending October 31,

2008, the members of the respective Boards simultaneously served on the Boards of 114

portfolios across the Fund Complex,<u>106 portfolios in 2009, and 98 portfolios in 2010</u>.

24.      The Board of Directors <u>of the Subject Funds </u>meets several times a year.  The

directors are compensated for their services with a fee based on a schedule that takes into

account an annual retainer, the number of meetings attended, and expenses incurred.  For the

fiscal years ending October 2008, 2009, and 2010, the independent directors for the funds in the

Fund Complex received total compensation in the following amounts:

| Director | 2008 | | 2009 | | 2010 | |
|---|---|---|---|---|---|---|
| | The Funds | Fund Complex | The Funds | Fund Complex | The Funds | Fund Complex |
| Elizabeth Ballantine | 93,162 | 106,170 | 108,668 | 121,075 | $125,012 | $143,850 |
| Kristianne Blake | 98,836 | 112,686 | 116,785 | 130,125 | $128,888 | $148,300 |
| Craig Damos* | 87,468 | 97,875 | 112,525 | 125,375 | $121,059 | $139,300 |
| Richard W. Gilbert | 107,504 | 122,717 | 126,244 | 140,675 | $137,061 | $157,700 |
| Mark A. Grimmett | 96,669 | 110,178 | 105,288 | 117,300 | $132,236 | $152,150 |
| Fritz Hirsch | 101,003 | 115,194 | 118,960 | 132,550 | $129,637 | $149,150 |
| William C. Kimball | 93,161 | 106,170 | 113,009 | 125,925 | $123,633 | $142,250 |
| Barbara A. Lukavsky | 98,836 | 112,686 | 115,486 | 128,675 | $122,325 | $140,750 |
| Daniel Pavelich | 96,669 | 110,178 | 114,695 | 127,800 | $126,674 | $145,750 |

&ast; Not elected as a Director until March 10, 2008

25.     As a result, board membership in the Fund Complex is a lucrative part-time job,

the continuation of which is dependent (at least in part) on the continued good will and support

of Defendants.

26.     While mutual fund boards are supposed to be the "watchdogs" for the

shareholders of the funds, two noteworthy industry insiders have commented on the general

failure of mutual fund boards to fulfill their responsibilities under the ICA.  Jack Bogle, founder

of The Vanguard Group, Inc. ("Vanguard") made the following comment:

> Well, fund directors are, or at least to a very major extent, sort of a bad joke.
> They've watched industry fees go up year after year, they've added 12b-1 fees.  I
> think they've forgotten, maybe they've never been told, that the law, the
> Investment Company Act, says they're required to put the interest of the fund
> shareholders ahead of the interest of the fund adviser.  It's simply impossible for
> me to see how they could have ever measured up to that mandate, or are
> measuring up to it.

27.     Warren Buffet, famous investor and chairman of Berkshire Hathaway, made the

following comment, which was aptly quoted by a United States District Court:

> I think independent directors have been anything but independent.  The
> Investment Company Act, in 1940, made these provisions for independent
> directors on the theory that they would be the watchdogs for all these people
> pooling their money.  The behavior of independent directors in aggregate since
> 1940 has been to rubber stamp every deal that's come along from management—
> whether management was good, bad, or indifferent.  Not negotiate for fee
> reductions and so on.  A long time ago, an attorney said that in selecting directors,
> the management companies were looking for Cocker Spaniels and not
> Dobermans.  I'd say they found a lot of Cocker Spaniels out there.

*Strougo v. BEA Assoc.*, 188 F. Supp.2d 373, 383 (S.D.N.Y. 2002) (citation omitted).

28.     Mr. Buffet further observed, in his letter to shareholders in the 2002 Berkshire

Hathaway, Inc. annual report:

> [A] monkey will type out a Shakespeare play before an "independent" mutual-
> fund director will suggest that his fund look at other managers, even if the
> incumbent manager has persistently delivered substandard performance.  When
> they are handling their own money, of course, directors will look to alternative
> advisors – but it never enters their minds to do so when they are acting as
> fiduciaries for others. . . . Investment company directors have failed as well in
> negotiating management fees . . . If you or I were empowered, I can assure you
> that we could easily negotiate materially lower management fees with the
> incumbent managers of most mutual funds.  And, believe me, if directors were
> promised a portion of any fee savings they realized, the skies would be filled with
> falling fees.  Under the current system, though, reductions mean nothing to
> "independent" directors while meaning everything to managers.  So guess who
> wins? . . . [I]n stepping up to [their] all-important responsibilities, tens of
> thousands of "independent" directors, over more than six decades, have failed
> miserably.  (They've succeeded, however, in taking care of themselves; their fees
> from serving on multiple boards of a single "family" of funds often run well into
> six figures.)

2002 Berkshire Hathaway, Inc. Annual Report to Shareholders, p. 17 – 18.

29.     The watchfulness and effectiveness of boards of directors continues to be an issue

today.  Indeed, as Judge Posner recently observed in his dissent from the denial of a petition for

rehearing en banc in another case brought under Section 36(b), there are "growing indications

that executive compensation in large publicly traded firms often is excessive because of the

feeble incentives of boards of directors to police compensation." *Jones v. Harris*, 537 F.3d 728,

730 (7th Cir. 2008), *vacated and remanded,* 559 U.S. __, 130 S.Ct. 1418 (2010).  Indeed,

"'broad cross-sectional analysis reveals little consistent evidence that board composition is

related to lower fees and higher returns for fund shareholders.'"  *Id.* at 731 (quoting OEA

Memorandum: Literature Review on Independent Mutual Fund Chairs and Directors," Dec. 29,

2006).

30.    The conflicts in the inherent structure of mutual funds, including those at issue

here, exemplify the concern raised in the preamble to the ICA that "investment companies are

organized, operated and managed in the interest of investment advisers, rather than in the interest

of shareholders."

## V.    SUBSTANTIVE ALLEGATIONS

31.    Defendants have breached their fiduciary duty pursuant to § 36(b) of the ICA with

respect to their receipt of advisory fees and distribution fees from the Subject Funds because

under "all the circumstances," the fees they received were unfair to the beneficiaries, *i.e.*, the

shareholders of the Subject Funds.

32.    An investment advisor's fiduciary duty requires both full disclosure and

substantive fairness.  *See Jones*, 130 S.Ct. at 1429 (a court's evaluation of whether an adviser has

breached its fiduciary duty "must take into account both procedure and substance").  Indeed, an

advisor "may not overreach in the amount of his fee even though the other party to the

transaction, in full possession of all the facts, does not believe the fee is excessive."  December

17, 1969 Letter from the Investment Company Institute included with Mutual Funds

Amendments (Part I): Hearings Before the Subcomm. On Commerce and Finance of the H.

Comm. On Interstate and Foreign Commerce, 91st Cong., at 441 (1969) ("1969 Hearings").  *See

also* S. Rep. 91-184, pp. 15-16 ("the ultimate test, *even if the compensation or payments are*

*approved by the directors* and stockholders, . . . will be whether the investment adviser has fulfilled his fiduciary duty to the mutual fund shareholders in determining the fee") (emphasis added).

33.     The essence of a claim for unfair fees is "'whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain.'"  *Jones*, 130 S.Ct. at 1427 (quoting *Pepper v. Litton*, 308 U.S. 295, 306-307 (1939)).  A breach of fiduciary duty occurs "when a fiduciary permits an unreasonable or excessive fee to be levied on the fund,"  1969 Hearings at 189, or "when compensation to the adviser for his services is excessive, in view of the services rendered – where the fund pays what is an unfair fee under the circumstances.  *Id.* at 190.

34.     In the case of fees that involve a conflict of interest, such as here, this standard requires both fair dealing and a fair price.  Relying on full disclosure in the process leading to a fee arrangement alone "would promote 'a safe harbor of exorbitance, for under such a view an adviser's fiduciary duty would be diluted to a simple and easily satisfiable requirement not to charge a fee that is egregiously out of line with industry norms.'"  *In re Federated Mutual Funds Excessive Fee Litig.*, No. 04-352, slip op. at 4 (W.D. Pa. Sept. 30, 2009) (quoting *Gallus*, 561 F.3d at 823).  Thus, under general fiduciary law, a fee that is not the result of a fair process, or that is not reasonable, is a breach of fiduciary duty.

35.     In *Pepper v. Litton*, 308 U.S. 295 (1939), former SEC Chairman Justice Douglas further explained the fiduciary duty standard, as he opined that fiduciaries'

> dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the [fiduciary] not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.  *The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain.  If it does not, equity*

*will set it aside . . .   He who is in such a fiduciary position cannot serve himself first and his cestuis second . . .   He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements.   For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the cestuis.   Where there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation.*

*Pepper*, 308 U.S. at 306-311 (emphasis added).   In *Jones*, the United States Supreme Court held the formulation of the concept of fiduciary duty stated in *Pepper* "expresses the meaning of the phrase 'fiduciary duty' in § 36(b) . . . ."  130 S.Ct. at 1427.    Thus, by adopting *Pepper,* the Supreme Court adopted a fiduciary duty standard for § 36(b) that requires both good faith in the negotiation process *and* a fair outcome.

36.    Factors which may be relevant to determining whether Defendants have breached their fiduciary duty pursuant to § 36(b) include, but are not limited to:  (1) size of the fees; (2) the extent to which benefits derived from the economies of scale realized as the fund grows have inured to the benefit of fund shareholders; (3) the nature and quality of the services rendered; (4) comparative fee structures; (5) the profitability of the funds to the advisor/manager; (6) fallout benefits (i.e. all benefits directly or indirectly received by persons affiliated with an investment company and their affiliated persons by virtue of their relationship with an investment company); and (7) the care and conscientiousness of the directors.  A review of these factors, and the facts in this case, demonstrates that the fees charged by Defendants to the Subject Funds violate § 36(b).

## A.    Size of the Fees

37.    "The size of the adviser's fee is of course one of the factors" that should be considered in the evaluation of a Section 36(b) claim.  *Gallus*, 561 F.3d at 823.

**(1)     Investment Advisory Fees**

38.     Investment advisers are generally compensated on the basis of a fixed percentage of the fund's assets rather than on services rendered or actual expenses, and Defendants in this case are no different.  Defendants have charged the SAM Funds (and the Underlying Funds) fees based upon a fixed percentage of the Subject Fund's assets.

39.     With regard to the SAM Balanced Portfolio, an analyst for Morningstar Inc., a noted, objective mutual fund rating agency, has noted since as early as April 20, 2007 that the fund "could still be cheaper" as its expense ratio is "still above the category median." Morningstar observed in an April 10, 2008 article that, "[t]he one area where there's some room for improvement is the price; the A shares cost 1.24%, above the median for comparable share classes of moderate-allocation funds."  Further, in an August 30, 2010 article, a Morningstar analyst commented that the SAM Balanced Fund is "too expensive," noting that "1.41% for A shares, is high for a broker-sold moderate-allocation fund."  As recently as September 30, 2011, Morningstar once again concluded that the fund "remains on the pricey side" with its expenses continuing to be "remain[ ] high relative to other funds in the category..."  With regard to the Principal family of funds in general, Morningstar gave Principal an average fee grade of C.

40.     Indeed, shareholders of the SAM Funds pay *four* layers of advisory fees as PMC has sub-advisors for both the SAM Funds as well as each Underlying Fund.  The first layer is the fees paid to the advisor of the SAM Funds itself, *i.e.*, Defendant PMC.  The second layer is the fees paid by PMC to the sub-advisor of the SAM Funds, *i.e.*, Edge.  The third layer is the fees paid by the SAM Funds to the advisor of each Underlying Fund, *i.e.*, Defendant PMC once again.  The fourth layer is the fees paid by PMC as the advisor of the Underlying Fund to the sub-advisor of that Underlying Fund, *i.e.*, PGI, Edge, Spectrum Asset Management, American Century, Montag & Caldwell, Columbus Circle Investors, AllianceBernstein, Westwood

Management Corp., and Principal Real Estate Investors.  While Plaintiffs do not challenge the second and fourth layers of fees, the fact that the defendants charge so many layers of fees is evidence of a flawed negotiation process.[5]

41.     With regard to the first layer of fees, Defendant PMC receives, and the SAM Funds shareholders pay, (and have continued to pay), a monthly fee based on the average daily net assets of the SAM Funds according to the following schedule for investment advisory services based on aggregate SAM Portfolio net assets:

| Assets Under Management | Fee percentage (as a percentage of average net assets) for fiscal years 2008, 2009, and 2010. |
| --- | --- |
| First $500 million | 0.55% |
| Next $500 million | 0.50% |
| Next $1 billion | 0.45% |
| Next $1 billion | 0.40% |
| Next $1 billion | 0.35% |
| Next $1 billion | 0.30% |
| Over $5 billion | 0.25% |

In percentage terms, these fees may at first look benign. However, in dollar terms, and in comparison to fees received by Defendants' competitors for substantially similar services, *see* Comparative Fee Structures, Section V.D., *infra*, the fees received from the SAM Funds are staggering.  As of October 31, 2008, the Principal SAM Balanced Portfolio had approximately $3.2 billion in assets under management, and PMC received $13,693,000 in compensation for investment advisory services for the SAM Balanced Portfolio alone– this is on top of the advisory fees PMC received for the management of the Underlying Funds.  *See* ¶ 45, *infra*. At the end of fiscal year 2009, PMC had approximately $3 billion in assets under management and received $9,988,000 in compensation for investment advisory services for the SAM Balanced

---

[5] Plaintiffs do not challenge the second and fourth layer of fees in this Complaint at this time and, therefore, make no representations regarding the fairness or legality of any of the sub-advisory fees.

Portfolio alone.[6]  At the end of fiscal year 2010, PMC had approximately $3.2 billion in assets under management and received $10,679,000 in compensation for investment advisory services for the SAM Balanced Portfolio alone.  With regard to the Principal SAM Strategic Growth Portfolio, PMC received $6,816,000 in compensation for investment advisory fees in 2008, $4,599,000 in 2009, and $4,916,000 in 2010 for roughly $1.5 billion, $1.4 billion, and $1.5 billion in assets under management, respectively.

42.     With regard to the second layer of fees, Edge (a for-profit investment management company) receives, and the SAM Funds shareholders pay, a flat rate of 0.0416% of net assets, or approximately 4.2 basis points, as a sub-advisory fee.  The effective or actual fee rates paid to Principal and Edge in fiscal years 2008, 2009, and 2010 are:

| Assets Under Management | Principal Effective Fee Schedule | Edge Effective Fee Schedule |
|---|---|---|
| $500 million | 0.55% | .042% |
| $1 billion | 0.52.5% | .042% |
| $5 billion | 0.405% | .042% |
| $10 billion | 0.328% | .042% |

In fiscal year 2008, PMC paid Edge $1,835,589 for sub-advising the SAM Balanced Portfolio and $921,657 for the SAM Strategic Growth Portfolio Funds. In fiscal year 2009, PMC paid Edge $1,174,586 for sub-advising the SAM Balanced Portfolio and $540,080 for the SAM Strategic Growth Portfolio.  In fiscal year 2010, PMC paid Edge $1,290,134 for sub-advising the SAM Balanced Portfolio and $593,466 for the SAM Strategic Growth Portfolio. The first level of advisory fee shareholders pay to Defendant PMC (*e.g.*, the $13.7 million in 2008 received for the SAM Balanced Portfolio) includes this second level of fees (*e.g.* the $1.8 million fee paid to Edge as the sub-advisor for the SAM Balanced Portfolio).

---

[6] The fees received in fiscal year 2011 were not available at the time of the filing of the Second Anniversary Complaint.

43.     With regard to the third layer of fees, the SAM Funds shareholders yet again pay PMC for investment advisory services to each of the Underlying Funds in the SAM Funds as each of the Underlying Funds is a fund within the Principal family of funds.  The schedule for the additional fees paid to Defendant PMC for the Underlying Funds in the SAM Funds are listed in the paragraph below.  From this third layer of fees, Defendant PMC received a total of $193.6 million in compensation for investment advisory services for the Underlying Funds, bringing the total compensation received for investment advisory services for the SAM Funds and the Underlying Funds to $214 million in fiscal year 2008. In fiscal year 2009, Defendant PMC received $150.2  million in compensation for the Underlying Funds for a combined total of $165 million for investment advisory services for the SAM Funds and the Underlying Funds.  In fiscal year 2010, Defendant PMC received $176.7 million in compensation for the Underlying Funds for a combinded total of $192 million for investment advisory services for the SAM Funds and the Underlying Funds.

44.     With regard to the fourth layer of fees, each Underlying Fund is sub-advised by yet another investment advisor, each of which is a for-profit investment management company. Sixteen of the eighteen Underlying Funds are sub-advised by subsidiaries of Defendants.  The only two Underlying Funds that are not sub-advised by subsidiaries of Defendants are: the Large Cap Growth Fund II, which is sub-advised by American Century Investment Management, Inc. and Montag & Caldwell; and the LargeCap Value Fund III, which is sub-advised by AllianceBernstein Investment Research and Management, Inc. and Westwood Management Corp.  Following is a side-by-side comparison of the fee schedules for Defendant PMC and each

sub-advisor for the Underlying Funds that were in effect in fiscal years 2008 and 2009 (and

beyond into 2010 and 2011):[7]

| SAM Funds | Principal Fee Schedule | Sub-Advisor Fee Schedule |
|---|---|---|
| **SAM Balanced and Strategic Growth Portfolios** | 0.550% on first  $500  million<br>0.500% on next  $500  million<br>0.450% on next  $1,000  million<br>0.400% on next  $1,000  million<br>0.350% on next  $1,000  million<br>0.300% on next  $1,000  million<br>0.250% on remaining assets | 0.042% on all assets (**Edge**) |
| **Underlying Fund** | **Principal Schedule** | **Sub-Advisor Schedule** |
| **Disc LC Blend** | 0.600% on first  $500  million<br>0.580% on next  $500  million<br>0.560% on next  $500  million<br>0.550% on next  $500  million<br>0.540% on next  $1000  million<br>0.53% on remaining assets | 0.264% on first  $50  million (**PGI**)<br>0.245% on next  $50  million<br>0.215% on next  $100  million<br>0.176% on next  $200  million<br>0.127% on next  $350  million<br>0.088% on next  $750  million<br>0.059% on remaining assets |
| **Div Intl** | 0.900% on first  $500  million<br>0.880% on next  $500  million<br>0.860% on next  $500  million<br>0.850% on next  $500  million<br>0.830% on next  $1,000  million<br>0.800% on remaining assets | 0.343% on first  $50  million (**PGI**)<br>0.274% on next  $50  million<br>0.196% on next  $100  million<br>0.157% on next  $200  million<br>0.118% on next  $350  million<br>0.098% on next  $750  million<br>0.078% on remaining assets |
| **Equity Income** | 0.600% on first  $250  million<br>0.550% on next  $250  million<br>0.500% on remaining assets | 0.264% on first  $50  million (**Edge**)<br>0.245% on next  $50  million<br>0.215% on next  $100  million<br>0.176% on next  $200  million<br>0.127% on next  $350  million<br>0.088% on next  $750  million<br>0.059% on remaining assets |
| **High Yield** | 0.625% on first  $250  million<br>0.500% on remaining assets | 0.264% on all assets (**Edge**) |

---

[7] For the Large Cap Growth, MidCap Blend, and Capital Appreciation funds, Plaintiffs have corrected typographical errors in the corresponding chart in the Amended Complaint.

| | | |
|---|---|---|
| **Income** | 0.500% on first  $2,000  million | 0.113% on first  $5,000 million (**Edge**) |
| | 0.450% on remaining assets | 0.098% on next  $1,000  million |
| | | 0.093% on next  $4,000  million |
| | | 0.088% on remaining assets |
| **Intl Emerg Mkt** | 1.200% on first  $500  million | 0.490% on all assets (**PGI**) |
| | 1.180% on next  $500  million | |
| | 1.160% on next  $500  million | |
| | 1.150% on remaining assets | |
| **Large Cap Growth** | 0.680% on first  $500  million | 0.264% on first  $50  million (**CCI**) |
| | 0.650% on next  $500  million | 0.245% on next  $50  million |
| | 0.620% on next  $1,000  million | 0.215% on next  $100  million |
| | 0.580% on next  $1,000  million | 0.176% on next  $200  million |
| | 0.550% on remaining assets | 0.127% on next  $350  million |
| | | 0.088% on next  $750  million |
| | | 0.059% on next 500 million |
| | | 0.245% on next $2.5 billion |
| | | 0.16<u>6</u>% on next $4.5 billion |
| **Large Cap Growth II** | 0.950% on first  $500  million | 0.450% on first  $50  million (**American Century/Montag & Caldwell**) |
| | 0.930% on next  $500  million | 0.400% on next  $200  million |
| | 0.910% on next  $500  million | 0.350% on next  $500  million |
| | 0.900% on <u>next $500  million</u> | |
| | <u>0.890% on next $1,000  million</u> | 0.300% on remaining assets |
| | <u>0.880% on remaining assets</u> | |
| **Large Cap Value III** | 0.800% on first  $500  million | 0.230% on first  $300  million (**Alliance Bernstein/Westwood**) |
| | 0.780% on next  $500  million | 0.200% on remaining assets |
| | 0.760% on next  $500  million | |
| | 0.750% on next  $500  million | |
| | 0.730% on next  $1,000  million | |
| | 0.700% on remaining assets | |
| **MidCap Blend** | 0.650% on first  $500  million | 0.392% on first  $<u>25</u>  million (**PGI**) |
| | 0.630% on next  $500  million | 0.313% on next  $<u>75</u>  million |
| | 0.610% on next  $500  million | 0.264% on next  $100  million |
| | 0.600% on remaining assets | 0.225% on next  $<u>300</u>  million |
| | | 0.176% on next  $<u>500</u>  million |
| | | 0.127% on next  $<u>500</u>  million |
| | | 0.078% on remaining assets |
| **Money Market** | 0.400% on first  $500  million | 0.073% on all assets (**PGI**) |
| | 0.390% on next  $500  million | |
| | 0.380% on next  $500  million | |
| | 0.370% on next  $500  million | |

| | | |
|---|---|---|
| | 0.360% on next  $1,000  million<br>0.350% on remaining assets | |
| **Government & High Quality Bond** | 0.500% on first  $2,000  million<br>0.450% on remaining assets | 0.113% on first  $5,000  million (**Edge**) |
| | | 0.098% on next  $1,000  million |
| | | 0.093% on next  $4,000  million |
| | | 0.088% on remaining assets |
| **Preferred** | 0.750% on first  $500  million | 0.340% on first  $100 million (**Spectrum**) |
| | 0.730% on next  $500  million | 0.290% on next  $150  million |
| | 0.710% on next  $500  million<br>0.700% on next  $500  million<br>0.690% on next  $1,000  million<br>0.680% on remaining assets | 0.200% on remaining assets |
| **Real Estate** | 0.850% on first  $500  million | 0.490% on first  $1,000  million (**P_REI**) |
| | 0.830% on next  $500  million | 0.441% on next  $500  million |
| | 0.810% on next  $500  million | 0.392% on remaining assets |
| | 0.800% on remaining assets | |
| **Short Term Income** | 0.500% on first  $200  million | 0.113% on first  $5,000  million (**Edge**) |
| | 0.450% on next  $300  million | 0.098% on next  $1,000  million |
| | 0.400% on remaining assets | 0.093% on next  $4,000  million |
| | | 0.088% on remaining assets |
| **Small Cap Growth** | 0.750% on first  $500  million | 0.470% on first  $25  million (**PGI**) |
| | 0.730% on next  $500  million | 0.352% on next  $75  million |
| | 0.710% on next  $500  million | 0.264% on next  $100  million |
| | 0.700% on remaining assets | 0.245% on next  $300  million |
| | | 0.215% on next  $500  million |
| | | 0.176% on next  $500  million |
| | | 0.118% on remaining assets |
| **Small Cap Value** | 0.750% on first  $500  million | 0.470% on first  $25  million (**PGI**) |
| | 0.730% on next  $500  million | 0.352% on next  $75  million |
| | 0.710% on next  $500  million | 0.264% on next  $100  million |
| | 0.700% on remaining assets | 0.245% on next  $300  million |
| | | 0.215% on next  $500  million |
| | | 0.176% on next  $500  million |
| | | 0.118% on remaining assets |
| **Capital Appreciation** | 0.625% on first  $500  million | 0.392% on first  $25  million (**Edge**) |
| | 0.500% on next  $500  million | 0.313% on next  $75  million |
| | 0.375% on remaining assets | 0.264% on next  $100  million |
| | | 0.225% on next  $300  million |
| | | 0.176% on next  $500  million |
| | | 0.127% on next  $500  million |
| | | 0.078% on remaining assets |

Plaintiffs do not challenge this fourth layer of fees.

45.    A comparison of the effective fee schedule (in basis points) for the SAM Funds as well as each Underlying Fund shows how much more Defendants charge on top of the advisory fees paid to each sub-advisor.

| Funds | | Assets Under Management ($Millions) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 25 | 50 | 100 | 250 | 500 | 1000 | 5000 | 10000 |
| SAM FUNDS | Principal | 55.0 | 55.0 | 55.0 | 55.0 | 55.0 | 52.5 | 40.5 | 32.8 |
| Edge | Sub-Advisor | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 |
| Disc LC Blend | Principal | 60.0 | 60.0 | 60.0 | 60.0 | 60.0 | 59.0 | 55.9 | 55.5 |
| PGI | Sub-Advisor | 26.4 | 26.4 | 24.0 | 21.7 | 18.7 | 14.7 | 8.0 | 6.9 |
| Div Intl | Principal | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 89.0 | 83.5 | 81.8 |
| PGI | Sub-Advisor | 34.3 | 34.3 | 30.8 | 23.3 | 18.7 | 14.7 | 9.4 | 8.6 |
| Equity Income | Principal | 60.0 | 60.0 | 60.0 | 60.0 | 57.5 | 53.8 | 50.8 | 50.4 |
| Edge | Sub-Advisor | 26.4 | 26.4 | 25.5 | 22.3 | 19.0 | 14.9 | 8.0 | 6.9 |
| High Yield | Principal | 62.5 | 62.5 | 62.5 | 62.5 | 56.3 | 53.1 | 50.6 | 50.3 |
| Edge | Sub-Advisor | 26.4 | 26.4 | 26.4 | 26.4 | 26.4 | 26.4 | 26.4 | 26.4 |
| Income | Principal | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 47.0 | 46.0 |
| Edge | Sub-Advisor | 11.3 | 11.3 | 11.3 | 11.3 | 11.3 | 11.3 | 11.3 | 10.3 |
| Intl Emerg Mkt | Principal | 120.0 | 120.0 | 120.0 | 120.0 | 120.0 | 119.0 | 115.9 | 115.5 |
| PGI | Sub-Advisor | 49.0 | 49.0 | 49.0 | 49.0 | 49.0 | 49.0 | 49.0 | 49.0 |
| Large Cap Growth | Principal | 68.0 | 68.0 | 68.0 | 68.0 | 68.0 | 66.5 | 59.3 | 57.2 |
| CCI | Sub-Advisor | 26.4 | 26.4 | 25.5 | 22.3 | 19.0 | 14.9 | 8.0 | 6.9 |
| Large Cap Growth II | Principal | 95.0 | 95.0 | 95.0 | 95.0 | 95.0 | 94.0 | 90.9 | 90.5 |
| American Century/ Montag & Caldwell | Sub-Advisor | 45.0 | 45.0 | 42.5 | 41.0 | 38.0 | 35.3 | 31.1 | 30.5 |

| Funds | | Assets Under Management ($Millions) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 25 | 50 | 100 | 250 | 500 | 1000 | 5000 | 10000 |
| **Large Cap Value III** | Principal | 80.0 | 80.0 | 80.0 | 80.0 | 80.0 | 79.0 | 73.5 | 71.8 |
| **AB/Westwood** | Sub-Advisor | 23.0 | 23.0 | 23.0 | 23.0 | 21.8 | 20.9 | 20.2 | 20.1 |
| **MidCap Blend** | Principal | 65.0 | 65.0 | 65.0 | 65.0 | 65.0 | 64.0 | 60.9 | 60.5 |
| **PGI** | Sub-Advisor | 39.2 | 35.3 | 33.3 | 28.4 | 25.4 | 21.5 | 11.0 | 9.4 |
| **Money Market** | Principal | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 39.5 | 36.6 | 35.8 |
| **PGI** | Sub-Advisor | 7.3 | 7.3 | 7.3 | 7.3 | 7.3 | 7.3 | 7.3 | 7.3 |
| **Mortgage** | Principal | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 47.0 | 46.0 |
| **Edge** | Sub-Advisor | 11.3 | 11.3 | 11.3 | 11.3 | 11.3 | 11.3 | 11.3 | 10.3 |
| **Preferred** | Principal | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 74.0 | 70.9 | 70.5 |
| **Spectrum** | Sub-Advisor | 34.0 | 34.0 | 34.0 | 31.0 | 25.5 | 22.8 | 20.6 | 20.3 |
| **Real Estate** | Principal | 85.0 | 85.0 | 85.0 | 85.0 | 85.0 | 84.0 | 80.9 | 80.5 |
| **P_REI** | Sub-Advisor | 49.0 | 49.0 | 49.0 | 49.0 | 49.0 | 49.0 | 41.6 | 40.4 |
| **Short Term Income** | Principal | 50.0 | 50.0 | 50.0 | 49.0 | 47.0 | 43.5 | 40.7 | 40.4 |
| **Edge** | Sub-Advisor | 11.3 | 11.3 | 11.3 | 11.3 | 11.3 | 11.3 | 11.3 | 10.3 |
| **Small Cap Growth** | Principal | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 74.0 | 70.9 | 70.5 |
| **PGI** | Sub-Advisor | 47.0 | 41.1 | 38.2 | 30.7 | 27.6 | 24.6 | 14.9 | 13.3 |
| **Small Cap Value** | Principal | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 74.0 | 70.9 | 70.5 |
| **PGI** | Sub-Advisor | 47.0 | 41.1 | 38.2 | 30.7 | 27.6 | 24.6 | 14.9 | 13.3 |
| **Capital Appreciation** | Principal | 62.5 | 62.5 | 62.5 | 62.5 | 62.5 | 56.3 | 41.3 | 39.4 |
| **Edge** | Sub-Advisor | 39.2 | 35.3 | 33.3 | 28.4 | 25.4 | 21.5 | 11.0 | 9.4 |

However, actual dollar amounts received in fiscal year 2008, rather than basis points

comparison, bring the disparity in fees charged into focus:[8]

---

[8] The fees paid for sub-advisory services in fiscal year 2011 were not available at the time of the filing of the Second Anniversary Complaint.

**2008**

| The SAM Funds | Amount Received by Principal | Amount Received by Sub-Advisor |
|---|---|---|
| SAM Balanced Portfolio | $13,693,000 | $1,835,589 |
| SAM Strategic Growth Portfolio | $6,816,000 | $921,657 |
| Underlying Fund | Amount Received by Principal | Amount Received by Sub-Advisor |
| Capital Appreciation | $7,221,000 | $2,014,670 |
| Disciplined LargeCap Blend | $17,493,000 | $3,153,892 |
| Diversified International | $18,330,000 | $1,683,833 |
| Equity Income | $17,555,000 | $2,771,719 |
| High Yield | $8,346,000 | $4,293,003 |
| Income | $5,811,000 | $1,154,646 |
| International Emerging Markets | $15,148,000 | $6,535,791 |
| LargeCap Growth | $20,057,000 | $6,205,992 |
| LargeCap Growth II | $13,682,000 | $4,902,893 |
| LargeCap Value III | $17,054,000 | $4,259,632 |
| MidCap Stock | $4,417,000 | $831,900 |
| Money Market | $10,671,000 | $1,791,204 |
| Government & High Quality Bond | $7,641,000 | $1,518,276 |
| Preferred Securities | $9,446,000 | $2,797,767 |
| Real Estate Securities | $12,346,000 | $7,064,848 |
| Short Term Income | $2,185,000 | $455,572 |
| SmallCap Growth | $2,441,000 | $896,657 |
| SmallCap Value | $3,771,000 | $1,302,842 |
| *Totals (excluding the SAM Funds)* | *$193,615,000* | *$53,635,137* |

The disparity in fees continued into fiscal year 2009 and 2010:

**2009**

| The SAM Funds | Amount Received by Principal | Amount Received by Sub-Advisor |
|---|---|---|
| SAM Balanced Portfolio | $9,988,000 | $1,174,586 |
| SAM Strategic Growth Portfolio | $4,599,000 | $540,080 |
| Underlying Fund | Amount Received by Principal | Amount Received by Sub-Advisor |
| Capital Appreciation | $4,682,000 | $1,437,843 |
| Disciplined LargeCap Blend | $11,380,000 | $2,302,495 |
| Diversified International | $11,206,000 | $1,078,095 |
| Equity Income | $9,669,000 | $1,696,688 |
| High Yield | $10,752,000 | $5,373,875 |
| Income | $4,718,000 | $959,661 |
| International Emerging Markets | $11,016,000 | $4,379,808 |
| LargeCap Growth | $12,786,000 | $3,178,902 |
| LargeCap Growth II | $12,829,000 | $4,022,417 |

| | | |
|---|---|---|
| LargeCap Value III | $13,316,000 | $3,232,466 |
| MidCap Blend | $3,827,000 | $990,972 |
| Money Market | $10,398,000 | $1,422,319 |
| Government & High Quality Bond | $6,075,000 | $1,179,327 |
| Preferred Securities | $12,226,000 | $3,493,312 |
| Real Estate Securities | $9,354,000 | $5,230,555 |
| Short Term Income | $1,518,000 | $316,651 |
| SmallCap Growth | $1,554,000 | $593,228 |
| SmallCap Value | $2,869,000 | $1,013,077 |
| *Totals (excluding the SAM Funds)* | *$150,175,000.00* | *$41,901,691.00* |

## 2010

| The SAM Funds | Amount Received by Principal | Amount Received by Sub-Advisor |
|---|---|---|
| SAM Balanced Portfolio | $10,679,000 | $1,290,134 |
| SAM Strategic Growth Portfolio | $4,916,000 | $593,466 |
| Underlying Fund | Amount Received by Principal | Amount Received by Sub-Advisor |
| Capital Appreciation | $5,418,000 | $ 1,787,816 |
| Disciplined LargeCap Blend | $8,550,000 | $ 1,965,742 |
| Diversified International | $13,881,000 | $ 1,321,130 |
| Equity Income | $11,620,000 | $ 1,864,966 |
| High Yield | $15,395,000 | $ 7,898,391 |
| Income | $5,951,000 | $ 1,192,852 |
| International Emerging Markets | $16,302,000 | $ 6,686,513 |
| LargeCap Growth | $14,469,000 | $ 3,931,663 |
| LargeCap Growth II | $13,878,000 | $ 3,517,748 |
| LargeCap Value III | $13,845,000 | $ 2,736,895 |
| MidCap Blend | $7,355,000 | $ 1,594,231 |
| Money Market | $5,940,000 | $ 1,142,058 |
| Government & High Quality Bond | $7,694,000 | $ 1,542,988 |
| Preferred Securities[9] | $14,749,000 | $ 4,250,934 |
| Real Estate Securities | $13,814,000 | $ 7,565,147 |
| Short Term Income | $3,112,000 | $ 670,295 |
| SmallCap Growth | $1,812,000 | $ 676,450 |
| SmallCap Value | $2,880,000 | $ 1,013,145 |
| *Totals (excluding the SAM Funds)* | *$176,665,000.00* | *$51,358,964.00* |

46.     Under the terms of the Management Agreement, Defendant PMC provides three

categories of services:  investment advisory services, accounting services, and corporate

---

[9] Period from November 1, 2009 through August 31, 2010.  Effective in 2010, Preferred Securities Fund's fiscal year end was changed from October 31 to August 31.

administrative services.  *See, e.g.,* June 6, 2011 Principal Funds, Inc. Amended and Restated

Management Agreement, Exhibit 1.  However, PMC bears the following expenses:

organizational expenses of the Funds; compensation of personnel, officers and directors who are

affiliated with PMC; and expenses and compensation associated with furnishing office space,

facilities, and personnel necessary to perform the general corporate functions of the Subject

Funds.  Further, portfolio accounting services are provided to the Subject Funds at cost.  On

information and belief, the accounting and corporate administrative type services included in the

Management Agreement are a very small percentage of the expenses incurred under the

agreement as transfer agency costs are typically by far the largest component of administrative

costs but are provided to the Subject Funds pursuant to a separate contract with Principal

Shareholder Services, Inc. (PSI), a wholly owned subsidiary of PMC.  *See, e.g.,* September 27,

2010 Amended and Restated Transfer Agency Agreement, Exhibit 2.  PSI's services include

communications with each Subject Fund's shareholders as well as the preparation and

distribution of reports, proxies, notices, confirmation of transactions, prospectuses, and tax

information.  In the aggregate, various miscellaneous administrative items aside from the transfer

agency cost do not account for more than three basis points of the average mutual fund's

advisory fee.  *See* John P. Freeman, Stewart L. Brown & Steve Pomerantz, *Mutual Fund

Advisory Fees: New Evidence and a Fair Fiduciary Test*, 61 Okla. L. Rev. 83, 113 (2008) (the

"Freeman, Brown, & Pomerantz Study"), Exhibit 3.

      47.     While Plaintiffs do not challenge the fees paid to the sub-advisors of the SAM

Funds or the Underlying Funds, the rates paid to the sub-advisors do provide a measure of how

much the investment advisory services cost (and the economies of scale realized by the advisors,

*see*, Section V.B., *infra*) as the sub-advisors also are for-profit investment management

companies.  Defendants charge far more than the sub-advisors they hire for the Subject Funds

even though the sub-advisors assume the obligations of Principal to provide investment advisory

services to their designated funds.  *See* ¶¶ 44-45 *supra*.  David Swensen, the chief investment

officer of Yale University, highlighted this issue in one of his books using the case of the

Principal Partners LargeCap Value Fund (now known as the Principal LargeCap Value Fund III):

> Consider the case of the Principal Partners LargeCap Value Fund, one of
> the family of mutual funds organized by Principal Life Insurance of Des
> Moines, Iowa.  Principal Management Corporation, the manager of the
> LargeCap Value Fund, actually provides no investment management
> services, focusing instead on "clerical, recordkeeping and bookkeeping
> services."  Responsibility for the day-in and day-out portfolio management
> rests with a subsidiary of Alliance Capital Management, Bernstein
> Investment Research and Management.
>
> The fee arrangement between Principal and Bernstein involves only a
> portion of Principal's take from its investors.  For the year ended
> December 31, 2003, Principal's no-load class B shares bore the burden of
> a 2.51 percent expense ratio . . . Investors paid a 12b-1 fee of 0.91 percent,
> other expenses of 0.85 percent and a management fee of 0.75 percent.
> Principal's fees all but guarantee that investors will fail to generate
> satisfactory returns.
>
> The management fee arrangement between Principal and Bernstein
> provides clues to the economies of scale available in the money
> management industry.  At asset levels below $10 million, of the 0.75
> percent management fee, 0.60 percent goes to Bernstein and 0.15 percent
> goes to Principal.  As assets under management increase, Bernstein's fee
> share decreases and Principal's fee share increases.  At the final
> breakpoint of $200 million in assets, of the scale-invariant 0.75 percent
> fee, Bernstein receives 0.20 percent and Principal receives 0.55 percent.
> The fee structure clearly illustrates scale economies in the investment
> management business.  Bernstein, the party responsible for the heart of the
> portfolio management process, earns fees that diminish (with increases in
> assets under management) from 0.60 percent of assets to 0.20 percent of
> assets.  Since Bernstein's work changes not at all as asset levels increase,
> the reduction in marginal charges makes sense.
>
> It makes no sense that Principal's mutual-fund clients accrue no benefits
> from economies of scale.  Total expenses incurred by investors remain at
> 2.51 percent regardless of portfolio size.  As Bernstein's management fee
> declines, Principal's management fee increases.  For assets above $200
> million Principal adds a management fee of 0.55 percent to other fees of

> 1.76 percent, bringing the egregious total to 2.31 percent for Principal and 0.20 percent for Bernstein.  In this topsy-turvy world, Principal earns a marginal management fee of 0.55 percent for performing back-office functions, while Bernstein earns a marginal management fee of 0.20 percent for making security-selection decisions.  As scale increases, Bernstein earns less while Principal takes more.

David F. Swensen, *Unconventional Success:  A Fundamental Approach to Personal Investment* 238-240 (2005).  The same remained true in 2008 through at least 2010 not only for the LargeCapValue III Fund but also for the other Underlying Funds (only LargeCapValue III Fund listed below as an example):

### LargeCapValue III Fund Effective Management Fee Schedule

| AUM ($millions) | Bernstein | Principal |
|-----------------|-----------|-----------|
| 10              | 0.23%     | 0.57%     |
| 50              | 0.23%     | 0.57%     |
| 100             | 0.23%     | 0.57%     |
| 500             | 0.22%     | 0.58%     |
| 1,000           | 0.21%     | 0.58%     |
| 5,000           | 0.20%     | 0.53%     |

*See also* chart comparing actual fee schedules at ¶¶ 44-45, *supra*.  The table below demonstrates the difference in dollar terms, with Principal earning over twice as much as the sub-advisor:

### Large Cap Value III Fund Effective Fees

| AUM ($millions) | Bernstein    | Principal    |
|-----------------|--------------|--------------|
| 10              | $23,000      | $57,000      |
| 50              | $115,000     | $285,000     |
| 100             | $230,000     | $570,000     |
| 500             | $1,090,000   | $2,910,000   |
| 1,000           | $2,090,000   | $5,810,000   |
| 5,000           | $10,090,000  | $26,660,000  |

48.    Adding insult to injury, at the SAM fund of funds level, Defendant PMC tacks on not one but two more layers of fees to those shareholders already pay for each Underlying Fund.  While the SAM Funds do involve some tactical allocation, PMC pays Edge as a sub-advisor to

the SAM Funds only 4.2 basis point to make the decisions regarding the allocations, regardless of the level of assets under management.  *See e.g., June 6, 2011* Sub-Advisory Agreement with Edge Asset Management, Inc., Exhibit 4.  However, the effective fee rate charged by PMC at the $1 billion mark was 52.5 basis points – or an additional 48.3 basis points.  Therefore in 2008, Defendant PMC retained $17.8 million of the $20.5 million shareholders of the SAM Funds paid for advisory services, paying sub-advisor Edge only $2.7 million for performing the actual advisory service.  In 2009, Defendant PMC retained $12.9 million of the $14.6 million shareholders of the SAM Funds paid for advisory services, paying sub-advisor Edge only $1.7 million for performing the actual advisory service.  In 2010, Defendant PMC retained $13.7 million of the $15.6 million shareholders of the SAM Funds paid for advisory services, paying sub-advisor Edge only $1.9 million for performing the actual advisory service.

49.   "[F]und managers . . . routinely add a hefty 'premium' or 'monitoring fee' to the sub-advisers' charge.  True, the sub-adviser may charge only 30bps for its investment advice, but the manager will then typically pad the bill, adding an additional twenty to thirty basis points 'premium' before passing along the advisory fee charge to fund shareholders."  *See* Freeman, Brown & Pomerantz Study at 117-118 [Exhibit 3].  Indeed, "overall fee levels for sub-advised funds are substantially higher than for funds managed in-house."  *Id.* at 118.  The advisors of the Subject Funds are no different, padding the bill to shareholders by over $157 million in fiscal year 2008 (almost $17.8 million for the SAM Funds and almost $140 million for the Underlying Funds), over $121 million in fiscal year 2009 (almost $12.9 million for the SAM Funds and over $108.2 million for the Underlying Funds), and $139 million in fiscal year 2010 (almost $13.7 million for the SAM Funds and over $125.3 million for the Underlying Fund) for few, if any additional services.  *See* ¶¶ 43-45, *supra.*

50.     In addition, despite the equivalence of the investment advisory services Defendants provide to the Subject Funds in comparison to their competitors, the fees Defendants receive from the Subject Funds for investment advisory services are much higher than the fees their competitors receive for substantially similar services.  *See* Comparative Fee Structures, Section <u>V</u>.D., *infra*.

51.     Finally, the investment advisory services Defendants provide to the Subject Funds are identical/substantially similar to the investment advisory services Defendants or their affiliates provide to other clients (such as institutional clients) and entail identical costs.  In fact, the cost of managers, analysts, research data, the physical plant, and other aspects of Defendants' investment advisory services are shared between the mutual funds and the other clients.  *See* Comparative Fee Structures, Section <u>V</u>.D., *infra*.

### (2)     Rule 12b-1 Distribution Fees

52.     Plaintiffs and the other shareholders of the Subject Funds also paid distribution fees for marketing, selling, and distributing mutual fund shares to new shareholders pursuant to distribution plans that Defendants adopted with respect to the Subject Funds pursuant to Rule 12b-l, 17 C.F.R. § 270.12b-1 ("Distribution Plans").  The distribution fees are paid to Defendant Principal Funds Distributor, Inc.  The distribution fees are based on a percentage of the net assets of each of the Funds.  Defendants purportedly collect these fees in order to grow or stabilize the assets of the Subject Funds so that the Subject Funds can benefit from economies of scale through reduced advisory and administrative fees.

53.     Prior to 1980, the use of fund assets (which are owned by the shareholders) to sell new fund shares was prohibited.  The SEC had historically been reluctant to allow fund advisers to charge their shareholders for selling shares to others because:

> [T]he cost of selling and purchasing mutual fund shares should be borne by the investors who purchase them and thus presumably receive the benefits of the investment, and not, even in part, by the existing shareholders of the fund who often derive little or no benefit from the sale of new shares.

Statement on the Future Structure of the Securities Markets, [Feb. 1972] Sec. Reg. & L. Rep. (BNA) No. 137 pt. II, at 7.

54.     After intense lobbying by the mutual fund industry, the Commission agreed to consider modifying its objections to allow current fund shareholders to pay distribution expenses.  In early comment letters and in proxy statements proposing adoption of plans of distribution, the mutual fund industry argued that adding assets to an existing mutual fund would create economies of scale that would allow the advisers to provide the same quality and nature of services to mutual fund shareholders at dramatically lower costs.

55.     Accepting the mutual fund industry's argument that a growth in assets would lead to a quid pro quo reduction in fees and other expenses, the Commission tentatively approved Rule 12b-l, 17 C.F.R. § 270.12b-1.  However, numerous conditions were attached to the use of fund assets to pay distribution expenses.  For example, the Commission wanted to be certain that investment advisers would not "extract additional compensation for advisory services by excessive distributions under a 12b-1 plan."  *Meyer v. Oppenheimer Management Corp.*, 895 F.2d 861, 866 (2d Cir. 1990).  Unfortunately, that is precisely what Defendants have done: extracted additional compensation for their retail advisory services by causing Plaintiffs and other shareholders to pay Defendants' marketing expenses to acquire new shareholders so that these new shareholders could pay additional advisory fees to Defendants.  Under this regime, Defendants have fashioned yet another way to increase their financial benefit while leaving Plaintiffs to bear the financial burden.

56.     Furthermore, the distribution fees are based on the net asset value of the Subject Funds and not on the distribution activity, if any, by Defendants, such as number of shares sold. Consequently, in addition to failing to benefit Plaintiffs and other shareholders, the Distribution Plans have extracted additional compensation for advisory services to Defendants, thereby resulting in excessive fees paid to them.  For example, any portion of the fees paid to Defendants that are derived from market increases in the net asset value of the fund rather than any distribution activity by Defendants constitutes additional and excessive compensation for advisory services.

57.     In fiscal year 2008, Defendants received $25,593,000 in 12b-1 payments from the SAM Balanced Portfolio itself and an additional $13,393,000 in 12b-1 payments from the SAM Strategic Growth Portfolio. In fiscal year 2009, Defendants received $15,928,000 in 12b-1 payments from the SAM Balanced Portfolio and an additional $7,617,000 in 12b-1 payments from the SAM Strategic Growth Portfolio. In fiscal year 2010, Defendants received $16,261,000 in 12b-1 payments from the SAM Balanced Portfolio and an additional $7,812,000  in 12b-1 payments from the SAM Strategic Growth Portfolio.[10]

58.     Distribution fees have served only Defendants, just as the SEC feared when it found that "the use of mutual fund assets to finance distribution activities would benefit mainly the management of a mutual fund rather than its shareholders, and therefore that such use of fund assets should not be permitted."  Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 9915, 1977 SEC LEXIS 943 (Aug. 31, 1977).  As such, the distribution fees are entirely a waste of fund assets.

---

[10] Fiscal year 2011 12b-1 payment figures were not available at the time of the filing of this Second Anniversary Complaint.

59.     Plaintiffs, on behalf of the SAM Funds as well as the Underlying Funds, are entitled to recover the excessive distribution fees received (and continuing to be received) by Defendants.

**B.     Economies of Scale**

60.     The size of the compensation received by the advisor should be evaluated in context with the economies of scale realized by a fund.  Economies of scale are created when (as with the Funds) assets under management increase more quickly than the cost of advising and managing those assets.  The work required to operate a mutual fund does not increase proportionately with the assets under management.

> [I]nvestment management efforts, the most important (and most expensive) input into portfolio management, do not increase long with portfolio size.  A portfolio manager can invest $5 billion nearly as easily as $1 billion and $20 billion nearly as easily as $10 billion.  (Size may impair performance, but it imposes little logistical challenge.)"

Swensen, *Unconventional Success:  A Fundamental Approach to Personal Investment* 238. Therefore, "[a]s scale increases, fees as a percentage of assets ought to decline, allowing both fund manager and fund shareholders to benefit."  *Id.*  Indeed, break points "reflect the economic reality of the direct relationship between decreasing marginal costs and increasing portfolio size."  *Id.*  According to another fund industry expert, John C. Bogle, the economies of scale generated in the mutual fund portfolio management and research business are "little short of staggering."  John C. Bogle, *The Battle for the Soul of Capitalism* 154 (2005).

61.     As an example, if a fund has fifty million dollars ($50,000,000) of assets under management and a fee of 75 basis points (100 basis points = 1%), the fee equals $375,000 per year.  A comparable mutual fund with five hundred million dollars ($500,000,000) of assets under management would generate a fee of three million seven hundred and fifty thousand

dollars ($3,750,000).  Similarly, a mutual fund worth five billion dollars ($5,000,000,000) would generate a fee of ***thirty-seven million, five hundred thousand dollars ($37,500,000) per year.***

62.     It simply does not cost a fund's advisor ten times as much to render services to a ten billion dollar ($10,000,000,000) fund as compared to a one billion dollar ($1,000,000,000) fund.  In fact, the investment advisory services or securities selection process for a ten billion dollar fund and a one million dollar fund are virtually identical, generating enormous economies of scale.  At some point (exceeded by the fund because of their large size), the additional cost to advise each additional dollar in the fund (whether added by a rise in the value of the securities or additional contributions by current or new shareholders) approaches a number at or close to zero.

63.     Advances in computing and communication technologies in the past twenty years have resulted in exponential efficiencies that have dramatically reduced the costs of servicing mutual funds in ways Congress could not have imagined when it enacted ICA § 36(b).  Further, as assets under management increase, the cost of providing services to additional assets does not increase at the same rate, resulting in tremendous economies of scale.  In the case of the Subject Funds, assets under management have grown, so have the advisory and distribution fees paid to Defendants grown dramatically, despite the economies of scale realized by Defendants.  *See* Comparative Fee Structures, Section V.D., *infra*.  As the fees paid to Defendants (and accepted by them in violation of their statutory fiduciary duties) are unfair, especially when compared to the rates charge by the sub-advisors, by competitors or to institutional clients, the excess profits resulting from these economies of scale belong to Plaintiffs and the other shareholders of the Subject Funds.

64.     The existence of economies of scale in the mutual fund industry has been confirmed by both the SEC and the Governmental Accounting Office (the "GAO").  Both

conducted in-depth studies of mutual fund fees in 2000, and both concluded that economies of scale exist in the provision of advisory services.  *See* SEC Division of Investment Management: Report on Mutual Fund Fees and Expenses (Dec. 2000) ("SEC Report"), at 30-31 [Exhibit 5]; GAO, Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House of Representatives (June 2000) ("GAO Report"), at 9 [Exhibit 6].

65.     In addition, the most significant academic research undertaken since the Wharton School study in the 1960s establishes the existence of economies of scale that are not being passed along to mutual fund shareholders in violation of Defendants' duty to do so under § 36(b) and Rule 12b-1.  *See* John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26 J. Corp L. 610, 661 (2001) (the "Freeman & Brown Study") [Exhibit 7].  As the Freeman & Brown Study noted:  "The existence of economies of scale has been admitted in SEC filings made by fund managers and is implicit in the industry's frequent use of fee rates that decrease as assets under management increase.  Fund industry investment managers are prone to cite economies of scale as justification for business combinations."  *Id*. at 620 [Exhibit 7].

66.     These economies of scale exist not only fund by fund but also exist with respect to an entire fund complex and even with respect to an investment advisor's entire scope of operations, including services provided to institutional and other clients.  *See* Freeman & Brown Study at 621 n.62 (quoting Victoria E. Schonfeld & Thomas M.J. Kerwin, Organization of a Mutual Fund, 49 Bus. Law 107 (1993)) [Exhibit 7].

67.     The clearest example of economies of scale occurs when total assets under management increase due purely to market forces (without the institution of new advisory

relationships or new asset gathering).  In such instances, as the GAO confirms, it is possible for

the advisor to service the additional assets with zero additional costs.  *See* GAO Report at 9

(noting that growth from portfolio appreciation is unaccompanied by costs) [Exhibit 6].  In other

words, an investment advisor can advise a fund that doubles in size purely because of market

forces with no increased costs because the services are unchanged.  *See id.* [Exhibit 6]; Freeman

& Brown Study at 619 n.43, 621 (noting that investment advisors have benefited by garnering

"increased fees from the general increase in market prices with no commensurate efforts on their

part" and also noting that as much as 64% of mutual fund asset growth has come from

appreciation of portfolio securities, which, unlike growth from share sales to new investors, is

costless) [Exhibit 7].

   68. Economies of scale exist for the SAM Funds as well as the Underlying Funds;

they are just being appropriated for the benefit of the service-provider managers of the funds.

Thus fund shareholders are suffering by being deprived of the benefits that their financial

participation (not the managers') creates.  The economies of scale benefits that have been

captured and misappropriated by Defendants can and do generate huge excessive, undeserved

profits for the Defendants.  These profits have been improperly misappropriated from the mutual

funds by, in part, depriving fund shareholders of the benefits of economies of scale.  These

benefits can (at least in part) be shared with the mutual funds and their shareholders by reducing

the advisory fees and other costs charged to the fund by Defendants.  In the case of the mutual

funds at issue in this case, no meaningful savings have been shared with the Subject Funds.

Defendants' price gouging on service charges has been complex-wide, unremitting, and massive.

   69. The economies of scale enjoyed by Defendants with respect to the Subject Funds

have not been shared with Plaintiffs as required by § 36(b) and Rule 12b-1.  As a result, the

excessive fees paid to Defendants for advisory services provided to the Subject Funds violate

§ 36(b).

**C.     The Nature and Quality of the Services Provided to the Funds**

70.     A basic problem with the SAM Funds as well as the Underlying Funds is that they

are grossly over-priced for the services they provide.  This is a consistent problem with all of the

Subject Funds as described in detail below.

71.     "In order to determine whether a fee is excessive for purposes of Section 36(b), a

court must examine the relationship between the fees charged and the services rendered by the

investment adviser."  *Krantz v. Prudential Investment Fund Management, LLC*, 305 F.3d 140,

143 (3d Cir. 2002) (citations omitted).

72.     The nature of the investment advisory services provided to the funds is

straightforward:  Defendants buy and sell, at their discretion, stocks, bonds, and other securities

for the funds.

**(1)     Sub-Advisory Services**

73.     Defendants hire sub-advisors for the SAM Funds as well as each Underlying

Fund, and each sub-advisor assumes the obligations of Principal to provide investment advisory

services to their designated funds.  On information and belief, Defendants provide little, if any,

additional advisory services beyond hiring the sub-advisor (in all instances, subsidiaries of

Defendants except for two Underlying Funds), and the non-advisory services called for in the

Management Agreement account for a very small percentage of the expenses to the advisor.

Therefore, Defendants provide minimal additional advisory services for the tens of millions of

they charged (and continue to charge) shareholders of the Subject Funds.  *See* ¶¶ 43-47, *supra*.

74.     Further, upon information and belief, while Defendants negotiated significantly

lower rates over the years for themselves while simultaneously demanding additional services

from the sub-advisors for those lower rates, Defendants only added immaterial breakpoints to the fees it charged the shareholders of the Subject Funds.  For example, in 2005, Defendant PMC paid the sub-advisor for the Real Estate Investors Fund a flat 54 basis points.   In 2008, despite adding compliance testing and monitoring to the duties of the sub-advisor, Defendant PMC decreased the fees it paid to the sub-advisor but did not change the fees it charged the funds' shareholders, thereby increasing the disparity between the fee paid to the sub-advisor and the fee paid by the shareholders from a total of 26 basis points to a total of 41 basis points at the last breakpoint.

### (2)    Competitors' Services

75.    Other investment advisors who offer fund of funds similar to the Principal model (*i.e.*, the advisors hire sub-advisors to make the tactical selections and allocations) such as Vanguard charge substantially less than Defendants.  On information and belief, the services provided by these other advisors are the same or substantially similar advisory services that Defendants provide to shareholders of the SAM Funds.  Yet, Defendants charged the shareholders of the SAM Funds almost $17.8 million more in fiscal year 2008 alone without any justification and, similarly, $12.9 million more in 2009 and $13.7 million more in 2010.  *See* Section V.D., *infra*.

### (3)    Institutional Client Services

76.    Defendant PMC provides investment advisory services to two institutional funds with identical names as their retail fund counterparts, *i.e.*, SAM Balanced Portfolio and SAM Strategic Growth Portfolio.  Both are diversified portfolios of the Principal Variable Contracts Funds, Inc. ("PVCFI") and also are open-end management investment companies registered under the Investment Company Act of 1940.  Under the Management Agreement with PVCFI, Defendant PMC provides the exact same investment advisory services to these institutional

clients.  Compare e.g., Exhibit 1 with December 31, 2009 Principal Variable Contracts Funds,

Inc. Amended and Restated Management Agreements, Exhibit 8.  While not identical, Defendant

PMC also provides corporate and administrative services to the PVCFI funds.  On information

and belief, the administrative services provided to both PVCFI and PFI account for a very small

percentage of the expenses to the advisor.  However, for the materially same tactical asset

allocation service to the PVCFI clients, Defendants charge dramatically higher fees because

these fees are not negotiated at arm's length as they are with the institutional clients.  This

disparity in fees evinces Defendants' willingness and determination to prefer their own financial

interests to the interests of the Funds and the shareholders of the Funds.  *See* Section V.D., *infra*.

**D.       Comparative Fee Structures**

77.     Analyzing the fees paid by Defendants' sub-advisors, its competitors or those fees

Defendants charge its institutional clients provides three additional measures by which

Defendants have violated their fiduciary duties to the shareholders of the Funds by charging

them unfair and excessive fees.

**(1)       Fee Structure of Defendants' Sub-Advisors**

78.     As discussed in Section V.C.1., *supra*, Defendants hired sub-advisors for all of

the Subject Funds that assumed the obligation of providing essentially all of the substantive

investment advisory services to their designated funds.  As each sub-advisor is a for-profit

investment management company that negotiated its fee with Defendants, the fees they charge

provide a guidepost of the cost of the investment advisory services provided to the Subject

Funds, presumably including a comfortable profit margin.  Compared to the fees charged by the

sub-advisors who actually perform the substantive advisory services to the Subject Funds, the

additional fees charged by Defendants for the little, if any, additional services to the Subject

Funds are unfair and excessive.

(2)      **Fee Structures of Competitors of Defendants**

79.      While rates charged by other adviser-managers to other similar funds are not a factor to be taken into account, "to the extent that other managers have tended 'to reduce their effective charges as the fund grows in size,' the Senate Committee noted that such a reduction represents 'the best industry practice [which] will provide a guide.'" *Gartenberg*, 694 F.2d at 929 (*quoting* S.Rep. No. 91-184, *supra*, [1970] U.S.Code Cong. & Ad.News at 4902).

80.      If the Subject Funds are compared with peer mutual funds, an industry where price competition is notoriously lacking, price gouging for advisory services by Defendant PMC is readily seen with excessive fees totaling more than $200 million in fiscal year 2008, over $160 million in 2009, and over $190 million in 2010.

81.      For example, the SAM Funds are balanced products with a tactical asset allocation overlay.  Vanguard offers a similar balanced product with moderate risk -- the Vanguard LifeStrategy Moderate Growth Fund ("LifeStrategy"), a fund of funds that invests in other Vanguard mutual funds.  While the LifeStrategy fund itself is not a tactical asset allocation product, 25% of the fund is invested in the Vanguard Asset Allocation Fund Investor Shares ("VAAF") – a tactical asset allocation product without a target allocation balance.  Vanguard hires Mellon Capital Management Corporation to sub-advise the VAAF.  As Vanguard charges no management fee to the shareholders of its LifeStrategy fund of funds, one can isolate the fee Vanguard negotiated with Mellon, a for-profit investment management company, for its asset allocation services.  Shareholders of the Vanguard LifeStrategy Fund pay 10 basis points to purchase the VAAF through LifeStrategy.  The ten basis points includes all advisory as well as administrative services. Analyzing the annual report of the VAAF, one can determine that the investment advisory fee paid to Mellon is 3.5 basis points which accounts for advisory services with three components to it:  1) the active management of the equity portfolio; 2) the active

management of the bond portfolio; 3) and the asset allocation function.  While Plaintiffs cannot

separate out how much of the 3.5 basis points accounts for only the asset allocation function, it is

clear that shareholders of the Vanguard LifeStrategy fund of funds pay Mellon somewhere

between 0 basis points and 3.5 basis points for the asset allocation service.  Contrasting this 3.5

basis points for a full tactical asset allocation service that was negotiated at arms length with the

32 basis points Defendants charged in 2008 (and the 35 basis points Defendants charged in 2009

and 33 basis points Defendants charged in 2010) to shareholders of the SAM Funds illustrates

the excessive nature of the fees charged by Defendants.

### (3)      Fee Structure of Institutional Clients of Defendants

82.      The fees advisors receive from mutual funds for investment advisory services are

directly comparable to, though materially higher than, the fees advisors receive from other

clients for the identical services.  As the Freeman & Brown Study noted:  "None of the leading

advisory fee cases involved equity funds, and hence, none of the courts were confronted directly

with the strong analogies that can be drawn between equity advisory services in the fund industry

as compared to the pension field where prices are notably lower."  Freeman & Brown Study at

653 [Exhibit 7].  While a "manager may encounter different levels of fixed and variable research

costs depending on the type of the portfolio, . . . the fundamental management process is

essentially the same for large and small portfolios, as well as for pension funds and mutual funds.

The portfolio owner's identity (pension fund versus mutual fund) should not logically provide a

reason for portfolio management costs being higher or lower."  *Id.* at 627-28 [Exhibit 7].  Indeed,

"a mutual fund, as an entity, actually is an institutional investor.  When it comes to fee

discrepancies, the difference between funds and other institutional investors does not turn on

'institutional status,' it turns on self-dealing and conflict of interest."  *Id.* at 629 n.93 [Exhibit 7].

Accordingly, the "'apples-to-apples' fee comparisons between equity pension managers and

equity fund managers can be most difficult and embarrassing for those selling advice to mutual

funds." *Id.* at 671-72 [Exhibit 7].

83.     More recently, New York Attorney General Eliot Spitzer surveyed two fund

complexes and confirmed the existence of massive over-charging of fund advisory fees.  Mr.

Spitzer testified before a Senate Subcommittee on January 27, 2004, as follows:

> Putnam's mutual fund investors were charged 40 percent more for advisory services than Putnam's institutional investors.  In dollar terms, what this fee disparity means is that in 2002 Putnam mutual fund investors paid $290 million more in advisory fees than they would have paid had they been charged the rate given to Putnam's institutional clients, and these are for identical services.

> There was a similar disparity in the advisory fees charged by Alliance. Once again, mutual fund investors were charged significantly higher advisory fees than institutional investors.  Specifically, Alliance's mutual fund investors paid advisory fees that were twice those paid by institutional investors.  In dollar terms, this means that Alliance investors paid more than $200 million more in advisory fees than they would have paid had they been charged the rate given to Alliance's institutional clients.

84.     The shareholders of the Funds at issue here are plagued by the same

discriminatory over-charging by Defendants as the shareholders of the funds mentioned by Mr.

Spitzer in his Senate testimony.  For example, Defendants are charging advisory fees to the SAM

Funds that are excessive in relation to the value of the services rendered.  Investment advisors

publish their rack rates, or the rates they offer as a starting point (with the understanding that the

actual rates ultimately agreed upon after arms-length negotiations are often even lower than the

published rack rates), in filings with the Securities and Exchange Commission.  With regard to

the SAM Funds, Defendants and their affiliates openly offer (and continue to offer) much lower

rates to their institutional or other clients for funds with the same name as the SAM retail funds:

| Assets Under Management | SAM Funds offered through Principal Fund, Inc. | SAM Funds offered through Principal Variable Contracts Fund, Inc. |
|---|---|---|
| First $500 million | 0.55% | .025% |
| Next $500 million | 0.50% | .025% |
| Next $1 billion | 0.45% | .020% |
| Next $1 billion | 0.40% | .020% |
| Next $1 billion | 0.35% | .020% |
| Next $1 billion | 0.30% | .020% |
| Over $5 billion | 0.25% | .020% |

The comparative effective rate by shareholders is:

| AUM ($millions) | SAM Funds offered through Principal Fund, Inc. | SAM Funds offered through Principal Variable Contracts Fund, Inc. |
|---|---|---|
| 10 | 0.55% | .025% |
| 50 | 0.55% | .025% |
| 100 | 0.55% | .025% |
| 500 | 0.55% | .025% |
| 1,000 | 0.53% | 0.25% |
| 5,000 | 0.41% | 0.21% |

In dollar terms, the shareholders of the SAM Funds are paying over twice as much as the institutional clients just based on the published rack rates (keeping in mind that these rack rates are typically much higher than what the institutional clients actually end up paying after negotiations with the advisor):

| AUM ($millions) | SAM Funds offered through Principal Funds, Inc. | SAM Funds offered through Principal Variable Contracts Fund, Inc. |
|---|---|---|
| 10 | $55,000 | $25,000 |
| 50 | $275,000 | $125,000 |
| 100 | $550,000 | $250,000 |
| 500 | $2,750,000 | $1,250,000 |
| 1,000 | $5,250,000 | $2,500,000 |
| 5,000 | $20,250,000 | $10,500,000 |

85.     However, according to the Management Agreements with PFI and PVCFI, Defendant PMC provides the exact same investment advisory services to the funds.  *Compare*

Exhibits 1 and 8.  In fact, Defendant PMC hires its subsidiary Edge to sub-advise both funds and *pays Edge the exact same fee to sub-advise both of the funds*, *i.e.*, 0.042%.

86.     Finally, Defendant PMC offers the substantially lower advisory fee schedule to PVCFI shareholders even though it is a much smaller fund (*i.e.*, 3 times smaller):  *e.g.,* the SAM Balanced Portfolio in the PVCFI family of funds only had approximately $935 million in 2010, compared to approximately $3.2 billion in assets under management in 2010 for the SAM Balanced Portfolio in the PFI family of funds.  The SAM Strategic Growth Portfolio in the PVCFI family of funds only had approximately $152 million in 2010, compared to almost $1.5 billion in 2010 for its retail counterpart.  Upon information and belief, like shareholders of the SAM Balanced and SAM Strategic Growth Portfolios, the shareholders of the Underlying Funds also are paying materially more than the Defendants' institutional clients for substantially similar services.

87.     That Defendants are able to manage strangers' money for far lower fees than they are charging the Subject Funds' shareholders, to whom fiduciary duties are owed based on the common law and federal statute, shows Defendants have completely abdicated their fiduciary responsibility of fair dealing to the funds and the funds shareholders when it comes to providing advisory services.

**E.     The Profitability of the Funds to the Adviser/Manager**

88.     "[T]he 'profitability of the fund to the adviser' [must] be studied in order that the price paid by the fund to its advisor be equivalent to 'the product of arm's-length bargaining.'"  *See* the Freeman & Brown Study at 661 [Exhibit 7].  The profitability of a fund to an adviser-manager is a function of revenues minus the costs of providing services.  However, on information and belief, Defendants' reporting of their revenue and costs is intended to, and does, obfuscate Defendants' true profitability.  For instance, on information and belief, Defendants

employ inaccurate accounting practices in their financial reporting, including arbitrary and unreasonable cost allocations.

89.     Following discovery of this information, Defendants' true profitability can be determined on either an incremental basis or a full-cost basis.  Defendants' incremental costs of providing advisory services to Plaintiffs are believed to be nominal while the additional fees received by Defendants are hugely excessive given that the nature, quality, and level of the services remain the same.  On information and belief, a review of Defendants' full costs of providing advisory services will also demonstrate the enormous profitability to Defendants of managing the Subject Funds.

**F.     Fallout Benefits**

90.     Defendants indirectly profit because of the existence of the Subject Funds through fallout benefits.  Indeed, it was the rush to capitalize on "fallout benefits" available to mutual fund managers that fed the late-trading/market timing misbehavior engulfing numerous fund sponsors.  These obvious, but difficult to quantify fallout benefits include the attraction of new customers, cross selling related funds to current customers, and other benefits associated generally with the development of goodwill and the growth in assets of the Subject Funds.

91.     Other, easier to quantify, benefits include "soft dollars" payable from broker-dealers.  Essentially, "soft dollars" are credits furnished to Defendants from broker-dealers and other securities-industry firms in exchange for routing the Subject Funds' securities transaction orders and other business to paying firms.  These soft-dollar credits should be used to purchase research and other goods or services that benefit the shareholders of the SAM Funds as well as the Underlying Funds.  On information and belief, however, the soft-dollar arrangements benefit Defendants and result in increased costs to the shareholders of the Subject Funds with little to no corresponding benefits to the shareholders of the Subject Funds.

92.     Defendants receive further fallout benefits from securities lending arrangements. Essentially, Defendants loan out the securities of the Subject Funds and receive compensation as the lending agents of the Subject Funds.

93.     A highly profitable fallout benefit to Defendants is the ability to sell investment advisory services paid for by the Subject Funds at virtually no additional cost.  Much like computer software, once the investment research and resulting recommendations are paid for, that research and those recommendations may be sold to other clients at virtually no cost whatsoever to Defendants.  Without payment by Plaintiffs and other shareholders of the Subject Funds of millions of dollars in advisory, administrative, and distribution fees (especially distribution fees that are nothing more than a means to extract additional compensation for advisory services), Defendants would have to pay to conduct that research independently in order to provide investment advisory services to other clients, including institutional clients.  This is a natural byproduct of the extraordinary economies of scale inherent in the investment advisory business.  However, although Plaintiffs and other shareholders of the Subject Funds pay all of the costs associated with the investment advisory services, Defendants resell these services to third parties without compensating Plaintiffs through reduced fees or in any other way.

94.     On information and belief, Defendants do not provide sufficient information regarding the existence and extent of these and other fallout benefits to the shareholders of the Subject Funds or to the Subject Funds' directors.  The evidence demonstrating the validity of this allegation is believed to be within Defendants' sole possession.

95.     The directors are thus unable to quantify or even meaningfully consider the benefits.  Plaintiffs and other shareholders of the Subject Funds have paid for these benefits and

are entitled to compensation in the form of reduced advisory and administrative fees and the elimination of distribution fees.

**G.      The Independence and Conscientiousness of the Directors**

96.      The fees paid to Defendants are technically approved by the Subject Funds' Board of Directors.  A majority of the Subject Funds' board is comprised of statutorily presumed "disinterested" directors as that term is defined in § 10 of the ICA, PMC has a common Board of Directors who oversees and monitors well over 98 portfolios in the Fund Complex.  Regardless of whether these presumably "disinterested" directors meet the requirements of § 10 of the ICA, there is a lack of conscientiousness by the directors in reviewing the advisory and distribution fees paid by each of the Subject Funds.

97.      On information and belief, the materials provided by Defendants to the directors of the Subject Funds establish that the nature of the services Defendants render to the Subject Funds has remained unchanged despite dramatic growth in the assets of the Subject Funds and advisory revenues.

98.      In addition, even if statutorily disinterested, the directors are in all practical respects dominated and unduly influenced by Defendants in reviewing the fees paid by Plaintiffs and other shareholders of the Subject Funds.  In particular, Defendants do not provide the directors with sufficient information for the directors to fulfill their obligations, a factor supporting a finding that Defendants have breached their fiduciary duties.

99.      For example, Defendants added the LargeCap Value Fund III to the SAM Balanced Portfolio, and the Fund's directors approved the applicable management and sub-advisory agreements during fiscal year 2008.  The LargeCap Value Fund III was added (and continues to be retained as a holding in the SAM Funds) despite David Swensen's skewering of the fee structure for the fund three years earlier, *see* ¶ 47, *supra*, and despite the fact that the

nature of the fee arrangement had not changed.  *Id.*  In addition, the fund was added and the investment advisory contracts approved despite the fact that Morningstar had given the A, B, C, and J classes of the fund its lowest rating of one star for the previous five year period (the institutional share class had a five year two star rating).

100.    Defendants also have adopted, and the Subject Fund's directors have approved, transfer agency fees that are paid to PSI, a wholly owned subsidiary of Defendant PMC.  While Defendants' public filings indicate that the services provided under the contract are provided at cost, Plaintiffs are unable to determine without discovery whether the alleged cost of the services was excessive.

101.    In addition, Defendants have adopted, and the Subject Funds' directors have approved, 12b-l Distribution Plans for the Subject Funds that do not benefit the shareholders of the Subject Funds.  These Distribution Plans must be reviewed annually by the Subject Funds' directors.  In particular, the directors must "request and evaluate . . . such information as may reasonably be necessary to an informed decision of whether such plan should be implemented or continued."  17 C.F.R. § 270.12b-1(d).  In addition, minutes must be maintained to record all aspects of the directors' deliberation, and the directors must conclude "in light of their fiduciary duties under state law and under Sections 36(a) and (b) of the ICA, that there is a reasonable likelihood that the Distribution Plans will benefit the company and its shareholders."  17 C.F.R. § 270.12b-l(e).

102.    Despite the fact that Plaintiffs and the other shareholders of the Subject Funds have enjoyed no benefits from the Distribution Plans even though they contributed to the growth of fund assets by paying distribution fees, and despite the fact that the Distribution Plans have allowed Defendants to extract additional and excessive compensation from Plaintiffs and the

other shareholders of the Subject Funds, the directors of the Subject Funds have continued to

approve, year after year, continuation of the Distribution Plans in violation of both Rule 12b-1

and § 36(b). A recent report written by Dr. Lori Walsh, financial economist at the S.E.C., studied

"whether shareholders do, in fact, reap the benefits of 12b-1 plans." It states:

> Prior studies have provided evidence that shareholders are not receiving
> sufficient benefits from expense scale economies to offset the 12b-1 fee.
> In fact most of the studies show that expense ratios are higher for funds
> with 12b-1 fees by almost the entire amount of the fee. This study
> confirms these results using a more recent dataset. . .
>
> In all, the evidence demonstrates that 12b-1 plans are successful at
> attaining faster asset growth; however, shareholders do not obtain any of
> the benefits from the asset growth. This result validates the concerns
> raised by opponents of 12b-1 plans about the conflicts of interest created
> by these plans. . .
>
> 12b-1 plans do seem to be successful in growing fund assets, but with no
> apparent benefits accruing to the shareholders of the fund. Although it is
> hypothetically possible for most types of funds to generate sufficient scale
> economies to offset the 12b-1 fee, it is not an efficient use of shareholder
> assets. . . Fund advisers use shareholder money to pay for asset growth
> from which the adviser is the primary beneficiary through the collection of
> higher fees.

Lori Walsh, The Costs and Benefits to Fund Shareholders of 12b-1 Plans: An Examination of

Fund Flows, Expenses and Returns (2004) at 4, 18, Exhibit 9.

103.    Nevertheless, despite the fact that a financial economist at the S.E.C. confirms,

consistent with overwhelming empirical evidence drawn from numerous scholarly studies, that

shareholders reap no benefits from 12b-1 plans and that 12b-1 fees are "not an efficient use of

shareholder assets," the directors of the Subject Funds repeatedly have approved the Distribution

Plans in violation of their duties under sections 12 and 36(b) and rule 12b-1 both to the Subject

Funds and to its shareholders, including Plaintiffs.

104.    The Subject Funds' Distribution Plans have not been adopted in accordance with

the rules.  The Board did not find that the Distribution Plans in general or the Distribution Fees

in particular benefit the Subject Funds or its shareholders by generating savings from economies of scale in excess of the cost of the plan. In fact, despite the dramatic growth in total assets held by the Subject Funds, both the management fee (including the Portfolio Selection Fee) and total 12b-l Distribution Fees (including Distribution Fees) received by Defendants have grown over time, thus depriving the Subject Funds of the benefit of these economies of scale in breach of Defendants' fiduciary and other duties.

105.    As discussed in the introduction, the members of the respective Boards of the funds at issue in this Complaint simultaneously serve on the Boards of over 98 mutual funds in the Fund Complex.

106.    The mutual fund boards typically meet each calendar quarter at a simultaneous meeting for all mutual funds, and they are paid a fee from each separate mutual fund, which means that by attending a single board meeting, the directors receive numerous separate fees.  As a result, board membership in the Fund Complex is a lucrative part-time job, the continuation of which is dependent (at least in part) on the continued good will and support of Defendant.  *See also*, Inherent Conflict in the Structure of Mutual Funds, Section IV.B. *supra*.

107.    At least 40% of the Fund's directors must be "disinterested" as defined in § 10 of the ICA.  As the GAO Report noted, the structure of most mutual funds embodies a potential conflict of interest between the fund's shareholders and its adviser.  This conflict arises because the fees paid by the shareholders represent revenue to the adviser.  The United States Supreme Court has stated that the disinterested-director requirement is "the cornerstone of the ICA's efforts to control" this conflict of interest.  *Burks v. Lasker*, 441 U.S. 471 (1979).

108.    The disinterested directors are supposed to serve as "watchdogs" for the shareholders of the Fund. As such, the disinterested directors have primary responsibility for,

among many other things, negotiating and approving all contracts and agreements with Defendants and reviewing the reasonableness of the advisory, administrative, and distribution fees received by Defendants.  Accordingly, as noted by the GAO, the directors are expected to review, among other things, the advisor's costs, whether fees have been reduced when the Fund's assets have grown, and the fees charged for similar services.  See GAO Report at 14 [Exhibit 6].  These responsibilities are intensive, requiring the directors to rely on information provided by Defendants.  Defendants, in turn, have a fiduciary duty to provide all information reasonably necessary for the directors to perform their obligations.  *See* 15 U.S.C., § 80a-15(c); 17 C.F.R. § 270.12b-1.

109.    The ICA contains a presumption that the disinterested directors are in fact disinterested.  However, the lack of conscientiousness of even disinterested directors in reviewing the fees paid by the Fund, the lack of adequate information provided to the directors in connection with their approvals of the advisory agreements and Distribution Plans, and the control of management over the directors in reviewing the fees paid by the Funds are not presumed but, rather, are important factors recognized in the *Gartenberg* line of cases in determining whether Defendants have breached their fiduciary duties.  In addition, the SEC has specifically recognized that even disinterested directors may not be independent but, rather, may be subject to domination or undue influence by a fund's investment adviser.  For example, the SEC has stated that "disinterested directors should not be entrusted with a decision on use of fund assets for distribution without receiving the benefit of measures designed to enhance their ability to act independently."  Bearing of Distribution Expenses by Mutual Funds, Investment Co. Act Rel. No. 11414, 1980 SEC LEXIS 444 at *36 (Oct. 28, 1980).  Finally, the Supreme Court has held that "where the board's process was deficient or the adviser withheld important

information, the court must take a more rigorous look at the outcome." *Jones*, 130 S. Ct. at
1430.

110.    On information and belief, Defendants did not keep the directors fully informed
regarding all material facts and aspects of their fees and other compensation.  A truly
independent board of directors would not have tolerated the fee levels and layers of fees charged
by Defendants or the conduct of the service providers if they had obtained adequate information
regarding, among other things: the sub-advisory fees Defendants paid for the Subject Funds and
the services received by the Subject Funds from Defendants for the additional "premium" they
charged; the advisory fees charged and services provided by competitors with similar fund
structures; the advisory fees and services provided to Defendants' pension and other institutional
clients; the economies of scale enjoyed or fallout benefits received by Defendants; the
profitability data (and how to evaluate the profitability data in light of economies of scale); and
the Distribution Plans and the benefit to the shareholders of the plans (such as whether the
Distribution Plans should have been implemented and whether they should have been
continued).

111.    On information and belief, the directors rarely, if ever, question any information
or recommendations provided by Defendants.  The evidence needed to establish the truth of
these allegations is believed to be exclusively in the control of Defendants and is not in
Plaintiffs' possession at this time.

112.    The foregoing assures that the directors do not understand Defendants' true cost
structure and, in particular, the economies of scale enjoyed by them in providing investment
advisory services to the Funds and their institutional and other clients.  Nor do the directors

understand the nature of the Distribution Plans and the benefits received by Defendants, and lack

of benefits received by Plaintiffs, from the Distribution Plans.

113.    On information and belief, the disinterested directors of the Subject Funds have

not received the benefit of any measures to enhance their ability to act independently, which has

caused the directors to be dependent on Defendants and has allowed Defendants to dominate and

unduly influence the directors.  In addition, the directors' failure to insist on adequate

information evinces a lack of care and conscientiousness on their part.

**COUNT I**
**ICA §36(b)**
**BREACH OF FIDUCIARY DUTY**
**(Excessive Fees)**

114.    Plaintiffs repeat and re-allege each allegation contained in the foregoing

paragraphs of this Complaint as of if fully set forth herein.

115.    <u>This count is alleged against Defendants Principal Management Corporation</u>.

116.    The fees charged by Defendants for providing advisory services to the SAM

Funds as well as the Underlying Funds represent a breach of Defendant's fiduciary duty to the

Subject Funds because they are excessive and were not negotiated at arm's length in light of all

the surrounding circumstances, including the advisory fees that Defendants paid to its sub-

advisors, Defendants' competitors charged for similar advisory services, and Defendants charged

its other clients for advisory services.  Plaintiffs specifically allege that all excessive fees alleged

herein have inured to the benefit of, and been received by, Defendants.

117.    In charging and receiving excessive or inappropriate compensation, and in failing

to put the interests of Plaintiffs and the other shareholders of the SAM Funds as well as the

Underlying Funds ahead of their own interests, Defendants have breached and continue to breach

their statutory fiduciary duty to Plaintiffs in violation of ICA § 36(b), both as a result of a flawed

negotiating process and/or with respect to the substantive amounts of the fees.

118.    Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting

from the breach of fiduciary duty" by Defendants, up to and including, "the amount of

compensation or payments received from" the Subject Funds or, pursuant to 15 U.S.C. § 80-

46(b) ("§ 47(b) of the ICA"), rescission of the contracts.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**ICA § 36(b)**
**(Excessive Rule 12b-l Distribution fees and Extraction of**
**Additional Compensation for Advisory Services)**

119.    Plaintiffs repeat and re-allege each allegation contained in the foregoing

paragraphs of this Complaint as of if fully set forth herein.

120.    This count is alleged against Defendant Principal Funds Distributor, Inc.

121.    The distribution fees charged and received by Defendants were designed to, and

did, extract additional compensation for Defendants' advisory services in violation of

Defendants' fiduciary duty under § 36(b).  Although the distribution fees may have contributed

to the growth in assets of the Subject Funds, the resulting economies of scale benefited only

Defendants, and not Plaintiffs or the Subject Funds.

122.    In failing to pass along economies-of-scale benefits from the distribution fees, and

in continuing to assess distribution fees pursuant to plans of distribution despite the fact that no

benefits inured to Plaintiffs, Defendants have violated, and continue to violate, the ICA and have

breached and continue to breach their statutory fiduciary duty to Plaintiffs in violation of ICA §

36(b), both as a result of a flawed negotiating process and/or with respect to the substantive

amounts of the fees.

123.    Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including, the "amount of compensation or payments received from" the Subject Funds or, pursuant to § 47(b) of the ICA, rescission of the contracts.

WHEREFORE, Plaintiffs demand judgment as follows:

a.    An order declaring that Defendants have violated and continue to violate § 12, 36(b), and Rule 12b-l of the ICA and that any advisory, administrative, service or distribution agreements entered into are void ab initio;

b.    An order preliminarily and permanently enjoining Defendants from further violations of the ICA;

c.    An order awarding damages against Defendants including all fees paid to them by Plaintiffs and the Funds for all periods not precluded by any applicable statutes of limitation through the trial of this case, together with interest, costs, disbursements, attorneys' fees, and such other items as may be allowed to the maximum extent permitted by law; and

d.    Such other and further relief as may be proper and just.

DATED this 28th day of October, 2011

                                        /s/ David H. Goldman
                                        David H. Goldman
                                        Michael J. Carroll
                                        Kodi A. Brotherson
                                        BABICH GOLDMAN, P.C.
                                        100 Court Avenue, Suite 403
                                        Des Moines, Iowa  50309-2200
                                        Telephone:  (515) 244-4300
                                        Facsimile:  (515) 244-2650
                                        dgoldman@babichgoldman.com
                                        mcarroll@babichgoldman.com
                                        kbrotherson@babichgoldman.com

                                        Lynn Lincoln Sarko
                                        Michael D. Woerner
                                        Tana Lin
                                        Laura R. Gerber
                                        KELLER ROHRBACK L.L.P.
                                        1201 Third Avenue, Suite 3200
                                        Seattle, WA  98101
                                        Telephone: (206) 623-1900
                                        Facsimile: (206) 623-3384
                                        lsarko@kellerrohrback.com
                                        mwoerner@kellerrohrback.com
                                        tlin@kellerrohrback.com
                                        lgerber@kellerrohrback.com

                                        ***Counsel for Plaintiffs***