# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | |
|---|---|
| JUDITH CURRAN and MICHAEL EARP, for the use and benefit of the Principal Funds, Inc. Strategic Asset Management (SAM) Balanced Portfolio, Principal SAM Strategic Growth Portfolio, *et al*., | Case No. 4:09-cv-00433-RP-CFB |
| Plaintiffs, | PLAINTIFFS' BRIEF IN RESISTANCE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | **Oral argument requested** |
| PRINCIPAL MANAGEMENT CORPORATION, PRINCIPAL GLOBAL INVESTORS, LLC, and PRINCIPAL FUNDS DISTRIBUTOR, INC. | |
| Defendants. | |

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

     A.     Overlay Fee ...................................................................................... 1

     B.     12b-1 Fee ........................................................................................ 2

II.     BACKGROUND ............................................................................................ 2

     A.     The SAM Funds ............................................................................... 2

     B.     The SAM Funds' Management Agreements with PMC and PMC's
              Overlay Fee ...................................................................................... 3

     C.     Principal Acquires the SAM Funds from Washington Mutual, and
              Despite ▮▮▮▮▮ Keeps their Overlay Fee the Same—Even
              While the Fees of Comparable Funds Fall ........................................... 5

     D.     The SAM Funds Have Much Higher Fees Than the Comparable
              LifeTime Portfolios .......................................................................... 7

     E.     The PFI SAM Funds Have Higher Fees Than the Identical PVC
              SAM Funds ...................................................................................... 7

     F.     The SAM Funds Charge Their Shareholders 12b-1 Fees ..................... 8

III.     LEGAL STANDARD ..................................................................................... 9

     A.     The Summary Judgment Standard ..................................................... 9

     B.     The *Gartenberg* Standard ................................................................. 9

     C.     The Record Evidence Reveals Genuine Issues of Material Fact ........ 10

IV.     ARGUMENT ............................................................................................. 12

     A.     The Overlay Fee That PMC Extracts from the SAM Funds
              Violates Section 36(b) .................................................................... 12

            1.     Separate Fees Paid Under Separate Contracts for Services
                    Must Be Analyzed Separately for Excessiveness Under
                    *Gartenberg* ........................................................................ 13

            2.     Comparable Funds Enjoy Identical or More Extensive
                    Services in Exchange for Vastly Lower Fees .......................... 15

3.   PMC Provides the SAM Funds with a Narrow Range of
     Services in Exchange for a Heavy Overlay Fee ..................................... 21

4.   PMC Realizes Large Economies of Scale in Its Oversight
     of the SAM Funds ................................................................................. 24

5.   The SAM Funds Have Proven Highly Profitable to PMC ..................... 26

6.   The Board of Directors' Care and Conscientiousness Were
     Grossly Inadequate ............................................................................... 27

B.   The 12b-1 Fee That PFD Extracts from the SAM Funds Violates
     Section 36(b) ...................................................................................................... 37

V.   CONCLUSION ............................................................................................................. 40

# TABLE OF AUTHORITIES

## Cases

*Am. Mut. Funds*, No. 04-5593 (C.D. Cal. July 23, 2009) ............................................................. 13

*Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Management L.P.*, No. 01-5734, 2004 WL 1459249 (D.N.J. Feb. 9, 2004) ............................................. 13

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009) ................................................. 14

*Curran v. Principal Mgmt. Corp.*, No. 09-433, 2010 WL 2889752 (S.D. Iowa June 8, 2010) ........................................................................................................ 9

*Curran v. Principal Mgmt. Corp.*, No. 09-433, 2011 WL 223872 (S.D. Iowa Jan. 24, 2011) ......................................................................................................... 9

*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 541 (1984) .......................................................... 9

*Gallus v. Ameriprise Fin., Inc.*, 675 F.3d 1173 (8th Cir. 2012) ................................................ 37

*Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir. 1982) ....................................................................................................................... 10

*Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009) ................................................................ 13

*In re American Mutual Funds Fee Litigation*, No. 04-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009) ..................................................................................... 13, 21, 26

*Jones v. Harris Assocs. L.P.*, 130 S. Ct. 1418 (2010) .......................................................... passim

*Maitland v. Univ. of Minn.*, 155 F.3d 1013 (8th Cir. 1998) ......................................................... 9

*Meyer v. Oppenheimer Management Corp.*, 707 F. Supp. 1394 (S.D.N.Y. 1988), *amended*, 715 F. Supp. 574 (S.D.N.Y. 1989), *aff'd*, 895 F.2d 861 (2d Cir. 1990) ........................................................................................................................ 26

*Meyer v. Oppenheimer Management Corp.*, 707 F. Supp. 1394 (S.D.N.Y. 1988), *amended*, 715 F.Supp. 574 (S.D.N.Y. 1989), *aff'd*, 895 F.2d 861 (2d Cir. 1990) ................................................................................................................. 13, 27

*Mid-State Aftermarket Body Parts, Inc. v. MQVP, Inc.*, 466 F.3d 630 (8th Cir. 2006) ....................................................................................................................... 9

*New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 399 (S.D.N.Y. 2000) .................................................................................................................... 36

*Pepper v. Litton*, 308 U.S. 295 (1939) ....................................................................................... 14

*Peter v. Wedl*, 155 F.3d 992, 996 (8th Cir. 1998) ........................................................................ 9

*Pfeiffer v. Integrated Fund Servs., Inc.*, 371 F. Supp. 2d 502 (S.D.N.Y. 2005) ........................ 13

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962 (S.D.N.Y.),
    *aff'd*, 835 F.2d 45 (2d Cir. 1987) ............................................................................ 24, 26, 27

## Statutes

15 U.S.C. § 80a-35(b) ............................................................................................... 9, 14, 32

H.R. Rep. No. 91-1382, at 10 (1970) ............................................................................................ 3

## Other Authorities

Daniel B. Bergstresser et al., *Assessing the Costs and Benefits of Brokers in the
    Mutual Fund Industry*, 22 Rev. Fin. Studies 4129 (2009) ................................................... 40

Jeffrey M. Perloff, *Microeconomics* 206 (2d ed. 2001) ............................................................ 33

R. Glenn Hubbard & Anthony Patrick O'Brien, *Economics* (4th ed. 2013) ............................. 34

Robert S. Pindyk & Daniel L. Rubinfeld, *Microeconomics* (3d ed. 1994) ................................ 33

Walsh, Office of Econ. Analysis, SEC, *The Costs and Benefits to Fund
    Shareholders of 12b-1 Plans: An Examination of Fund Flows, Expenses and
    Returns* 3-6 (2004), *available at*
    http://sec.gov/rules/proposed/s70904/lwalsh042604.pdf ..................................................... 40

## Rules

Fed. R. Civ. P. 56(a) ..................................................................................................................... 9

## Regulations

17 C.F.R. § 270.12b-1 ................................................................................................................. 37

## I.   INTRODUCTION

The Investment Company Act forbids mutual fund advisers from charging fees that are so disproportionately large that they bear "no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones v. Harris Assocs. L.P.*, 130 S. Ct. 1418, 1426 (2010). Here, two fees charged to the SAM Balanced Portfolio and SAM Strategic Growth Portfolio (the "SAM Funds") flunk this test. The first fee is called the "Overlay Fee." The second is the "12b-1 fee."

### A.      Overlay Fee

Principal Management Corporation ("PMC") is the mutual fund adviser to the SAM Funds. But PMC does not provide day-to-day investment services to the SAM Funds; it delegates those services to another company, Edge Asset Management ("Edge"). PMC simply provides very limited oversight services. For these skimpy services, it charges a hefty "Overlay Fee" to the SAM Funds. This Overlay Fee is much higher—from almost two times to nearly ten times higher—than comparable fees charged by PMC. The Overlay Fee is also vastly higher— some thirty times higher—than the industry standard. Naturally, the SAM Funds have proven extraordinarily profitable to PMC, which on a pretax basis takes home close to ██ cents out of every fee dollar it receives. This profitability comes in part from the huge economies of scale that PMC enjoys in overseeing the SAM Funds.

This evidence, by itself, would require denial of the current motion for summary judgment. Plaintiffs have also produced evidence showing "a large disparity in fees that cannot be explained by . . . different services," plus "other evidence that the fee is outside the arm's-length range"—namely, evidence about the kind and quality of PMC's oversight services, about the SAM Funds' profitability, and about the large economies of scale that PMC realizes in

overseeing them. "[T]rial" on the Overlay Fee is therefore "appropriate." *Jones*, 130 S. Ct. at 1429 n.8.

But the evidence does not stop there. Plaintiffs have also adduced evidence showing that the board of directors that approved the Overlay Fee was both incurious and fundamentally misinformed about the facts—in part because Principal misdirected it. Because the board's process of approving the Overlay Fee was "deficient," this Court "must take a more rigorous look" at the Overlay Fee. *Id.* at 1430. This "more rigorous look" also necessitates a trial on the Overlay Fee.

**B.      12b-1 Fee**

Plaintiffs have also challenged another fee charged to the SAM Funds—the 12b-1 fee, which supposedly pays for marketing and share distribution costs. Plaintiffs have produced evidence creating a triable issue as to whether the 12b-1 fee is so disproportionate that it bears no reasonable relationship to the services rendered.

## II.      BACKGROUND

**A.      The SAM Funds**

A mutual fund consists of a portfolio of investments belonging to the individual investors in the fund. *Jones*, 130 S. Ct. at 1422. An investment adviser—an entity separate from the fund—creates the fund, appoints itself as the fund's adviser, and selects the fund's board of directors. *Id.* This relationship between fund and adviser means that the fund "cannot, as a practical matter, sever its relationship with the adviser," so that "the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." *Id.* (quotation marks and citation omitted).

The SAM Funds are both "funds of funds"—that is, mutual funds whose investment portfolios consist of other mutual funds. In amending the Investment Company Act in 1970 to

include section 36(b), Congress expressed particular concern about funds of funds—specifically, the "layering of costs to investors in terms of duplication of administrative expenses, sales charges and advisory fees." H.R. Rep. No. 91-1382, at 10 (1970).

As required by law, the SAM Funds have a board of directors that must annually approve the fees that the funds pay for services. *See Jones*, 130 S. Ct. at 1423. The board consists of directors who are affiliated with Principal as well as a requisite number of directors who are unaffiliated. Plaintiffs' Response to Defendants' Corrected Statement of Proposed Undisputed Facts ("DSUF Resp.") ¶ 39. This board oversees all of the mutual funds in the Principal family of funds. *See id.* ¶¶ 59, 63, 67, 71, 75, 78, 81, 84, 86.

**B.      The SAM Funds' Management Agreements with PMC and PMC's Overlay Fee**

Each SAM Fund has a Management Agreement with PMC. Plaintiffs' Statement of Additional Undisputed Material Facts ("PSUF") ¶ 70. Under these Agreements, PMC is responsible for providing investment advisory services to the SAM Funds, for which PMC receives a management fee ("Overlay Fee"). *Id.*

PMC, however, has delegated day-to-day investment advisory services to Edge, a separate affiliate of PMC. *Id.* ¶ 71; Defendants' Corrected Statement of Proposed Undisputed Facts ("DSUF") ¶ 109. Edge, as "subadviser," is responsible for all of the active investment management of the SAM Funds, including decisions about which underlying Principal mutual funds to invest in, how to allocate investment assets, and how to change that allocation over time. PSUF § IV.A. In exchange for these services, PMC pays Edge a "subadvisory fee," a small portion of the Overlay Fee. DSUF ¶ 112. PMC retains responsibility for limited oversight services. PSUF §§ IV.A-B. Schematically, then, the management of the SAM Funds is the following:





In exchange for the Overlay Fee, PMC is responsible only for ███████ ██████████

███████████████████████████████████████████████████████████████████████████████████████████

*Id.* Principal dubs its supervisory responsibilities the "Due Diligence Program."  DSUF ¶ 177.

Under this program, PMC ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████  PSUF § IV.B.3.

PMC also ███████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████  *Id.*  ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  *Id*. ¶¶ 92, 102. The  ████

████████████████████████████  services provided by PMC to the SAM Funds utilize a minimal

amount of additional resources. *Id*. §§ IV.B.2-3, IV.C.

The Overlay Fee that PMC charges the SAM Funds is calculated as a percentage of the

assets held by all five mutual funds in the SAM group of Principal funds.[1]  DSUF ¶ 99. From

---

[1] While there are a total of five Strategic Asset Management ("SAM") Funds in the Principal complex of mutual
funds, only two of those SAM Funds are at issue in this litigation.

2008 through 2011, the Overlay Fee, Edge's subadvisory fee, and the net Overlay Fee (i.e., its

Overlay Fee minus Edge's subadvisory fee) were the following:

| *SAM Balanced Fund* | | | |
|---|---|---|---|
| Year | Overlay Fee | Edge's Subadvisory Fee | Net Overlay Fee |
| 2008 | $13,693,000 | $1,835,589 | $11,857,411 |
| 2009 | $9,988,000 | $1,174,586 | $8,813,414 |
| 2010 | $10,679,000 | $1,290,134 | $9,388,866 |
| 2011 | $11,175,000 | $1,392,729 | $9,782,271 |

| *SAM Strategic Growth Fund* | | | |
|---|---|---|---|
| Year | Overlay Fee | Edge's Subadvisory Fee | Net Overlay Fee |
| 2008 | $6,816,000 | $921,657 | $5,894,343 |
| 2009 | $4,599,000 | $540,080 | $4,058,920 |
| 2010 | $4,916,000 | $593,466 | $4,322,534 |
| 2011 | $5,033,000 | $630,093 | $4,402,907 |

PSUF ¶ 60.

**C.     Principal Acquires the SAM Funds from Washington Mutual, and Despite ███ ███, Keeps their Overlay Fee the Same—Even While the Fees of Comparable Funds Fall**

In 2007, PMC's parent company acquired the SAM Funds from an affiliate of the now-

defunct Washington Mutual Bank. PSUF ¶ 3. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

██████████████████ *Id.* ¶ 17; *see also id.* § II.B.

████████████████████████████████ *Id.* § II.D.

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████ *Id.* ¶ 29.

There has been a steady stream of criticism from other third parties as well regarding the

SAM Funds' high management fees. *Id.* § II.E. Morningstar, a prominent and independent

mutual fund rating agency that is relied upon by PMC for performance data, has repeatedly

stated since as early as April 20, 2007 that the fund "could still be cheaper" as its expense ratio is

"still above the category median"; that "[t]he one area where there's some room for improvement

is the price; the A shares cost 1.24%, above the median for comparable share classes of

moderate-allocation funds"; that the fund is simply "too expensive"; and ███████████████████

████████████████████████ *Id.* ¶¶ 38, 39, 43. Further, the median overlay fees of the

SAM Funds' peers uniformly *fell* between 2008 and 2011. DSUF ¶¶ 105-06. Indeed, for the

SAM Balanced Portfolio, the median overlay fee rate of its peers *fell* from 12.6 basis points to

*zero* basis points while the effective Overlay Fee rate for the SAM Balanced Portfolio *rose* from

31 basis points to 34.2 basis points. *Id.* ¶ 105. ██████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████ PSUF ¶ 35.

**D.      The SAM Funds Have Much Higher Fees Than the Comparable LifeTime Portfolios**

Despite these concerns, the Overlay Fee schedule applicable to the SAM Funds has not changed since Principal's acquisition of the Funds in 2007. PSUF ¶ 54. This stands in stark contrast to what has happened to the Principal LifeTime Portfolios during the same period.

Like the SAM Funds, the Principal LifeTime Portfolios are funds of funds; like the SAM Funds, they invest in the same limited menu of 35 or so Principal mutual funds. *Id.* ¶¶ 2, 192. PMC provides ███████████████ due diligence services to both the SAM Funds and the LifeTime Portfolios. *Id.* ¶ 171. The LifeTime Portfolios have a subadviser (Principal Global Investors, Inc. or "PGI"), just as the SAM Funds have a subadviser in Edge. *Id.* ¶ 181. In sharp contrast to PMC's management of the SAM Funds, however, PMC does not completely delegate the day-to-day investment management of the LifeTime Portfolios to PGI. *Id.* ¶ 181. Instead, PMC actually provides portfolio management services to the LifeTime Portfolios *in addition to* oversight services. *Id.* § IV.D. Indeed, PMC has supplied at least half of the individual portfolio managers who do the day-to-day investment advising for the LifeTime Portfolios. *Id.* ¶ 184.

Even though PMC provides more elaborate services to the LifeTime Portfolios than it does to the SAM Funds, the overlay fee rate charged to the LifeTime Portfolios, until 2009, was 12.25 basis points, or about one-third of the Overlay Fee rate charged to the SAM Funds. *Id.* ¶ 196; DSUF ¶¶ 105-06. After 2009, the LifeTime Overlay Fee rate was reduced to 3 basis points, less than one-tenth of the effective Overlay Fee rate charged to SAM Funds. *Id.*

**E.      The PFI SAM Funds Have Higher Fees Than the Identical PVC SAM Funds**

The SAM Funds at issue in this case are PFI SAM Funds: they fall under the umbrella of Principal Funds, Inc. ("PFI") and are available to the general public. DSUF ¶ 214. There are also PVC SAM Funds, mutual funds whose shares can only be purchased through certain life insurance companies and are part of the Principal Variable Contracts ("PVC") Funds, Inc. *Id.*

The PFI and PVC SAM Funds, however, are identical in their investment management: they have the same objectives, the same investment processes, and the same portfolio managers. PSUF ¶¶ 126-27. ████████████████████████████████████████████████ ████████████████████████ *Id.* ¶¶ 125-26. But even though the PVC and PFI SAM Funds are essentially identical, the Overlay Fee charged to the PVC SAM Funds has consistently been 35% higher than the Overlay Fee rate charged to the PFI SAM Funds. *Id.* ¶ 167.

F.      **The SAM Funds Charge Their Shareholders 12b-1 Fees**

In addition to the Overlay Fee (and the multiple other layers of fees that SAM Fund shareholders pay), the SAM Funds also pay 12b-1 fees to Principal Funds Distributor ("PFD"). DSUF ¶ 115. These fees take their name from SEC Rule 12b-1, which, under strict conditions, allows mutual fund shareholders to be charged a fee to compensate a mutual fund distributor for the cost of selling and distributing shares. Because the Overlay Fee rates charged to the SAM Funds decrease as the SAM Funds' assets increase, the stated rationale for the 12b-1 fees ████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ PSUF ¶ 335. PFD also justifies the 12b-1 fees based on the continued servicing that is supposedly provided to the funds' shareholders. *Id.* ¶ 327. PFD, however, ██████████████████████████████ ████████████████████████████████ and the 12b-1 fee is calculated based on the SAM Funds' level of assets rather than the number of shareholders in a fund. *Id.* § VII.B. ████ ████████████████████████████████████████████████████████████ ████████████████████████████ *Id.* ¶¶ 344-47, 356-57, 368-70.

### III.   LEGAL STANDARD

**A.   The Summary Judgment Standard**

Summary judgment is proper only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Peter v. Wedl*, 155 F.3d 992, 996 (8th Cir. 1998); *see also* Fed. R. Civ. P. 56(a). An issue of material fact is "genuine" if a reasonable factfinder could find in favor of either party on that issue. *See Peter*, 155 F.3d at 996. In determining whether there are genuine issues of material fact, courts do not weigh the evidence or make credibility determinations. *Id*.  Rather, they view the evidence in the light most favorable to the nonmoving party—here, Plaintiffs—and make all reasonable inferences in that party's favor. *See, e.g.*, *Maitland v. Univ. of Minn.*, 155 F.3d 1013, 1015 (8th Cir. 1998).

Summary judgment should seldom be granted in cases that turn on fact-intensive questions. *See Mid-State Aftermarket Body Parts, Inc. v. MQVP, Inc.*, 466 F.3d 630, 634 (8th Cir. 2006). As this Court has noted, "fact-intensive inquiries" make the summary resolution of section 36(b) cases, like this one, especially inappropriate. *Curran v. Principal Mgmt. Corp.*, No. 09-433, 2010 WL 2889752, at *9 (S.D. Iowa June 8, 2010), *order vacated in part on other grounds*, 2011 WL 223872 (S.D. Iowa Jan. 24, 2011) .

**B.   The *Gartenberg* Standard**

Because normal market forces do not work in the mutual fund industry, section 36(b) of the Investment Company Act provides that mutual fund advisers "have a fiduciary duty with respect to the receipt of compensation for services."  15 U.S.C. § 80a-35(b). Under this provision, individual investors may sue to enforce the adviser's fiduciary duty. *See id.*; *see also Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 541 (1984) (actions under section 36(b) of the Investment Company Act are an "independent check[] on excessive fees").

An adviser breaches its fiduciary duty under section 36(b) when it violates the standard first articulated in *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir. 1982). The Supreme Court has adopted this standard, holding that an adviser violates section 36(b) when it charges "a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones*, 130 S. Ct. at 1426. Under this standard, "all relevant circumstances" must "be taken into account," *id.* at 1427, including what have become known as the "*Gartenberg* factors": (1) fees paid by comparable funds; (2) the nature and quality of the services the mutual fund adviser provides to the funds; (3) the economies of scale the adviser realizes in managing the funds; (4) the profitability of the funds to the adviser; (5) the extent to which the adviser receives "fall-out benefits" from its services—that is, collateral benefits the adviser gets from its relationship with the funds; and (6) the independence, care, and conscientiousness of the funds' board of directors. *See Gartenberg*, 694 F.2d at 929-32.

**C.      The Record Evidence Reveals Genuine Issues of Material Fact**

Application of the *Gartenberg* standard to the record evidence discloses numerous triable issues of fact. A reasonable factfinder could conclude the following.

*Overlay fees paid by comparable funds.* (1) The LifeTime Portfolios and PVC SAM Funds are comparable to the PFI SAM Funds; (2) shareholders in the comparable LifeTime Portfolios pay PMC a vastly lower overlay fee in exchange for more extensive services; (3) shareholders in the almost identical PVC SAM Funds pay about half as much of an overlay fee in exchange for the same services; and (4) the Overlay Fee charged to the PFI SAM Funds is many times the industry median and near the highest industry rates charged. *See infra* Part IV.A.2.

*Nature and quality of the services provided in exchange for the Overlay Fee.* (1) The services that PMC performs in exchange for the Overlay Fee are comprised of a Due Diligence Program, accounting services, and compliance services; (2) these services are undemanding and inexpensive; and (3) the size of the PMC's retained Overlay Fee cannot be justified as a mere accounting device. *See infra* Part IV.A.3.

*Economies of scale realized by PMC.* PMC realizes enormous economies of scale in its oversight of the SAM Funds. *See infra* Part IV.A.4.

*Profitability of the SAM Funds to PMC.* (1) The SAM Funds' return has consistently hovered around ██ cents of pretax profit for every dollar of revenue received; and (2) in the materials it prepared for the board, PMC itself ████████████████████████████████ ██████████████████████ *See infra* Part IV.A.5.

*Directors' care and conscientiousness.* The board's process was deficient because (1) due in part to PMC's misdirection, many of the directors did not ████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████ (2) partly because of PMC's misdirection, many of the directors misattributed ████████████████████████████████████████████ ████████████████████████████████████ (3) even if the SAM Funds' performance were relevant, PMC did not ████████████████████████████████████ ██████████████████████████ (4) the directors justified the fee disparity between the SAM Funds and the LifeTime Portfolios on the basis of ████████████████████████████ ████████ (5) the directors felt no need to inquire into ████████████████████████████ ████████████████ (6) PMC confused the directors into thinking that ████████████████████

████████████████████ and (7) the directors hardly considered ████████ at all. *See infra* Part IV.6.

*12b-1 Fee*. The 12b-1 fee charged to the SAM Fund shareholders bears no relationship to services rendered in exchange for it because (1) it cannot possibly lead to commensurate savings on other fees; and (2) it bears no relationship to the quality or quantity of shareholder services. *See infra* Part IV.B.

## IV.   ARGUMENT

**A.   The Overlay Fee That PMC Extracts from the SAM Funds Violates Section 36(b)**

A reasonable factfinder, applying the *Gartenberg* factors, could easily conclude that the SAM Funds' Overlay Fee is so disproportionately large that it bears no reasonable relationship to the meager services that PMC provides in exchange and that the fee could not have been the product of arm's-length bargaining. Indeed, a reasonable factfinder could conclude that the fee was not in fact the product of arm's-length bargaining, partly because PMC misled and misdirected the board of directors, and partly because the board simply lacked understanding of the relevant facts.

Unfortunately, Defendants have confused the issue by failing to analyze whether the Overlay Fee comports with *Gartenberg*. Instead, they dodge that question by focusing on the *total* fees paid by the SAM Funds—i.e., the sum of all fees under all the separate contracts for services into which the SAM Funds have entered. In what follows, Plaintiffs will first explain why both case law and common sense require each fee to be separately analyzed for excessiveness, and then discuss the evidence creating a triable issue as to whether the Overlay Fee violates the *Gartenberg* standard.

1.      **Separate Fees Paid Under Separate Contracts for Services Must Be Analyzed Separately for Excessiveness Under *Gartenberg***

In determining whether a mutual fund adviser has violated *Gartenberg*, each contract that the adviser makes with a mutual fund must be analyzed separately for excessiveness. This is true for five reasons.

*First*, separate analysis of contracts is the standard laid out by the case law. The Second Circuit, for example, holds that fees should not be "aggregated . . . to determine the merits of a Section 36(b) claim." *Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 866 (2d Cir. 1990). Payments for "different services," the court said, must be "viewed separately." *Id.* The same result was reached recently in *In re American Mutual Funds Fee Litigation*, No. 04-5593, 2009 WL 5215755, at *44 (C.D. Cal. Dec. 28, 2009).[2]  *Accord Pfeiffer v. Integrated Fund Servs., Inc.*, 371 F. Supp. 2d 502, 508 (S.D.N.Y. 2005). Defendants' contrary position is not supported by the cases on which they rely. *See* Mem. in Supp. of Defs.' Mot. for Summary Judgment ("MSJ") 28. *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009), an ERISA case, holds not that discrete fees must be aggregated to determine whether they are excessive, but rather that there was no fiduciary duty to disclose an arrangement under which a discrete management fee was shared with another company *after* it was collected. *Id.* at 586. Nor does *Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Management L.P.*, No. 01-5734, 2004 WL 1459249 (D.N.J. Feb. 9, 2004), hold that fees must be aggregated. It simply holds that a section 36(b) claim cannot be predicated on one bad investment decision made in exchange for a discrete management fee, when that fee was paid in exchange for many other decisions and services as well. *Id.* at *8-9. Finally, Plaintiffs are baffled by Defendants' citation to *Braden v. Wal-Mart*

---

[2] Indeed, the *American Mutual Funds* court twice rejected the position that Defendants advance.  *See* Order on Defendants' Motion in Limine at 4-5, *Am. Mut. Funds*, No. 04-5593 (C.D. Cal. July 23, 2009) (attached to Plaintiffs' Appendix as PA:01280-84).

*Stores, Inc.*, 588 F.3d 585, 595-96 nn.5-6 (8th Cir. 2009), an ERISA case that does not discuss whether fees must be aggregated before their excessiveness may be decided. The relevant case law holds that separate fees must be analyzed separately.

*Second*, separate analysis of contracts is required by the Supreme Court's decision in *Jones*. *Jones* makes it clear that mutual fund advisers' fiduciary duty is a *transactional* one—that the duty must be satisfied in every separate transaction that the adviser has with the mutual fund: "The essence of the test is whether or not under all the circumstances the *transaction* carries the earmarks of an arm's length bargain." *Jones*, 130 S. Ct. at 1427 (quoting *Pepper v. Litton*, 308 U.S. 295, 306-07 (1939)) (emphasis added).

*Third*, separate analysis of contracts is required by the very notion of a fiduciary duty. Plaintiffs are not familiar with any fiduciary duty that allows a fiduciary to gouge a client on one contract just because the fiduciary's other contracts with the client are within the realm of fairness. Defendants cite no fiduciary context where such a rule prevails. They simply claim that when section 36(b) imposes a fiduciary duty "with respect to the receipt of compensation for services," 15 U.S.C. § 80a-35(b), the statute means aggregate compensation. MSJ 28-29 n.11. But "aggregate compensation" is not what the statute says, and the phrase that the statute does use—"compensation for services"—suggests that compensation must be measured against the services rendered in exchange for that compensation. The Overlay Fee that PMC receives must therefore be measured against the specific services that PMC performs in exchange for that Fee.

*Fourth*, PMC has  it told the directors that

PSUF ¶ 236.

*Fifth and last*, a contract-by-contract analysis is appropriate precisely because there is no "industry-wide standard describing what services are covered by the management fee."  MSJ 29 n.11. The fact that the services provided under management fees varies means that, in order to determine whether a management fee is excessive, a court should look at the specific services that are being performed in exchange for that fee.

Plaintiffs are not arguing that it is unlawful to charge more than one fee. *Cf.* MSJ 29. They are simply saying—consistent with the law—that each fee must be evaluated in light of the specific services performed for that fee.

### 2. Comparable Funds Enjoy Identical or More Extensive Services in Exchange for Vastly Lower Fees

*Jones* confirms that the fees that a mutual fund adviser charges comparable funds may be probative. *Jones*, 130 S. Ct. at 1428-29. Here, a reasonable factfinder could find that apposite comparisons with similar funds reveal the SAM Funds' Overlay Fee to be grossly excessive.

#### a. *PMC charges its comparable LifeTime Portfolios about one-tenth of what it charges the SAM Funds—while providing more extensive services to the LifeTime Porfolios*

The Principal LifeTime Portfolios are funds of funds, just like the SAM Funds. PSUF ¶ 168. They are "target date" funds aimed at a particular investment horizon, which is usually the investor's estimated retirement date. *Id.* ¶ 169. The Overlay Fee rate charged to the LifeTime Portfolios was 12.25 basis points until 2009, when it was reduced to 3 basis points. During this same period, the effective Overlay Fee rate charged the SAM Funds ranged from 31 basis points to 35 basis points. DSUF ¶¶ 105-06. In dollar amounts, if the fee rates charged to the LifeTime Portfolios had been charged to the SAM Funds, there would have been an approximately *eight-fold* reduction in the Overlay Fee between October 28, 2008 and July 13, 2012:

| Fund | Overlay Fee Actually Charged | Overlay Fee If the LifeTime Fee Rate Had Been Used | Difference |
|---|---|---|---|
| SAM Balanced Portfolio | $39,435,773 | $5,176,575 | $34,259,198 |
| SAM Strategic Growth Portfolio | $17,823,437 | $2,345,433 | $15,478,004 |
| Total | $57,259,210 | $7,522,008 | $49,737,202 |

PSUF ¶ 63-64.

Despite this huge difference in fees,  Michael

Finnegan, PMC Chief Investment Officer, testified that PSUF ¶¶ 170-71. he

said, *id.* ¶ 171, and he observed

that *Id.* ¶ 172.

Even assuming *arguendo* that the due diligence that PMC provides the SAM Funds is

more elaborate than that which it provides the LifeTime Portfolios, PMC still ends up providing

the LifeTime Portfolios with more services than it provides the SAM Funds. *Id.* §§ IV.B, IV.D

That is because PMC does not completely delegate day-to-day investment management services

for the LifeTime Portfolios to a subadviser, as PMC does for the SAM Funds. *Id.* ¶ 181. Instead,

PMC itself provides at least half of the individual portfolio managers for the LifeTime Portfolios.

*Id.* ¶¶ 183-84. This day-to-day investment management of the LifeTime Portfolios is demanding:

it requires PMC to help select asset classes in which the Portfolios will invest and select

appropriate benchmarks, design the way in which the Portfolios will change their asset allocation

mix as the target date approaches, select the underlying holdings, and rebalance the Portfolios as

needed. *See id.* ¶¶ 178-80. In order to perform these tasks, PMC must continuously monitor the Portfolios' investment positions and risk exposure. *Id.* ¶ 182. By contrast, the due diligence provided to the SAM Funds does not involve any day-to-day investment management. *Id.* ¶ 71. So, compared to investors in the LifeTime Portfolios, investors in the SAM Funds are paying vastly more for considerably less. At the least, a reasonable factfinder could so conclude.

In response to these simple facts, Defendants maintain that the SAM Funds are more actively managed than the LifeTime Funds, and thus require more work from the portfolio managers. MSJ 32. Even if that is true, it is irrelevant. All of those day-to-day portfolio management tasks are *not* performed by PMC, but rather are delegated to the subadviser, Edge. PSUF § IV.A. PMC cannot rely upon a service that somebody else performs in order to justify a fee that it itself retains.

The only way in which the SAM Funds' more active management affects PMC's oversight program is that ███████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████ ████████████████ These undemanding ministerial tasks hardly justify an exponentially larger Overlay Fee. More to the point, they cannot justify the fee disparity between the SAM Funds and the LifeTime Portfolios, since both funds ████████████████████ ███████████████████████████████████████ █████████████████████████████████████████ █████████████████████████████████ █████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████   *Id.* ¶ 187.

      **b.**    **PMC charges the PFI SAM Funds much more than it does the identical PVC SAM Funds, without any justification**

Defendants claim that the PFI and PVC SAM Funds are "different products."  MSJ 34. The evidence, however, demonstrates that the PFI SAM Funds—the mutual funds at issue in this litigation—are identical to the PVC SAM Funds. Both sets of funds have the ████████████ ████████████████████████████████████ the same portfolio managers, ████████████ ████████████████████ PSUF ¶¶ 126-127. And yet, during the relevant time period, the PFI SAM Funds' overlay fee has consistently exceeded the PVC SAM Funds' Overlay Fee by a significant margin, and not a "slightly higher" margin, as Defendants claim. MSJ 35. The PFI SAM shareholders have been charged 35% more than PVC SAM shareholders. PSUF ¶ 61-62, 167. Indeed, if the PVC SAM Fund rates had applied to the PFI SAM Funds, the latter would have saved over $20 million:

| Fund | Overlay Fee Actually Charged | Overlay Fee If the PVC Fee Rates Had Been Used | Difference |
|---|---|---|---|
| SAM Balanced Portfolio | $39,435,773 | $24,907,622 | $14,528,151 |
| SAM Strategic Growth Portfolio | $17,823,437 | $12,272,782 | $5,550,655 |
| Total | $57,259,210 | $37,180,404 | $20,078,806 |

*Id*. A reasonable factfinder could easily conclude that this is not a "minimal difference" in fees. MSJ 35.

Defendants defend this disparity by pointing out the PFI SAM Funds have more share classes than do the PVC SAM Funds, MSJ 34, and claiming that ████████████████████ ████████████████████████████████████████ *See* PSUF ¶ 145. But PMC ██ ████████████████████████████████████████████████████████████ ████████████████████████████████ *Id.* ¶¶ 146-47. ████████████████████



*Id.* ¶¶ 153-54. If that 2009 figure is extrapolated to four years, then PMC received about $20 million in extra fees from the PFI SAM Funds as payment ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮

Defendants also argue that the PVC SAM Funds require longer SEC reports than do the PFI SAM Funds. But these reports are virtually identical in substance from year to year. DSUF Resp. ¶¶ 137, 217; PSUF § IV.C. The only parts that differ materially from year to year are the balance sheets and income statements—and those are created by accountants. DSUF Resp. ¶ 137. But as has been seen, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Further, the compliance staff responsible for these reports consists of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 217.

Defendants also say—without explanation—that the PFI and PVC SAM Funds are not comparable because they "serve completely different markets."  MSJ 34. Defendants appear to mean that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ *See* Ballantine Dep. at 101-02:PA00773-76. It is hard to see how that fact helps Defendants, however. If true, it suggests that PFI SAM Funds are *not* subject to market forces, and hence the Overlay Fee is not within the arm's-length range.[3] Moreover, while the PFI SAM Funds are not subject to market forces, there is also a triable issue as to whether the PVC SAM Funds themselves *are* subject to market forces. Like the PFI SAM Funds, the PVC SAM Funds enjoy extraordinarily high profitability rates; on a pre-tax basis, PMC retains over ▮ cents on every dollar of revenue it takes in from the PVC SAM Funds. PSUF ¶ 136; *see also infra*

---

[3] The fact that the overlay fee charged to the comparable LifeTime Portfolios have been reduced while the Overlay Fee charged to the PFI SAM Funds has stayed the same also suggests that the PFI SAM Funds are not subject to normal market forces. *See* PSUF ¶ 198.

p. 26 (discussing how  The following chart shows that the PVC SAM Funds, like the

PFI SAM Funds, have proven extremely profitable:



PSUF ¶ 136.

In sum, the only explanation that PMC is left with for the fee disparity between the PFI

and PVC SAM Funds is no explanation at all. Or, as Director Gilbert testified:



Q.

A.

*Id.* at 134. A factfinder could reasonably believe that ▮▮▮▮▮ cannot justify the fee disparity.

   ***c.***  ***The Overlay Fee rate that PMC charges the SAM Funds is many times larger than is normal even in the mutual fund industry***

*Jones* cautioned that "courts should not rely too heavily on comparisons with fees

charged to mutual funds by other advisers," since those fees, "like those challenged, may not be

the product of negotiations conducted at arm's length."  *Jones*, 130 S. Ct. at 1429. Given *Jones*'s

caveat that competing mutual fund rates may not be within the arm's-length range, it is all the

more significant that the Overlay Fee rate charged to the SAM Funds is vastly larger than the

median in the industry:

| Fund/ Benchmark | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| **SAM Balanced Portfolio** | 0.310% | 0.320% | 0.350% | 0.342% |
| Lipper's Mixed Asset Target Allocation Growth Funds Category (median) | 0.126% | 0.083% | 0.017% | 0.000% |
| Lipper Percentile Rankings (lower percentiles correspond to lower fees) | 89 | 94 | 95 | 96 |
| | | | | |
| **SAM Strategic Growth Portfolio** | 0.310% | 0.320% | 0.350% | 0.342% |
| Lipper's Combined Multi-Cap Growth and Multi-Cap Core categories (median) | 0.123% | 0.020% | 0.008% | 0.020% |
| Lipper Percentile Rankings (lower percentiles correspond to lower fees) | 88 | 99 | 99 | 86 |

DSUF ¶¶ 105-06. These tables indicate that the SAM Funds' Overlay Fee rate was never less than about three times the industry median, and that by 2010 and 2011, the Overlay Fee rates were many times the industry median and often near the *highest* rates charged in the industry. Indeed, in 2011, the industry median for competitors to the SAM Balanced Fund was *no Overlay Fee at all*. A factfinder could reasonably conclude that compared to the normal practices of the industry, the SAM Funds' Overlay Fee is freakishly large. *Cf. Am. Mut. Funds*, 2009 WL 5215755, at *25-27 (the challenged advisory fees were lower than at least 75% of peers' advisory fees).

> **3.    PMC Provides the SAM Funds with a Narrow Range of Services in Exchange for a Heavy Overlay Fee**

Because PMC has delegated investment management duties to Edge, the SAM Funds' subadviser, the only services that PMC itself provides in exchange for its Overlay Fee are the "Due Diligence Program," accounting services, and compliance services. *See* PSUF § IV. A factfinder could reasonably find that these services are so skimpy as to make the SAM Funds' large Overlay Fee excessive under *Gartenberg*.

### a. The oversight services that PMC performs in exchange for the Overlay Fee are undemanding and inexpensive

The Due Diligence Program is supposed to identify, hire and retain subadvisers for all Principal mutual funds, DSUF ¶ 178, but these services are far from extensive. The Program, which covers *all* Principal funds, has ████ full-time employees. PSUF ¶ 94. Since the Program covers all Principal funds, ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ *Id.* ¶¶ 118-20. The Due Diligence Program requires minimal time and effort from PMC.

Nor does PMC provide intricate accounting services to the SAM Funds. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

The compliance services that PMC provides the SAM Funds are similarly undemanding. PMC has had, at most, ████ employees in its compliance department, counting the Chief Compliance Officer; ██████████████████████████████████████████████

███████████████████████████████████████████████ *Id.* ¶ 100. These are not

costly activities. The accounting expenses budgeted for the SAM Balanced Fund in 2009 was

about ██████ of the Overlay Fee that PMC charged the fund for that year. *Id.* ¶¶ 153-154.

A reasonable factfinder, then, could easily conclude that the extraordinarily high Overlay

Fee bears no reasonable relationship to the unimpressive services that PMC provides the SAM

Funds, such that the Fee could not have been the product of arm's-length bargaining.

Remarkably, Defendants do not confront this argument directly. Instead, they focus on

performance. MSJ 23-24. While performance might be a good gauge of the quality of day-to-day

investment management services, it is Edge, and not PMC, that provides those investment

services to the SAM Funds. PMC is not involved in investment decisions. PSUF ¶ 76. Indeed,

Michael Finnegan, PMC Chief Investment Officer, candidly admitted that that ███████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████.") Charles Averill, one of the portfolio managers of the SAM

Funds, confirmed this, stating that ████████████████████████████████████████████

██████████████████████████████ *Id.* ¶ 244; *see also id.* § VII.A.

Further, a factfinder could reasonably conclude that even if the SAM Funds' investment

performance were relevant to the present inquiry, it would not justify the size of the Overlay Fee,

██████████████████████████████████████████████████████████████████████████████

MSJ 23. Under the analysis that ████████████████████████ PSUF § VII.C.2, both SAM

Funds ████████████████████████████ *Id.* ¶ 316. The analysis of Dr. Pomerantz—████████

██████████████████████████████████████████ *id.* ¶ 319—likewise finds that both SAM Funds

██████████████████████████████ *Id.* ¶¶ 319-22. Notably, courts that have approved high fees have

generally conditioned their approval on the fund's performance consistently ranking within the

top quintile of comparable funds for an extended period of time. *See Schuyt v. Rowe Price Prime*

*Reserve Fund, Inc.*, 663 F. Supp. 962, 976, 989 n.77 (S.D.N.Y.), *aff'd*, 835 F.2d 45 (2d Cir.

1987).

        **b.**      *Because Edge's subadvisory fee represents a higher than fair-market price, the Overlay Fee's size cannot be justified by treating Edge's subadvisory fee as a mere accounting device*

███████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

       The problem with this theory, however, is that it has no basis in this case's concrete

evidence. ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████ *Id*. At the very least,

there is a triable issue as to whether Edge's subadvisory fee is ████████████████████

    **4.**    **PMC Realizes Large Economies of Scale in Its Oversight of the SAM Funds**

       Economies of scale occur when a mutual fund's level of assets rise, but its costs rise at a

lower rate (or do not rise at all). PSUF ¶ 204. The consensus opinion is that great economies of

scale exist in the mutual fund industry. *Id.* ¶ 205. As Dr. Pomerantz notes in his expert report, the



PSUF ¶ 205.

*Id.* ¶ 206.

In exchange for the Overlay Fee, PMC provides three main services: its Due Diligence

Program, accounting services, and compliance services. PMC experiences large economies of

scale in providing each of these services. Michael Finnegan explained that

*Id.* ¶ 207. Similarly, Jill Brown, PMC

CFO, testified that

*Id.* ¶ 209. PMC also enjoys

*Id.* ¶ 143.

*Id.* ¶¶

216. From 2008 through 2011, the PFI SAM Balanced Portfolio consistently had over $3 billion

in assets, and the PFI SAM Strategic Growth Portfolio had about $1.4 billion.[4]  *Id.* ¶¶ 56, 58.  In

short, a factfinder could reasonably conclude that PMC realizes large economies of scale in its

oversight of the SAM Funds.

---

[4] In addition to PMC's own economies-of-scale study, Plaintiffs have provided several alternatives for calculating
economies of scale.  *See* PSUF ¶¶ 217-19; *see also* Resp. to DSUF ¶¶ 224-25.

### 5.      The SAM Funds Have Proven Highly Profitable to PMC

Each year, PMC provides the board of directors with ███████████████████



Every year since their acquisition from Washington Mutual, both the SAM Balanced and

SAM Strategic Growth Funds ███████████████ *Id.* ¶ 233. The SAM Balanced Fund's

profitability ranged from ██████ to █████, and the SAM Strategic Growth Fund's profitability

from ███████ to ██████:

| Fund Profitability | 2008 | 2009 | 2010 |
|---|---|---|---|
| SAM Balanced Portfolio | ███ | ███ | ███ |
| SAM Strategic Growth Portfolio | ███ | ███ | ███ |

DSUF ¶ 227.

█████████████████████████████████████████████████

███████████████████████. Given that these profitability levels ████████████████

███████████████████ a factfinder could reasonably conclude that PMCs' profitability

is excessive.

Defendants say that the case law approves of these profit margins, MSJ 38, but that is not

so. In *American Mutual Funds*, 2009 WL 5215755, at *24, the pre-tax operating margins were

consistently above 30%—i.e., profitability was consistently below 70%, and often *well* below

70%. *Meyer v. Oppenheimer Management Corp.*, 707 F. Supp. 1394 (S.D.N.Y. 1988), *amended*,

715 F. Supp. 574 (S.D.N.Y. 1989), *aff'd*, 895 F.2d 861, and *Schuyt*, 663 F. Supp. 962, are also

inapposite. *Meyer* and *Schuyt* are procedurally inapposite because both were decided after a full

bench trial. Here, to deny Defendants' motion, the Court need find only that there are triable

issues on profitability. But *Meyer* and *Schuyt* are substantively inapposite as well. While the

adviser's profitability in *Meyer* was high, the fund's performance was better than the average for

comparable funds, and its advisory fees were in the middle of its competitors. *Meyer*, 715 F.

Supp. at 576. In *Schuyt*, the fund's performance never once fell below the top 20% of

comparable funds, 663 F. Supp. at 976, its fees were lower than "many comparable money

market funds," *id.* at 966, and its directors performed their duties "carefully and

conscientiously," *id.* at 984.[5]   The court noted that, "under other circumstances," a profit margin

"of up to 77.3%" could "very well be excessive"—if, for example, "advisory services . . . were

not of the highest quality and if the directors were not so obviously qualified, fully informed, and

conscientious."   *Id.* at 989 n.77. This is just such a circumstance. In contrast to *Meyer* and

*Schuyt*, PMC's profitability was extremely high, but the performance of the SAM Funds was

middling even by PMC's own account,[6] the Overlay Fee was higher than nearly every

competitor's, and the directors were far from fully informed and conscientious. *See supra* Parts

IV.A.2-3; *infra* Part IV.A.6. This case is much like the one that *Schuyt* hypothesized, in which

profit margins "of up to 77.3%"—███████████████—are excessive.

**6.      The Board of Directors' Care and Conscientiousness Were Grossly
Inadequate**

In scrutinizing a fee under section 36(b), courts "must take into account both procedure

and substance."  *Jones*, 130 S. Ct. at 1429. "[W]here the board's process was deficient or the

adviser withheld important information, the court must take a more rigorous look at the

---

[5]The directors in *Schuyt* negotiated a fee reduction, *see Schuyt*, 663 F. Supp. at 971—whereas here, the Overlay Fee
for the SAM Funds has remained the same since Principal acquired them from Washington Mutual. *See supra* Part
II.C.

[6] To the extent PMC had anything to do with performance at all.  *See supra* p. 23.

outcome." *Id.* at 1430. As indicated by the record evidence and Professor Murdock's scathing

expert report (attached as PA00431-482), the board's process was inadequate and a "more

rigorous look" at Principal's Overlay Fee is required. *Id.* While a board may be owed deference

when its unaffiliated directors have "considered the relevant factors," *id.* at 1429, in this case a

reasonable factfinder could conclude that, as to every relevant *Gartenberg* factor, the directors

were either misled by PMC, fundamentally misunderstood the facts, misunderstood the factor

itself, or were simply incurious.

> ***a.***     ***The directors did not understand*** ████████████████████
████████████████████████████████████████

Time and again, depositions of the unaffiliated directors revealed that they did not

understand that ████████████████████████████████████ *See*

PSUF § IV. Lead Director Gilbert, a twenty-seven year member of the board, was under the

misimpression that ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████ *Id.* ¶ 75. Director Ballantine did not know ████████████████████

████ *Id.* Director Damos thought that ████████████████████

████████████████████████ *Id.* Director Hirsch thought that ████████████

████████████████████████████████ *Id.* Despite approving

these types of contracts for 19 years, Director Lukavsky did not understand that ████████

████████████████████████████████████████████

████████████████████████ *Id.*

PMC contributed to these misunderstandings. ████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

*Id.* ¶ 236. Notably, *Jones* does not include a fund's total expense ratio as a relevant factor in the

*Gartenberg* analysis. ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████ *Id.* ¶

237. Because of this misdirection, the board noted that the sum of *all* fees paid by SAM Fund

shareholders "compare[d] favorably" to competitors without noting that the SAM Fund Overlay

Fee was near the highest rate in the industry. *Id.* ¶ 242. When PMC *did* mention the Overlay Fee,

it justified it by stating that █████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ *Id.* ¶ 73. ████████████████████████████

█████████████████████████████████████████████—which of course

would be false. It is no wonder that the directors were confused about the limited services that

PMC was actually providing for the Overlay Fee.

      **b.**    ***The directors falsely attributed the SAM Funds' performance to***
███████████████████████

    In the materials it provided to the board, PMC repeatedly ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████ *id.* ¶ 243, and one of the portfolio managers of the SAM Funds and the PMC Chief

Investment Officer have both stated that PMC's oversight █████████████████████████

 *id.* ¶¶ 244-45. Thus, the way in which many of the directors justified the SAM Funds' Overlay Fee rested on a serious misapprehension of fact.

**c.     PMC did not provide the board with appropriate performance comparisons for the SAM Funds**

Compounding many of the directors' misunderstanding of who was responsible for the SAM Funds' performance was PMC's failure to give the directors appropriate performance comparison against which to gauge that performance accurately, assuming *arguendo* that performance was a relevant consideration with regard to the Overlay Fee. *Id.* § VII.

During the contract renewal process, the directors requested **▮▮▮▮▮▮▮** **▮▮▮▮▮▮▮** *Id.* ¶ 274. PMC provided the board **▮▮▮▮▮▮▮▮** **▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮** **▮▮▮▮▮▮▮▮▮▮▮▮** **▮▮▮▮▮▮** *Id.* ¶ 275. These benchmarks are not appropriate for the SAM Funds because they invest in a variety of asset classes other than those represented in the two indices. *Id.* § VII.C.1.a. Even **▮▮▮▮▮▮▮▮▮▮** **▮▮▮▮▮▮** *Id.* ¶¶ 278-83. Thus, **▮▮▮▮▮▮** **▮▮▮▮** the board was never provided with an appropriate benchmark for the SAM Balanced Portfolio—even though appropriate benchmarks could have easily been made available. *See id.* § VII.C.1.a. **▮▮▮▮▮▮▮▮▮▮▮▮** **▮▮▮▮▮** *Id.* § VII.C.1.b. If the performance of the SAM Funds is compared against

---

[7] During the 2009 contract renewal process for the SAM Balanced Portfolio, the board was provided with **▮** **▮▮▮▮▮▮▮▮** *Id.* ¶ 276.  Dirk Lashanzky, one of the SAM Fund portfolio managers at that time, testified that **▮▮▮▮▮▮▮▮** *Id.* ¶ 278. Despite going through the motions of carrying out their duties by **▮▮▮▮▮▮**

30

benchmarks that—████████████████████████████████████████—are more

appropriate, it is clear that the SAM Funds slightly *underperformed*. *See id.* § VII.C.3. Once

again, the directors' evaluation of the SAM Funds rested on a misapprehension of fact.

     The directors also asked for ███████████████████████████████████

███████ *Id.* ¶ 246. PMC obliged them, *id.* ¶¶ 248-49, even though it knew that █████████

████████████████████████████████████████████████████████████████████

████████ *Id.* ¶ 250. The directors (guided by supposedly qualified outside counsel)

requested this information but, as with ██████████████ they requested, did not understand

them, *id.* § VII.B.2—another clear example of a board going through the motions of being

conscientious but *not* actually performing their duties conscientiously.

       **d.**       ***Due to PMC's misleading information, the directors justified the fee disparity between the SAM Funds and the LifeTime Portfolios by*** ████████████████████████

     Each year when PMC submitted materials on the SAM Funds to the directors, ██████

████████████████████████████████████████████████████████████████████

████████████████████████ *Id.* ¶ 72. Accordingly, as has been seen, a

number of the directors erroneously thought that █████████████████████████████

████████████████████████████████████████████████ *Id.* ¶ 75. It

should be no surprise, then, that when the directors justified the enormous fee disparity between

the SAM Funds and the LifeTime Portfolios, they relied on what they believed was the SAM

Funds' more active management. *Id.* ¶ 74.

       **e.**       ***Because PMC mischaracterized*** ██████████████████████████
       ***the directors generally*** ███████████████████████████████

     Principal focused the directors' attention on the difference between the PVC and PFI

SAM Funds' Overlay Fees ████████████████████ *Id.* ¶¶ 163-64. ██████████████

████████████████████████████████████████████████████████████████

████████████████████████ *Id.* ¶¶ 155-58. But when correctly measured in "compensation," as it must be under the statute, 15 U.S.C. § 80a-35(b), the Overlay Fee disparity is revealed to be large, with the PFI SAM Funds paying much more than the PVC SAM Funds, *See id.* ¶ 162. In dollars, the fee disparity resulted in PMC receiving, and shareholders paying, an additional $20 million between October 28, 2008 and July 13, 2012. *Id.* ¶ 167.

Despite this large difference in fees, the board █████████████████████ ███████████████████████████████████████████ *Id.* ¶ 155. Inquiring into those costs, said Director Grimmett, █████████████████████ *Id.* ¶ 157. Director Pavelich agreed. *See id.* ¶ 158 █████████████████████████. Worse, several of the directors apparently felt ████████████████████████████ ███████████████████████████████████████ director Lukavsky said, ███████ ███████ *Id.* ¶ 156. Director Kimball also did not know ████████████████████ ███████████████████████ *Id.* And Director Damos did not know ████████████ ████████████████████████████████████████████████████████████ ███████████ *Id.* Mark Grimmett, the board's designated financial expert, set the tone, stating that █████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ *Id.* ¶ 155.

   **f.**  ***The directors were misled about, and were either ignorant of or misunderstood,*** ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████

This was extraordinarily misleading. Under the standard definition, a mutual fund experiences economies of scale when its costs rise less than proportionately with its asset level. *Id.* ¶¶ 203-04. If, for example, a fund's asset level increases by 10% but its costs only increase by 1%, then the fund is experiencing economies of scale. But this was not the definition that PMC was using. ████████████████████████████████████████████████████

███████████████████████████ *See* Murdock Report 21: PA00451. Yet under the traditional definition, once expenses stop growing, economies of scale skyrocket.

Even stranger was PMC's use of the term ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████ Under the widely accepted definition of "diseconomies of scale," though, costs rise faster than assets, so that profits *decrease* as assets rise. *See* Jeffrey M. Perloff, *Microeconomics* 206 (2d ed. 2001) (diseconomies of scale occur when average costs rise when output rises, or, equivalently, when costs rise more than proportionately with output); Robert S. Pindyk & Daniel L. Rubinfeld, *Microeconomics* 212-13 (3d ed. 1994) (providing the equivalent definition that diseconomies of scale result when costs rise more than proportionately with output).[8]

---

[8] The Perloff and the Pindyk and Rubinfeld textbooks are among the most widely used economic textbooks. However, even Defendants' expert, Glenn Hubbard, has similarly defined diseconomies of scale in his book, R.

PMC's upside-down definitions misled the board. Director Blake correctly stated that



*Id.*

¶ 229. Director Pavelich, evidently misled by PMC's use of the term

*Id.* ¶ 230. Thus, Directors Blake and Pavelich

have been factually misinformed as to

The other directors either do not know

or do not understand                    . *Id.* ¶¶ 229-30. Thus, Director Gilbert neither knew

*Id.* Director Kimball,

said that

*Id.* For his part, Director Damos concluded

*Id.* As Professor Murdock has

commented, Director Damos

Murdock Report 32: PA00462.

> **g.      *The directors hardly considered***

The profits that PMC extracted with its Overlay Fee were considerable. *See supra* Part

IV.A.5. And yet the directors hardly considered                         PSUF § IV.B.

---

Glenn Hubbard & Anthony Patrick O'Brien, *Economics* 369 (4th ed. 2013) (defining diseconomies of scale as "[t]he situation in which a firm's long run average costs rise as the firm increases output").

Thus, Director Gilbert commented that █████████████████████████████████

████████████████████████████████████████████████████ *Id.* ¶ 240. When

asked about profitability, Director Lukavsky said simply that ████████████████████

████ ████████████████████████████████████████████ *id.* ¶ 241—and

yet the Breakpoint Task Force, by its own admission, ███████████████████████

██████ *Id.* Director Blake testified that █████████████████████████████████

████████████████████████████████████████████████ *Id.* ¶ 240.

Director Kimball agreed that ████████████████████████████████████████

████████████████████ *Id.* The board, in short, evinced almost total indifference to

███████████ even in the abstract.

### h.    The "robustness" of a board's review depends on its actions and knowledge, rather than its members' resumes or the amount of paper that is given to it

Defendants claim that the board's fee-review process was robust. They emphasize that

the unaffiliated directors have impressive resumes, MSJ 24-25, meet regularly and are divided

into committees, MSJ 25, receive guidance from attorneys, MSJ 25, and go through a lot of

paper, MSJ 26. What board members actually know and do for shareholders, however, should

matter more than their credentials or the sheer amount of information they receive. Indeed, as

Professor Murdock points out, ████████████████████████████████████[10] Murdock

Report 43: PA00473. Here, no amount of paper can cover the fact that the directors' review of

_____

[9] ████████████████████████████████████████████████████████████████████

[10] PMC's modus operandi seems to be to bury people in information.  As Morningstar pointed out in its July 21, 2010 report on the SAM Balanced Portfolio, "Principal's regulatory filings with the SEC are among the industry's most cumbersome. The most recent . . . is nearly 500 pages long, making it very difficult to find information on any given fund. Principal also files a single prospectus covering all of its funds. It clocks in at 330 pages." DSUF Resp. ¶ 137.

the SAM Funds' Overlay Fee was predicated on fundamental misunderstandings of ████ ██████████████████████████

 What is more, several of the directors ████████████████████████ ████████████████████████████████████ PSUF § IX.B. Thus, for example, Director Lukavsky testified that ██████████████████████████ ████████████████████████ *Id.* ¶ 383(A); *see also id.* ¶ 383(B)-(C). Director Grimmett said that ████████████████████████████ ████████████████████████████ *Id.* ¶ 383(D). And yet Director Pavelich plainly misunderstood that ████████████████████████ ████████████████████████████ *Id.* ¶ 230.

 Professor Murdock, an expert on fiduciary duty and corporate governance, concluded that ████████████████████████ Murdock Report 44-45: PA00474-475. In his words, the directors



DSUF Resp. p. 1.

 Nor can PMC hide behind the fact that the unaffiliated directors were advised by outside counsel (who simultaneously actively seeks to represent investment advisers such as PMC, DSUF Resp. ¶ 90). ████████████████████████████████ ████████████████████████ *Cf. New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 399, 404 n.2 (S.D.N.Y. 2000) (giving the "self-serving" minutes of board meetings "no weight").

**B.      The 12b-1 Fee That PFD Extracts from the SAM Funds Violates Section 36(b)**

SEC Rule 12b-1 allows mutual fund advisers to charge a fee to compensate the adviser for selling and distributing shares in the mutual fund. 17 C.F.R. § 270.12b-1. But the fees must be charged under a written 12b-1 plan and approved by a majority of the unaffiliated directors and a majority of the fund's outstanding voting shares. *Id.* § 270.12b-1(b). Most importantly, before 12b-1 fees may be charged, the directors must formally determine, "in the exercise of reasonable business judgment and in light of their fiduciary duties . . . under sections 36(a) and (b) [of the Investment Company Act], that there is a reasonable likelihood that the [12b-1] plan will benefit the company and its shareholders." *Id.* § 270.12b-1(e). These 12b-1 fees are subject to judicial review under section 36(b), which they violate if they bear no reasonable relationship to the services they supposedly pay for and are outside "the range of what would have been negotiated at arm's-length in the light of all the surrounding circumstances." *See, e.g., Gallus v. Ameriprise Fin., Inc.*, 675 F.3d 1173, 1182 (8th Cir. 2012) (quotation marks and citation omitted).

Here, PFD has justified its 12b-1 fee by claiming that  PSUF ¶ 335. This reasoning, however, cannot easily apply to the SAM Funds, since their asset level has been above the last breakpoint in the Overlay Fee ever since the day Principal acquired the funds. *Id.* ¶ 340.

*id.* ¶ 339, these further reductions bear no reasonable relationship to the 12b-1 fee. If the aggregate AUM reach $10 billion, the effective Overlay Fee rate will be 33 basis points, a negligible reduction from the current effective rate.

*See* DSUF ¶¶ 105-06; PSUF ¶ 338. If the aggregate AUM increase from their current level to $15 billion—i.e., to significantly above their pre-financial-crisis level—the effective Overlay Fee rate will go down to 30 basis points. At that level of assets, then, Class A shareholders would be paying 25 basis points in a 12b-1 fee in exchange for a savings of 3 basis points in Overlay Fee—or, in dollar terms, paying $37.5 million in one fee to save $12.5 million in another. PSUF ¶ 339. The situation would be even worse for Class C shareholders, who would be paying 100 basis points ($150 million) in a 12b-1 fee to save 3 basis points ($12.5 million) in the Overlay Fee. *Id.* This contemplated savings in the Overlay Fee bears no reasonable relationship to the size of the 12b-1 fee that is designed to lead to the savings.

PFD also says that the 12b-1 fee is justified because it pays for the direct services that Principal representatives provide to shareholders. *Id.* ¶ 348. But PFD



*id.* ¶ 361.

Moreover, if the SAM Funds' 12b-1 fee were designed to fund shareholder servicing, then one would expect that it would vary based on the number of shareholders in a fund. But even though PFD can ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *id.* ¶ 363, the 12b-1 fee is not dependent upon the number of shareholders in a fund, *id.* ¶ 362. It is dependent solely on a fund's assets. *Id.* Take, as an example, $1 million worth of Class A shares in the SAM Balanced

Portfolio. PFD will collect $25,000 in 12b-1 fees annually from that $1 million no matter whether there is one shareholder who owns all $1 million or 1,000 shareholders who each own $1,000—even though it would be vastly less expensive to provide services to the former than to the latter. *Id.* ¶ 351.

Defendants argue that a 12b-1 fee of 25 basis points is "customary" in the industry, MSJ 40, but this is precisely the kind of appeal to industry norms that *Jones* warns against. *See Jones*, 130 S. Ct. at 1429 ("[C]ourts should not rely too heavily on comparisons with fees charged to mutual funds by other advisers. These comparisons are problematic because these fees, like those challenged, may not be the product of negotiations conducted at arm's length.").

Finally, Defendants insist that the 12b-1 fee must be reasonable because PFD lost money. MSJ 40. Defendants' figures, however, show only that *all* of PFD's activities, put together, were a net loser; they do not show whether the specific 12b-1 fee charged to the SAM Funds were profitable or not. *See* DSUF ¶ 118. More fundamentally, Defendants ignore the dispositive question: whether the 12b-1 fee bears a reasonable relationship to services rendered. The evidence that Plaintiffs have developed show that, in fact, the 12b-1 fee bears no reasonable relationship to the services that shareholders receive in exchange. *See* PSUF § VIII.

It is only natural that PFD's 12b-1 fee bears no reasonable relationship to services rendered, since quite a few of the board members ███████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████Murdock

Report 13: PA00443,  *Id.* ¶ 370. While a number of the directors were

aware of

*Id.* ¶ 376.[11]  The directors said

*Id.* In fact, when asked if

Director Pavelich summed up the board's

attitude and lack of conscientiousness when he responded, *Id.*

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be denied.

Plaintiffs respectfully ask the Court to grant oral argument on the motion.


Dated: March 22, 2013                                       Respectfully submitted,

---

[11] *See, e.g.,* Daniel B. Bergstresser et al., *Assessing the Costs and Benefits of Brokers in the Mutual Fund Industry,*
22 Rev. Fin. Studies 4129 (2009) (concluding that mutual fund representatives do not deliver substantial tangible
benefits to mutual fund shareholders); Lori Walsh, Office of Econ. Analysis, SEC, *The Costs and Benefits to Fund
Shareholders of 12b-1 Plans: An Examination of Fund Flows, Expenses and Returns* 3-6 (2004), *available at*
http://sec.gov/rules/proposed/s70904/lwalsh042604.pdf (concluding that existing mutual fund shareholders do not
obtain benefits from 12b-1 fees and that the fees create a conflict of interest).

  /s/Tana Lin
Lynn Lincoln Sarko
lsarko@kellerrohrback.com
Michael D. Woerner
mwoerner@kellerrohrback.com
Tana Lin(IL Bar No. 6271031)
tlin@kellerrohrback.com
Laura R. Gerber
lgerber@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA  98101
Tel: (206) 623-1900
Fax: (206) 623-3384

David H. Goldman
dgoldman@babichgoldman.com
Michael J. Carroll
mcarroll@babichgoldman.com
Kodi A. Brotherson
kbrotherson@babichgoldman.com
BABICH GOLDMAN, P.C.
501 SW 7th Street, Suite J
Des Moines, Iowa 50309-4537
Tel:  (515) 244-4300
Fax:  (515) 244-2650

**_Counsel for Plaintiffs_**

**CERTIFICATE OF SERVICE**

I hereby certify that on March 22, 2013, a copy of the foregoing PLAINTIFFS' BRIEF IN

RESISTANCE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT was filed

electronically. Notice of the filing will be sent to all parties by operation of the Court's electronic

filing system. A copy of this filing will be served on all parties via electronic mail.

/s/ Erica J. Knerr
Erica J. Knerr, Legal Assistant